Liza M. Walsh
Katelyn O'Reilly
Lauren R. Malakoff
**WALSH PIZZI O'REILLY
FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Fl
Newark, NJ 07102
(973) 757-1101
lwalsh@walsh.law
koreilly@walsh.law
lmalakoff@walsh.law

*Attorneys for Defendants Stryker Corporation and Wright Medical Technology, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TREACE MEDICAL CONCEPTS, INC., | Case No. 24-cv-9763-JKS-MAH |
| Plaintiff, | |
| v. | **Return Date: February 18, 2025** |
| STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COUNTS XIII TO XVI OF PLAINTIFF'S COMPLAINT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STANDARD OF REVIEW ...............................................................3

ARGUMENT ...................................................................................7

I.    TREACE FAILS TO STATE A CLAIM FOR RELIEF UNDER NEW JERSEY & FEDERAL ANTITRUST LAWS (COUNTS XIII-XV). ............7

    A.    Treace Lacks Antitrust Standing Because it Does Not Allege an Antitrust Injury and is not an Appropriate Antitrust Plaintiff..............9

    B.    Treace Does Not Plausibly Allege an Antitrust Claim Based on Cross-Product Rebates Offered to Stryker's Customers.....................16

        1.    Treace Fails to Name any Tying Product or Allege Stryker's Dominant Power in It. ................................................17

        2.    Treace's Non-Conclusory Allegations Are Inconsistent with Substantial Foreclosure of a Well-Pleaded Antitrust Market. ................................................................21

        3.    Treace Does Not Adequately Allege that "the United States" is an Appropriate Antitrust Geographic Market..........26

II.   TREACE FAILS TO STATE A STATE CLAIM FOR INTENTIONAL INTERFERENCE UNDER NEW JERSEY LAW (COUNT XVI)..............................................................29

CONCLUSION ................................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AlphaCard Sys. LLC v. Fery LLC*,
   No. 19-20110, 2023 WL 3506414 (D.N.J. May 17, 2023) ...................................5

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
   34 F. Supp. 3d 465 (D.N.J. 2014) ......................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................3, 5, 6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
   Carpenters ("AGC")*,
   459 U.S. 519 (1983) ....................................................................6, 9

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ......................................................................2

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016) ...........................................................18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................3, 5

*Brunswick Corp. v. Pueblo Bowl—O—Mat, Inc.*,
   429 U.S. 477 (1977) .....................................................................10

*Burch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) .............................................................4

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*,
   No. 3:16-CV-1000, 2018 WL 2209518 (M.D. Pa. May 14, 2018),
   *aff'd*, 767 F. App'x 348 (3d Cir. 2019)............................................10, 11

*Connelly v. Lane Constr. Corp.*,
   809 F.3d 780 (3d Cir. 2016) .............................................................3

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
   No. CIV.A. 14-4657, 2015 WL 1969380 (D.N.J. Apr. 29, 2015)..........29, 30, 31

*Del. Health Care, Inc. v. MCD Holding Co.*,
  893 F. Supp. 1279 (D. Del. 1995)........................................................28

*Dicar, Inc. v. Stafford Corrugated Prods, Inc.*,
  No. 2:05-cv-5426, 2010 WL 988548 (D.N.J. Mar. 12, 2010)........................5, 28

*Dill v. Yellin*,
  725 F. Supp. 3d 471 (D.N.J. 2024)........................................................31

*Eichorn v. AT & T Corp.*,
  248 F.3d 131 (3d Cir. 2001) ..............................................................11

*Ford-Greene v. NHS, Inc.*,
  106 F. Supp. 3d 590 (E.D. Pa. 2015) .....................................................31

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ...............................................................4

*Giuliani v. Polysciences, Inc.*,
  275 F. Supp. 3d 564 (E.D. Pa. 2017) .....................................................32

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022) ...............................................................9

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)........................................................................7

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) ..............................................................19

*Lifewatch Servs. Inc. v. Highmark, Inc.*,
  902 F.3d 323 (3d Cir. 2018) ............................................................7, 16

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) .............................................................22

*MacDougall v. Weichert*,
  144 N.J. 380 (1996) .......................................................................30

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
  948 F. Supp. 2d 416 (M.D. Pa. 2013).....................................................12

*Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*,
  886 F.3d 332 (3d Cir. 2018) ......................................................8, 9, 11

*Premier Comp Sols. LLC v. UPMC*,
  377 F. Supp. 3d 506 (W.D. Pa. 2019)...........................................26, 28

*Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*,
  No. CV 18-600, 2019 WL 635405 (D. Del. Feb. 14, 2019)..................10, 11, 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  922 F. Supp. 1055 (E.D. Pa. 1996), *aff'd*, 124 F.3d 430 (3d Cir. 1997) .....................................................................................26

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) .........................................................10, 25

*Robinson v. Jackson Hewitt, Inc.*,
  No. 19-9066, 2019 WL 5617512 (D.N.J. Oct. 31, 2019) ....................5

*Shire US, Inc. v. Allergan, Inc.*,
  375 F. Supp. 3d 538 (D.N.J. 2019)............................................*passim*

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978) .....................................................18, 19

*St. Clair v. Citizens Fin. Grp.*,
  340 F. App'x 62 (3d Cir. 2009) ...................................................5

*Syncsort Inc. v. Sequential Software, Inc.*,
  50 F. Supp. 2d 318 (D.N.J. 1999) ...............................................16

*Synthes, Inc. v. Emerge Med., Inc.*,
  No. CIV.A. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012).................28

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
  ___ F. Supp. 3d ____, 2024 WL 4329936 (D. Del. Sept. 27, 2024) .................18

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017) .......................................................4

*Varrallo v. Hammond Inc.*,
  94 F.3d 842 (3d Cir. 1996) .........................................................29

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ....................................................................6

*Warren Gen. Hosp. v. Amgen Inc.*,
   643 F.3d 77 (3d Cir. 2011) ....................................................................7

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...........................................................7, 22

*Commonwealth of Pa.. ex. Rel. Zimmerman v. PepsiCo, Inc.*,
   836 F.2d 173 (3d Cir. 1988) ....................................................................6

## Statutes

15 U.S.C. § 1 .........................................................................................7

15 U.S.C. § 3 .........................................................................................7

15 U.S.C. § 14 .......................................................................................7

## Other Authority

Fed. R. Civ. P. 12(b)(6)......................................................................3, 6

## **INTRODUCTION**

Treace Medical ("Treace" or the "Plaintiff") alleges that it created, and until recently was the only participant in, the alleged market of "TMT Bunion Systems." While Treace was once a monopolist in that market, it has lost its monopoly and may have fallen to number two as a result of new competition from Wright Medical ("Wright"), which is now owned by Stryker Corporation ("Stryker"). Frustrated by this competition, Treace brings this Complaint, seeking to forcefully exclude Stryker from "Treace Medical's Market." (*See* Compl. p 30 (describing the alleged TMT Bunion Systems market as being "Treace Medical's Market").) But the antitrust laws were not created to stamp out competition—they were written to protect it. And Treace's allegations do not withstand scrutiny under the robust tools courts have developed to weed out claims like Treace's at the motion to dismiss stage.

As a supplement to Article III standing, antitrust jurisprudence has unique requirements for who is eligible to seek damages for alleged anticompetitive behavior; this is called "antitrust standing." The antitrust standing doctrine is designed to eliminate cases, like this one, where the plaintiff's interests are at odds with robust competition. As part of antitrust standing, a plaintiff must establish antitrust injury. "Antitrust injury" requires that an antitrust plaintiff must not only have suffered an injury, but that injury must have been "of the type for which the antitrust laws were intended to provide redress," meaning the injury must have

resulted from a *reduction* or *elimination* of competition, not an *increase* in competition. *E.g., Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). The allegations in Treace's Complaint concede that Treace's woes are not due to a reduction in competition, but rather to the *introduction* of competition. As such, Treace lacks antitrust standing, and the Complaint's antitrust counts should be dismissed (with prejudice) for this reason alone.

In addition to not having antitrust standing, Treace has failed to adequately plead that Stryker unreasonably restrained competition for at least three reasons. First, though Treace's claims depend entirely on Stryker having dominant market power in a tying product, Treace failed to identify any such product or any market in which Stryker has dominant market power. Second, the Complaint fails to plead facts supporting the necessary requirement that Treace has been substantially foreclosed in the alleged market for the purportedly tied product. In fact, Treace is very honest about its past and continued success in that market. Finally, despite needing to allege facts establishing the geographic market associated with both the tying and tied product market definitions, Treace offers only a single paragraph unadorned with any meaningful factual allegations in support of its conclusory assertion that "the United States" is a well-defined geographic antitrust market in this case.

Each of these failures is enough to justify dismissal of Treace's antitrust claims. Once the woefully lacking antitrust allegations are stripped from the Complaint, there is nothing left to substantiate Treace's state law intentional interference claim, which the Court should similarly dismiss.

## **STANDARD OF REVIEW**

For a complaint to survive dismissal under Fed. R. Civ. P. 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This requires "a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [its] claims." *Id.* at 789. This is of particular import in antitrust cases because of "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts." *See, e.g.*, *Twombly*, 550 U.S. at 558 (finding that increasing costs and caseloads "counsel against sending the parties into discovery when there is no reasonable likelihood that

the plaintiffs can construct a claim from the events related in the complaint" (citation omitted)).

A court's role in evaluating whether to dismiss claims takes on outsized significance where, as here, an industry incumbent appears to be openly using antitrust law as a cudgel against a new competitor (Stryker) it seeks to have the courts exclude from the market because the prices Stryker has offered have been allegedly too low. *Cf., e.g.*, *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 192 (3d Cir. 2017) ("[M]istaken inferences are especially costly in antitrust cases, since they could penalize desirable competitive behavior and chill the very conduct the antitrust laws are designed to protect" (internal quotation marks and citations omitted)).

"In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 545 (D.N.J. 2019) [hereinafter "*Allergan*"] (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). This requires a district court to separate the factual and legal elements of a complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of a claim's elements are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011); *see also* Judicial Preferences on Motion to Dismiss,

Semper, J. ("Conclusory allegations unsupported by facts and details will be deemed irrelevant to the Court's analysis.").

In the antitrust context, complaints regularly use conclusory language that sounds somewhat like factual allegations—but in substance is a mere recitation of the elements of various types of antitrust claims. For example, a bald allegation that conduct "deter[red] and prevent[ed] other potential competitors from entering the relevant Marketplace" merely states an element of an antitrust claim based on exclusionary conduct. *AlphaCard Sys. LLC v. Fery LLC*, No. 19-20110, 2023 WL 3506414, at *4 (D.N.J. May 17, 2023). As a result, courts in this circuit regularly refuse to credit such bald allegations. *See, e.g.*, *Dicar, Inc. v. Stafford Corrugated Prods, Inc.*, No. 2:05-cv-5426, 2010 WL 988548, at *12 (D.N.J. Mar. 12, 2010) ("[A] mere assertion that market access is restricted, without more, is insufficient to withstanding a motion to dismiss."); *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 66 (3d Cir. 2009) (finding that allegation that the defendants "effectively barricaded entry into the market" was too conclusory to be sufficient under *Twombly*).

When those conclusory allegations are set aside, the remaining factual material alleged in the Complaint must be considered against the elements of the claims. *E.g.*, *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *see also Robinson v. Jackson Hewitt, Inc.*, No. 19-9066, 2019 WL 5617512, at *2 (D.N.J.

Oct. 31, 2019) (quoting *Iqbal*, 556 U.S. at 678) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). And those remaining factual allegations must support a plausible inference of liability. "Some claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). "For example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." *Id.; see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 528 n.17 (1983) (noting in an antitrust case that "a district court must retain the power to insist upon some specificity in [the] pleading before allowing a potentially massive factual controversy to proceed"). A complaint that provides facts "merely consistent with" the defendants' liability "stops short of the line between possibility and plausibility" and should not survive review under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 555 U.S. at 557); *see also Commonwealth of Pa. ex. Rel. Zimmerman v. PepsiCo, Inc*., 836 F.2d 173, 180 (3d Cir. 1988) ("It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.") (quoting *Associated Gen. Contractors*, 459 U.S. at 526 n.11).

**ARGUMENT**

I.   **TREACE FAILS TO STATE A CLAIM FOR RELIEF UNDER NEW JERSEY & FEDERAL ANTITRUST LAWS (COUNTS XIII-XV).**

Counts XIII through XV of the Complaint allege, respectively, violations of Section 1 of the Sherman Act, Section 3 of the Clayton Act, and unlawful restraint of trade under the New Jersey Antitrust Act. (Compl. ¶¶ 634-66; 15 U.S.C. §§ 1, 14). Section 1 of the Sherman Act declares "[e]very contract, . . . in restraint of trade . . . to be illegal." 15 U.S.C. § 1. Despite its sweeping language, the Supreme Court "has repeated time and again that § 1 outlaws only unreasonable restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (citation omitted). "An 'unreasonable' restraint is one that inhibits competition in the relevant market." *Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323, 335 (3d Cir. 2018) (citation omitted).

The analysis of Treace's antitrust claims here does not vary based on whether analyzed under Section 1 of the Sherman Act or Section 3 of the Clayton Act. *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 80 (3d Cir. 2011); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 157 & n.10 (3d Cir. 2003) (en banc)). For its part, the New Jersey Antitrust Act is to "be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *Allergan*, 375 F. Supp. 3d at 546 (quoting

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016)).

Therefore, each of Treace's three antitrust counts should be analyzed together.

To state a claim under the relevant antitrust laws, Treace must provide enough well-pleaded facts that, taken as true, would establish, among other things: (1) that it has "antitrust standing," meaning it is an appropriate plaintiff to bring a suit on the theory presented, and (2) that Stryker unreasonably restrained trade under the antitrust laws. *See, e.g.*, *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 481 (D.N.J. 2014). Almost without fail, a complaint brought by an admitted industry incumbent who continues to have the number one or number two position in the alleged market but is asking a court to exclude a new competitor fails to state a claim on both fronts.[1] This case is no exception.

Because the Complaint alleges harm to Treace that stems from an *increase* in competition, not a *restraint* of competition, Treace does not have antitrust standing. After all, antitrust law is designed to protect "competition, not competitors." *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (1986) and *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

---

[1] Defendants are not aware of and have not found any comparable examples of market-leading, industry incumbents attempting to use the antitrust laws to suppress competition in the way Treace seeks here—much less examples of such cases that were allowed to proceed to discovery on similar non-sensical allegations.

The Complaint also fails to plausibly allege that Stryker unreasonably restrained trade. Indeed, the Complaint fails to plead facts that, taken as true, would allow Treace to prove several elements essential to its theory, including:

- A tying product in which Stryker has dominant market power;
- A well-defined antitrust market for a tied product in which Stryker has substantially foreclosed competition; and
- A well-defined geographic market for any of its putative product markets.

We explain each failure in greater detail below. Any one of these deficiencies requires dismissal of Counts XIII-XV of the Complaint, and their combination demonstrates that the dismissal should be with prejudice.

### A. Treace Lacks Antitrust Standing Because it Does Not Allege an Antitrust Injury and is not an Appropriate Antitrust Plaintiff.

The first reason Treace's Complaint should be dismissed is that Treace lacks standing as an antitrust plaintiff.

"Antitrust standing" has nothing to do with Article III standing or this Court's jurisdiction. Rather, it is an element of a private antitrust suit that must be alleged with well-pleaded facts like any other element. *E.g.*, *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248-49 & n.6 (3d Cir. 2022). While "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact," courts must also consider "whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors*, 459 U.S. at 535 n.31; *Phila.*

9

*Taxi*, 886 F.3d at 343. "[A]ntitrust injury is a necessary . . . condition" to antitrust standing. *Id.* at 343 (citation omitted). Therefore, the absence of an "antitrust injury" means a plaintiff lacks antitrust standing. *Id.* Treace has not alleged an "antitrust injury."

Antitrust injury is "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (quoting *Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993)); *accord Brunswick Corp. v. Pueblo Bowl—O—Mat, Inc.*, 429 U.S. 477, 489 (1977). These requirements ensure that the antitrust laws are enforced "for the protection of competition, not competitors." *Brunswick Corp.*, 429 U.S. at 488 (citation omitted); *accord Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, No. 3:16-CV-1000, 2018 WL 2209518, at *3 (M.D. Pa. May 14, 2018), *aff'd*, 767 F. App'x 348 (3d Cir. 2019).

To establish antitrust injury, a plaintiff must demonstrate that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market, not just on plaintiff as a competitor." *Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*, No. CV 18-600, 2019 WL 635405, at *2 (D. Del. Feb. 14, 2019) (collecting cases). "[I]t is inimical to the antitrust laws to award damages for

losses stemming from continued competition." *Phila. Taxi*, 886 F.3d at 338 (quoting *Cargill*, 479 U.S. at 109-10 and *Brown Shoe*, 370 U.S. at 320).

Courts in this Circuit regularly and consistently dismiss complaints that allege only harm to a plaintiff's personal bottom-line that did not stem from a *reduction in competition* or that resulted—as here—from an *increase* in competition. As the Third Circuit has held, "[c]ompetition is at the heart of the antitrust laws; it is only anticompetitive conduct, or 'a competition-reducing aspect or effect of the defendant's behavior,' that antitrust laws seek to curtail." *Phila. Taxi*, 886 F.3d at 338 (quoting *Atl. Richfield*, 495 U.S. at 344); *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (noting that the Third Circuit has "consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market"). For example, in *Philadelphia Taxi*, the Third Circuit noted that the appellants, Philadelphia taxi drivers, could not plead antitrust injury by simply alleging that their businesses were harmed when a powerful competitor, Uber, entered the market. 886 F.3d at 339; *see also Cable Line, Inc.*, 2018 WL 2209518, at *4 ("Plaintiffs' injury flows from their loss of a single—albeit lucrative—client. This type of injury does not amount to a decline in competition . . . . If anything, Comcast's subcontractor reduction plan . . . is exactly the type of competition that antitrust laws are meant to foster." (cleaned up)); *Prescient Med.*

*Holdings*, 2019 WL 635405, at *2-3 ("Prescient argues that it suffered an antitrust injury in the loss of its contract with Connections and other loss of income. This, however, is an injury to Prescient's own business interests, and is not enough by itself to establish antitrust injury." (cleaned up)). In short, antitrust injury must stem from a "competition-reducing aspect" of the defendant's behavior. *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 433 (M.D. Pa. 2013) (citation omitted).

Here, the Complaint's factual allegations do not describe any decrease in competition. Instead, Treace carefully describes its status as a market-leading, industry incumbent that appears to seek 100% market share in the product market it alleges. Whatever injuries Treace contends it incurred, they cannot, on the alleged facts, be "antitrust" injuries.

According to its Complaint, Treace was founded in 2014 (Compl. ¶ 3) and "is the United States' leading designer, developer, and manufacturer of surgical instruments, implants, and methods focused on addressing the root cause of bunion deformities and related midfoot correction" (Compl. ¶ 26). Said another way, on the eighth page of its 199-page Complaint, Treace acknowledges that it is the "leading" competitor in its alleged market.

The Complaint explains that Treace created the Instrumented TMT Bunion Systems market and measures the market from 2015 to 2020 based solely on

Treace's revenues. (*See* Compl. ¶ 163 ("Sales of Instrumented TMT Bunion Systems had grown from essentially zero when Treace Medical launched the Lapiplasty® System in 2015 to $39,416,000 for Treace Medical alone in 2019 and $57,365,000 for Treace Medical alone in 2020.")). In antitrust parlance, this means that through 2020, Treace enjoyed a monopoly in its alleged product market and that its sales significantly increased from 2015 through 2020. According to the Complaint, Treace's growth continued after that: "Treace Medical is the undisputed leader in the instrumented TMT bunion correction market that it created, with Treace Medical achieving a compound annual revenue growth rate of 48.3% from 2020 to 2023." (Compl. ¶ 61). And, Treace's own website tells us that there are currently "1,000s of trained & experienced Lapiplasty® surgeons":



*See* https://www.lapiplasty.com/faq/.

Against that backdrop of success, Treace complains that it "has been stymied . . . at numerous hospitals" and provides the names of four customers (Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System) who said "they could not purchase . . . or had their purchases limited" because of the Stryker's alleged conduct. (Compl. ¶ 232). In other words, the entirety of the alleged

foreclosure is that Treace may have lost some sales to four customers. But regardless of the scope of foreclosure, a purported loss of business by the market leader is not the type of foreclosure that supports an antitrust suit.[2]

The Complaint goes on to explain the source of these handful of alleged losses—competition with a new competitor. Specifically, in February 2020, Wright launched its new lapidus correction system – LapiFuse™. (Compl. ¶ 91).

The Complaint alleges that the defendant-competitors interfered with Treace's business by "targeting specific [Integrated Delivery Networks ("IDNs")] where surgeons were using the Lapiplasty® System under agreements with IDNs or where Treace Medical had contracts or was bidding on contracts." (Compl. ¶ 670). The result, according to the Complaint, is that "Stryker is [now] either the first or second largest supplier of TMT Bunion Systems, despite Treace Medical's product leadership and approximately 5-year head start." (Compl. ¶ 173). In short: the Complaint alleges that Treace's injury is that it lost some business to a new competitor and *might* be at risk of losing its number one position in the market. Treace's solution is to sue the competitor and ask this Court to eliminate that competition to ensure Treace stays in its number one position.

---

[2] *See infra* § I.B.2 (discussing why this alleged "foreclosure" is insufficient to establish that Stryker engaged in an unreasonable restraint of trade).

The Complaint's allegations are entirely inconsistent with a competitor who has been unable to sell its products due to anticompetitive exclusion. They are, however, entirely *consistent* with an industry incumbent upset that it no longer has 100% market share in the alleged market. When the Complaint turns from Treace's loss of business to harm to the broader market, it becomes noticeably conclusory. Unlike the robust factual allegations related to Treace's prior market dominance and its loss of business when a new competitor entered the market, the allegations related to harm to the market are limited to bald assertions essentially reciting the legal elements of the antitrust counts. (*See, e.g.*, Compl. ¶ 197 (Stryker "effectively tie[d] the trauma service line in which it is dominant . . . ."); ¶ 6 (Stryker has "foreclosed competition in a substantial portion of the market of bunion correction systems through rebate agreements and other misconduct," which "ha[s] resulted in increased costs, decreased quality of patient care, and decreased adoption of life-changing surgical systems and procedures."); ¶ 235 ("Treace Medical and other competitors in the TMT Bunion Market are being seriously impeded in competing on the merits of product and price in the largest portion of the TMT Bunion Market.")).

Courts routinely disregard such conclusory allegations offered without supporting allegations of fact. *See, e.g.*, *Prescient Med. Holdings*, 2019 WL 635405, at *4 (rejecting as conclusory allegations that patients "[we]re receiving lower quality health care at higher costs" because they "[we]re being deprived of the ability

to receive Prescient's unparalleled testing methodologies, efficiencies and accuracies which assist in diagnosis and which LabCorp's testing does not" (cleaned up)); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330, 339 (D.N.J. 1999) ("Allegations that [the defendant] 'suppressed or reduced competition' in the leveraged market 'are the type of conclusory allegations . . . that are insufficient even at the pleading stage.'" (citations omitted)).

This Court should similarly set aside Treace's conclusory allegations that are not supported by any factual allegations. When that is done, Treace has no basis for maintaining its antitrust claims. The Complaint affirmatively and repeatedly asserts facts that make clear that Treace does not have antitrust standing. As such, the Court should dismiss Counts XIII-XV of Treace's Complaint for failure to adequately plead an antitrust injury.

### B. Treace Does Not Plausibly Allege an Antitrust Claim Based on Cross-Product Rebates Offered to Stryker's Customers.

Even supposing Treace is an appropriate plaintiff here, and therefore has antitrust standing (which it does not), its Complaint should still be dismissed for failure to allege an "unreasonable restraint of trade" under the antitrust laws. "An 'unreasonable' restraint is one that inhibits competition in the relevant market." *Lifewatch Servs. Inc.*, 902 F.3d at 335 (citation omitted). Here, the allegedly anticompetitive conduct challenged by Treace is a "bundled rebate," in which

Stryker is alleged to provide a discount across a portfolio (the "bundle") of separate products.

The Third Circuit has developed a rich body of law explaining precisely how to analyze the kind of antitrust claims Treace brings here. These cases were summarized by Judge Vazquez in *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538 (D.N.J. 2019), and the dismissal there maps very closely to why Treace's antitrust counts should be dismissed here. Specifically, Treace's Complaint fails to adequately plead an unreasonable restraint and should thus be dismissed because it fails to adequately allege:

- A tying product with which Stryker bundles TMT Bunion Systems in which Stryker has dominant market power;
- A well-defined antitrust market for a tied product in which Stryker has substantially foreclosed competition; and
- That "the United States" is an appropriate geographic market for any relevant product market in this case.

Each of these failures individually warrants dismissal of Treace's antitrust claims.

### 1. Treace Fails to Name any Tying Product or Allege Stryker's Dominant Power in It.

The lynchpin of Treace's antitrust theory is that Stryker has such dominant power in a tying product that it forces customers to buy unwanted TMT Bunion Systems (the "tied products") by bundling them with that powerful tying product on terms that make separate purchases uneconomical—thereby eliminating competition for TMT Bunion Systems.

17

Of course, "neither bundled rebates nor exclusive dealing contracts are inherently anticompetitive." *Allergan*, 375 F. Supp. 3d at 557. And treating all bundling as unlawful "would risk making practically every product the subject of an antitrust suit, because, in theory at least, most any product can be deconstructed into component parts that could be sold separately." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016).

To that end, the "Third Circuit has reviewed numerous cases involving bundling agreements" of the type alleged here and has provided a detailed road map on what plaintiffs must allege, and ultimately prove, to show that a particular bundled rebate scheme is anticompetitive. *Allergan*, 375 F. Supp. 3d at 552-53 (collecting cases). These cases establish that Treace first needed to define two products: a tying product and a tied product. *E.g.*, *Avaya*, 838 F.3d at 398. Indeed, for there to be a bundle fundamentally, there must be two "distinct" products. *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, ___ F. Supp. 3d ___, 2024 WL 4329936, at *3 (D. Del. Sept. 27, 2024).

Treace here asserts "TMT Bunion Systems" as a tied product and "the trauma service line" as a tying product. (*See, e.g.*, Compl. ¶¶ 196-97). Treace's claim requires that Stryker has dominant market power in the latter. *See, e.g., SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1060 (3d Cir. 1978) (alleging that the defendant had almost 90% market share in Keflin and Keflex, the tying (or "linked")

products); *LePage's*, 324 F.3d at 146 (asserting that 3M controlled over 90% of the transparent tape market and used that market power to eliminate competition in other bundled products). Not only does Treace fail to allege any specific tying product, it also fails to contend that Stryker has dominant power in any product in its "trauma service line," let alone in the entire line.

As a threshold matter, a line of products is not a "tying product." To be sure, a defendant can have monopoly power in more than one product that it includes in its bundle, *see SmithKline*, 575 F.2d at 1060-61 (identifying two different bundled products "for which the defendant "faced no competition"), but the plaintiff must identify which product or products within the bundle it believes the defendant is using to gain an advantage in the tied product. Treace never does so here.

Indeed, Treace never even defines "trauma service line" or alleges Stryker's market share in such an alleged market. The Complaint mentions the term "trauma service line" 76 times and yet never explains in what product(s) within it Stryker purportedly has monopoly power. Treace does not allege that Stryker "enjoyed a complete . . . monopoly" in the alleged market (or any market), as asserted in *SmithKline*, 575 F.2d at 1059, nor does it allege that Stryker "face[s] no competition" in the alleged market, as claimed in *LePage's*, 324 F.3d at 156. And, Treace "has not asserted that [customers] must have" any unnamed tying product that Stryker

19

sells with its TMT Bunion Systems. *Allergan*, 375 F. Supp. at 557 (dismissing bundled rebate claim for similar reasons).

While the contours of "the trauma service line" are unclear, the Complaint does reveal several aspects of it—all of which make clear that it is not a sufficient tying product for Treace's claims. For example, the Complaint explains that "[w]ithin the medical field, the term 'trauma' is generally understood to refer to traumatic bone injuries–typically fractures . . . . Within the hospital supply chain, the trauma service line is *generally understood* to refer to *a variety of implants* that are used to repair such fractures and restore bone function in the context of providing emergency medical treatment." (*See, e.g.*, Compl. ¶ 153 (emphases added)). The Complaint does not explain anything further. While it makes passing reference to some products that seemingly, by implication, are within the "trauma service line," (*see, e.g.*, *id.* ("For example, Stryker's recently launched Pangea plating system includes anatomy-specific implants (Humerus, Peripro Femur, Distal Femur, Proximal Tibia, Distal Tibia, Distal Fibula) and fracture-specific implants (Large Fragment, Small Fragment, and Mini Fragment).")), Stryker is left to guess which product or products Treace is referring to when it claims Stryker has dominant power

in "the trauma service line" or that such a product market would pass a hypothetical monopolist test. (*See* Compl. ¶ 162).[3]

In any event, the Complaint explains that DePuy Synthes (owned by Johnson & Johnson) is (along with Stryker) "one of two dominant suppliers in the trauma field. (Compl. ¶ 155). The Complaint goes on to identify at least two other competitors (Zimmer Biomet and Smith & Nephew) who offer products within "the trauma service line." (*Id.*).

This may explain why the Complaint never alleges Stryker's market share in the trauma service line and never claims that Stryker has monopoly power over the trauma service line or any product in it. If such a dominant tying product exists, the Complaint keeps its identity and the competitive conditions in the relevant product market a secret. The absence of an identifiable tying product, or one in which Stryker "faces no competition," dooms Treace's antitrust claims, and the Court should therefore dismiss them.

### 2. Treace's Non-Conclusory Allegations Are Inconsistent with Substantial Foreclosure of a Well-Pleaded Antitrust Market.

Even if Treace had alleged a tying product in which Stryker has dominant market power (it has not), the Court should still dismiss Counts XIII-XV because

---

[3] The hypothetical monopolist test is a way of being certain that one has not drawn a market *too narrowly*. It is not a test for determining whether a broad, vague market is properly defined or whether a defendant has undue market power in that market.

Treace has not provided well-pleaded factual allegations of "substantial foreclosure" in a well-defined antitrust market. *E.g.*, *ZF Meritor*, 696 F.3d at 271 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961)). Treace asserts that the market that was substantially foreclosed was the market for TMT Bunion Systems. (*See, e.g.*, Compl. ¶ 173 ("Stryker has already foreclosed a substantial portion of the market for TMT Bunion Systems . . . .")). The law is clear that "the relevant product market consists of those to whom the supplier can sell unless special circumstances exist." *Allergan,* 375 F. Supp. 3d at 547 (dismissing the complaint because plaintiff's proposed market "fail[ed] to account for others, such as non-government payers, to whom Plaintiff can sell its products"); *see also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) (similarly holding that competitor-plaintiffs alleging exclusion must allege a market defined as all available buyers).

Here, the Complaint's allegations about the myriad customers available to Treace doom its antitrust claims.

The Complaint identifies four types of customers: Integrated Delivery Networks ("IDNs," Compl. ¶¶ 132-35), group purchasing organizations ("GPOs," Compl. ¶ 136), independently owned surgical centers (Compl. ¶ 133) and ambulatory surgical centers ("ASCs," Compl. ¶ 172). Despite those four categories, every allegation related to the putatively unlawful bundled rebates relate to only one

type of customer (IDNs). (*See, e.g.*, Compl. ¶¶ 637, 670). By focusing its allegations exclusively on IDNs, Treace has copied and pasted the plaintiff's error in *Allergan*. To be sure, "courts have recognized that suppliers may . . . establish a special subgroup of buyers if the supplier shows that special circumstances exist." *Allergan*, 375 F. Supp. 3d at 551. But Treace has not alleged an "IDN-only" submarket here. While the absence of allegations related to foreclosing behavior concerning the other three categories of customers would itself be damning, the Complaint actually provides details about how those customers are **not** foreclosed.

For example, the Complaint *affirmatively alleges* that "ASCs typically specialize, and thus do not purchase a trauma bundle that Stryker can leverage. *Thus, independent ASCs provide an example of competition on the merits, without Stryker's bundling practices.*" (Compl. ¶ 206 (emphasis added); *see also* ¶ 207 ("Treace Medical's Lapiplasty® System has a greater market share within these cost-constrained ASCs, while the Stryker TMT Bunion Systems have minimal market share.")). The Complaint also makes clear *that GPOs do not allow for bundled rebates* of the kind Treace attempts to challenge here. (*See* Compl. ¶¶ 138-40 ("Many GPOs have explicit policies prohibiting bundles of unrelated products. . . . A Government Accountability Office report similarly indicates that 'all five GPOs reported that they did not bundle unrelated products.' . . .")).

The Complaint goes on to explain that in the non-IDN "portion of the market, Treace Medical and other competitors have a much larger share of the market while Stryker's market share is significantly lower than its market share within IDNs." (Compl. ¶ 230). In other words, there is admittedly **no** foreclosure, much less substantial foreclosure, in competition for three of the four categories of customers identified in the Complaint. While the Complaint is unclear as to how much of the market those three categories comprise, it makes clear that the three categories are not *de minimis*. (*See* Compl. ¶ 133 (alleging that "[m]ore than half of instrumented TMT bunion procedures nationwide are performed at an IDN-affiliated hospital or surgical center, with the vast majority of the remaining procedures performed by independently owned surgical centers, *i.e.*, that operate outside of IDNs.")).

Even with regard to IDNs, the Complaint does not allege how much business Stryker has foreclosed: it merely alleges that Stryker "has the highest percentage of direct agreements with IDNs of all suppliers." (Compl. ¶ 143). And the Complaint does not assert that all of these agreements contain bundled rebates. In other words, the Complaint on its face concedes (a) that the alleged conduct does not affect three categories of customers comprising, by the Complaint's own allegations, nearly 50% of the market and (b) that the alleged conduct only affects some undefined portion of the fourth category. Foreclosure of some unknown percentage of slightly more than half of the customers in a market is insufficient to survive a motion to dismiss.

Similar to the plaintiff in *Race Tires America,* Treace "never suffered the kind of injury that gives rise to an antitrust claim." *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010). "On the contrary, it has had the clear opportunity to compete and did compete, sometimes successfully." *Id.* Indeed, according to Treace, it has more than "sometimes" competed successfully. Treace is the clear leader in sales to most, if not all, categories of customers. (*See, e.g.*, Compl. ¶ 207 ("Treace Medical's Lapiplasty® System has a greater market share within these cost-constrained ASCs, while the Stryker TMT Bunion Systems have minimal market share."); ¶ 230 (Outside of IDNs, "Treace Medical and other competitors have a much larger share of the market while Stryker's market share is significantly lower than its market share within IDNs."); ¶ 26 (identifying Treace as the "leading" competitor); ¶ 163 (alleging Treace had a monopoly through 2020); ¶ 61 ("Treace Medical is the undisputed leader in the instrumented TMT bunion correction market that it created, with Treace Medical achieving a compound annual revenue growth rate of 48.3% from 2020 to 2023.")).

Because entire classes of customers can apparently ignore Stryker's alleged preference to give bundled rebates, the Complaint's factual allegations are entirely inconsistent with the inference that Stryker has dominant power as a seller. And the pleaded facts mean that Treace does not face a "substantially foreclosed" market as a seller. On the contrary, it has brought this lawsuit because it lost some unspecified

portion of a few IDN customers.[4] This alleged market foreclosure is insufficient to state a claim, and the antitrust claims should be dismissed for this additional reason.

### 3. Treace Does Not Adequately Allege that "the United States" is an Appropriate Antitrust Geographic Market.

"Market definition" is important in antitrust cases where, as here, market power is an element of the claim. An antitrust market has two components: (1) a product market and (2) a geographic market. *See, e.g.*, *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 524 (W.D. Pa. 2019) ("To state a viable antitrust injury, a plaintiff must generally show that it is a competitor or a consumer in the relevant product and geographic markets in which competition was adversely impacted."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055, 1060 (E.D. Pa. 1996) (collecting cases and stating, "in order to state a Sherman Act claim under either § 1 or § 2, a plaintiff must identify the relevant product and geographic markets and allege that the defendant exercises market power within those markets"), *aff'd*, 124 F.3d 430 (3d Cir. 1997).

---

[4] Only four customers are identified in the Complaint as having moved some of their business to Stryker. Treace may still be selling to one or *all of them*. (*See* Compl. ¶ 232 ("The following are some examples of the many customers who told Treace Medical that they could not purchase the Lapiplasty® System *or had their purchases limited* because of Stryker trauma contracts: Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System.") (emphasis added)).

As explained earlier, bundling cases require the plaintiff to allege separate markets for the tying and tied products. But an antitrust market is not simply defined by the product aspect of the market; it must also be bounded by the geographic scope in which each of the tying and tied products compete. Here, Treace devotes only a single paragraph to its alleged geographic market asserting simply that the market is the United States. (*See* Compl. ¶ 147). This is hopelessly vague, ambiguous, and conclusory. In fact, the Complaint does not clarify which of the product markets (tying or tied) the alleged geographic market definition is meant to apply to, nor does it provide any well-pleaded facts in support of this geographic market for either of them.

For example, the Complaint does not allege that the parties sell *only* in the United States; it just alleges that *Treace* only sells in the United States and that a "majority of Stryker's sales are in the United States." (*Id.*). It does not explain whether the "majority" pertains to all of Stryker's sales across its entire portfolio of products, in the allegedly tying trauma services line, or in the allegedly tied TMT Bunion Systems, or all three. The Complaint vaguely asserts unidentified "legal and regulatory requirements" without elaboration. (*Id.*). Do these laws and regulations prevent foreign manufacturers from selling into the United States or prevent Treace and Stryker from offering their products outside the United States? If the latter, the Complaint does not explain how Stryker makes a sub-majority of its sales outside of

the United States. (*Id.*). There is no assertion that producers of either the unidentified tying product or the allegedly tied product outside of the United States would not respond to a domestic price increase by selling more units within the United States; there are no facts alleged about whether producers outside of the United States are unable to sell into the United States; there are no facts alleged about whether domestic customers would turn to foreign suppliers in the face of a domestic price increase. *See Premier*, 377 F. Supp. 3d at 529 ("The geographic market, therefore, is not comprised of the region in which the seller attempts to sell its product, but, rather, is comprised of the area where customers would look to buy such a product."); *accord Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1289 (D. Del. 1995); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012) ("Emerge has made no effort to explain why the relevant market is limited to the United States, particularly where Synthes is alleged to be a 'multi-national corporation.'"); *Dicar*, 2010 WL 988548, at *12 ("Where . . . there is no indication that a consumer would be unable to purchase a product abroad, the Court will not arbitrarily limit the geographical market to the U.S.").

In any event, Treace has not adequately pleaded facts supporting that "the United States" is the appropriate geographic market for any particular market, much less each of the product markets (the tying and tied products) it must plausibly allege.

## II.    TREACE FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE UNDER NEW JERSEY LAW (COUNT XVI).

Under New Jersey law, tortious interference has four elements: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989)).

Intentional interference counts are common in antitrust complaints, and their dismissal as also-ran claims are common in antitrust dismissals. Here, as is typically the circumstance when the claims are dismissed along with the antitrust counts, the only qualifying "malicious" (intentional) conduct alleged in the Complaint is the same conduct that purportedly supports Treace's antitrust allegations. As a result, as the antitrust counts go, so should the interference count. *Allergan*, 375 F. Supp. 3d at 558 (dismissing New Jersey interference claims because "as pled, the only improper conduct on which Plaintiff bases its claim for tortious interference is Defendants' alleged anticompetitive activity," which the court also dismissed). Here, there is no conduct alleged in the Complaint beyond the insufficient antitrust allegations that allegedly qualifies as intentional interference. *Cf. Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, No. 14-4657, 2015 WL 1969380, at *7 (D.N.J. Apr. 29, 2015) (stating a "'bare recital that Defendants' alleged interference

was carried out with "malice" falls short' of the required allegations to sustain a claim under this count" (citation omitted)).

Treace's interference claim also fails for another, independent reason: Treace has failed to allege a protectable relationship or expectancy. *See, e.g.*, *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996) (articulating elements of a New Jersey interference claim, including the requirement that the plaintiff "allege facts that show some protectable right—a prospective economic or contractual relationship" (citation omitted)). The Complaint names four customers from which Stryker allegedly took some business from Treace. (*See* Compl. ¶ 232). But the Complaint does not explain what Treace's contractual relationship is or was with any of them, the length of those contracts, why Treace had some expectancy that it would continue to do business with them, or what level of business it reasonably expected to have. In fact, Treace's allegations are so vague that they call into question whether Treace even had a contractual relationship with the four customers. For example, Treace makes a vague allegation of Stryker "targeting specific IDNs where surgeons were using the Lapiplasty® System under agreements with IDNs *or* where Treace Medical had contracts *or was bidding on contracts*." (Compl. ¶ 670 (emphases added)).

These conclusory allegations are similar to those rejected in the dismissed complaint in *Debjo*:

> Plaintiff has alleged only that it had "contractual agreements" or "agreements" with various entities. Plaintiff provides a list of twenty-three school districts with which it had "agreements," but does not provide adequate specifics concerning these agreements. As an example of this deficiency, it is not clear whether any of these agreements were actual paying contracts. Plaintiff also fails to identify the date any of these agreements became effective, so it is unclear whether any of these agreements predate the policy change. Given the ambiguity of Plaintiff's Amended Complaint, the Court finds that Plaintiff has failed to identify valid relevant contracts with reasonable specificity.

*Debjo*, 2015 WL 1969380, at *7 (citing *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012), which dismissed a tortious interference claim because plaintiffs failed to "allege [ ] adequate details about a specific contract"); *see also Dill v. Yellin*, 725 F. Supp. 3d 471, 488-89 (D.N.J. 2024) (stating that "a mere assertion that Plaintiff prevented Defendant from raising necessary funds is simply too speculative to qualify as a reasonable expectation" (cleaned up)).

Just as in *Debjo* and the cases it relies upon, Treace's tortious interference claim has not been adequately pled and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Treace's antitrust and New Jersey state law claims in Counts XIII-XVI and strike the allegations that relate to these claims.[5] At least as to the antitrust claims,

---

[5] For the sake of clarity, those would include paragraphs 6, 12, 80, 131-244, and 634-76 of the Complaint. *See, e.g.*, *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 615 (E.D. Pa. 2015) ("Federal Rule of Civil Procedure 12(f) permits a court to

because the Complaint includes numerous alleged facts that affirmatively foreclose

entitlement to antitrust liability, the dismissal should be with prejudice.

---

strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.") (quoting Fed. R. Civ. P. 12(f)); *Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 579 (E.D. Pa. 2017) (striking portions of a Complaint after a partial dismissal).

Dated: January 24, 2025

*Of Counsel (pro hac vice forthcoming):*

Corey W. Roush
J. Matthew Schmitten
Taylor Randleman
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
corey.roush@sidley.com
jmatthew.schmitten@sidley.com
taylor.randleman@sidley.com

Stephanie P. Koh
Rachel Zingg
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
(312) 853-7000
skoh@sidley.com
rzingg@sidley.com

Phillip M. Aurentz
Morgan Mendicino
SIDLEY AUSTIN LLP
1501 K Street, N.W.
2021 McKinney Ave. Ste. 2000
Dallas, TX 75201
paurentz@sidley.com
mmendicino@sidley.com

*Attorneys for Defendants Stryker Corporation and Wright Medical Technology, Inc.*

Respectfully submitted,

/s/Liza M. Walsh
Liza M. Walsh
Katelyn O'Reilly
Lauren R. Malakoff
**WALSH PIZZI O'REILLY FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Fl
Newark, NJ 07102
(973) 360-7900
lwalsh@walsh.law
koreilly@walsh.law
lmalakoff@walsh.law

33