Rebekah R. Conroy
Shalom D. Stone
**Stone Conroy LLC**
25A Hanover Road, Suite 301
Florham Park, NJ  07932
Telephone:  (973) 400-4181
Facsimile:  (973) 498-0070
rconroy@stoneconroy.com
sstone@stoneconroy.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| TREACE MEDICAL CONCEPTS, INC., | Civil Action No. 2:24-cv-09763-JKS-MAH |
| Plaintiff, | **Return Date: March 3, 2025** |
| v. | **ORAL ARGUMENT REQUESTED** |
| STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC., | |
| Defendants. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS XIII TO XVI OF PLAINTIFF'S COMPLAINT

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................2

    I.    TREACE'S BUNION CORRECTION SYSTEM AND
        PROCEDURE. .....................................................................2

    II.    STRYKER'S INFRINGEMENT AND ILLEGAL ACTIONS
         FORECLOSING COMPETITION IN THE MARKET FOR
         TMT BUNION CORRECTION SYSTEMS. ......................................3

LEGAL STANDARD................................................................................6

ARGUMENT .......................................................................................8

    I.    TREACE'S COMPLAINT STATES CLAIMS UNDER
        THE SHERMAN ACT, CLAYTON ACT, AND NEW
        JERSEY ANTITRUST ACT. .........................................................9

        A.    Antitrust Standing—Treace Pleads that Stryker Has
            Harmed Competition and the Competitive Process.................10

            1.    Antitrust Injury Is an Inherently Factual
                Determination. ................................................................10

            2.    Treace Pleads Both Elements of Antitrust Injury...........11

            3.    Stryker's Arguments to the Contrary Fail. .....................15

        B.    Stryker Engaged in Anticompetitive Unreasonable
            Restraints of Trade in Violation of Federal and State
            Antitrust Laws.........................................................................17

            1.    Treace Has Adequately Alleged the Relevant
                 Product Markets..............................................................19

             2.    The Geographic Market Is Adequately Plead. ...............26

             3.    Stryker's Substantial Foreclosure of the TMT
                 Bunion Market.................................................................30

i

(a) Stryker Confuses Treace's Substantive Theories. .................................................30

(b) Stryker Mischaracterizes Treace's Well-Pleaded Facts. ......................................31

(c) Treace Pleads Substantial Foreclosure. ...............33

II. TREACE STATES A CLAIM FOR INTENTIONAL INTERFERENCE. ............................................35

CONCLUSION ....................................................................40

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*3Shape Trios A/S v. Align Tech., Inc.*,
    No. 18-cv-1332, 2020 WL 2559777 (D. Del. May 20, 2020) ..................... 23, 31

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................... 6, 7, 8

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
    Carpenters ("AGC"),*
    459 U.S. 519 (1983) ................................................................................................7

*BanxCorp v. LendingTree LLC,*
    No. 10-cv-2467, 2011 WL 541807 (D.N.J. Feb. 7, 2011) ................................15

*Barton & Pittinos v. SmithKline Beecham Corp.*,
    118 F.3d 178 (3d Cir. 1997) ..............................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ 6, 7, 8, 24

*Brader v. Allegheny Gen. Hosp*.,
    64 F.3d 869 (3d Cir. 1995) ................................................................................11

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    140 F.3d 494 (3d Cir. 1998) ................................................................. 24, 30, 31

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ..................................................................................... 18, 27

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*,
    No. 3:16-cv-1000, 2018 WL 2209518 (M.D. Pa. May 14, 2018) .....................15

*Cooper Distrib. Co. v. Amana Refrigeration, Inc.*,
    63 F.3d 262 (3d Cir. 1995) ................................................................................36

*Dicar, Inc. v. Stafford Corrugated Prods., Inc.*,
    No. 2:05-cv-5426, 2010 WL 988548 (D.N.J. Mar. 12, 2010) ...........................29

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ....................................................................... 29, 34

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ...........................................................................................9, 18

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016) ....................................................................... 30, 33

*Fineman v. Armstrong World Indus., Inc.*,
    980 F.2d 171 (3d Cir. 1992) .................................................................................18

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
    394 U.S. 495 (1969) ...............................................................................................30

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ..................................................................................8

*Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*,
    No. 16-cv-4544, 2017 WL 548944 (D.N.J. Feb. 10, 2017)................................36

*FTC v. Hackensack Meridian Health, Inc.*,
    30 F.4th 160 (3d Cir. 2022) ....................................................................... 17, 26

*FTC v. Qualcomm Inc.*,
    No. 17-cv-00220, 2017 WL 2774406 (N.D. Cal. June 26, 2017) .....................34

*GN Netcom, Inc. v. Plantronics, Inc.*,
    967 F. Supp. 2d 1082 (D. Del. 2013)..................................................................14

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 425 (3d Cir. 1993) ....................................................................... 13, 14

*Hannah's Boutique, Inc. v. Surdej*,
    No. 13-cv-2564, 2013 WL 4553313 (N.D. Ill. Aug. 28, 2013).........................23

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*,
    No. 12-cv-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) ............................ 18, 34

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    514 F. Supp. 2d 683 (E.D. Pa. 2007)..................................................................28

*In re Surescripts Antitrust Litig.*,
608 F. Supp. 3d 629 (N.D. Ill. 2022) ...................................................35

*Int'l Raw Materials v. Stauffer Chem. Co.*,
978 F.2d 1318 (3d Cir. 1992) .............................................................13

*Kenney v. Am. Bd. of Internal Med.*,
847 F. App'x 137 (3d Cir. 2021) .........................................................31

*Kickflip, Inc. v. Facebook, Inc.*,
999 F. Supp. 2d 677 (D. Del. 2013)....................................................21

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ........................................... 9, 23, 24, 31

*LifeWatch Servs. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018) ........................................................ 19, 20

*Little Rock Cardiology Clinic PA v. Baptist Health*,
591 F.3d 591 (8th Cir. 2009) ..............................................................35

*Mandel v. UBS/Painewebber, Inc.*,
373 N.J. Super. 55 (App. Div. 2004)...................................................38

*Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharmacy*,
34 F.4th 190 (3d Cir. 2022) ...............................................................36

*McWane v. FTC*,
783 F.3d 814 (11th Cir. 2015) ............................................................33

*NRT Tech. Corp. v. Everi Holdings Inc.*,
No. 19-cv-804, 2020 WL 3403091 (D. Del. June 19, 2020)...............21

*PepsiCo, Inc. v. Coca–Cola Co.*,
No. 98-cv-3282, 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ..........30

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018) ......................................... 12, 15, 29

*Prescient Med. Holdings, LLC v. Lab. Corp. of Am. Holdings*,
No. 18-600, 2019 WL 635405 (D. Del. Feb. 14, 2019) .............. 15, 16

*Printing Mart–Morristown v. Sharp Elecs. Corp.*,
116 N.J. 749 (N.J. 1989) ............................................................. 36, 38

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) ...............................................................18

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
199 F. Supp. 2d 362 (M.D.N.C. 2002) ................................................34

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010) ................................................................11

*Regeneron Pharms., Inc. v. Amgen Inc.*,
No. 22-cv-697, 2023 WL 1927544 (D. Del. Feb. 10, 2023) .............................23

*Roxul USA, Inc. v. Armstrong World Indus.*,
No. 17-cv-1258, 2018 WL 810143 (D. Del. Feb. 9, 2018) ...............................34

*Sandoz, Inc. v. United Therapeutics, Corp.*,
No. 3:19-cv-10170, 2020 WL 697137 (D.N.J. Feb. 4, 2020) .........................13

*Schuykill Energy Res., Inc. v. Pa. Power & Light Co.*,
113 F.3d 405 (3d Cir. 1997) ..............................................................11

*Shire US, Inc. v. Allergan, Inc.*,
375 F. Supp. 3d 538 (D.N.J. 2019) ..................................................... 26, 35, 40

*SmithKline Corp. v. Eli Lilly & Co.*,
575 F.2d 1056 (3d Cir. 1978) .......................................................9, 23

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ..............................................................24

*Syncsort Inc. v. Sequential Software, Inc.*,
50 F. Supp. 2d 318 (D.N.J. 1999) ......................................................16

*Synthes, Inc. v. Emerge Med., Inc.*,
No. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012)....................... 28, 29

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
No. 1:20-cv-613, 2024 WL 4329936 (D. Del. Sept. 27, 2024) .........................22

*Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953) ................................................................................24

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................18

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    No. 10-cv-4413 (FSH), 2011 WL 2181189 (D.N.J. June 1, 2011) ...................11

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) ..................................................................18

*U.S. Horticultural Supply, Inc. v. The Scotts Co.*,
    No. 03-cv-773, 2004 WL 1529185 (E.D. Pa. Feb. 18. 2004)...........................28

*United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*,
    839 F.3d 242 (3d Cir. 2016) ..................................................................40

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ..............................................................9, 33

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)..............................................................................18

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ....................................................................8

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ......................................................................7

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .............................................................. 23, 33

## Rules

Fed. R. Civ. P. 12(b)(6)........................................................................28

Fed. R. Civ. P. 8 ................................................................................7

Fed. R. Civ. P. 8(a)..............................................................................7

## **INTRODUCTION**

Defendants' Motion is a failed attempt to reframe Treace's allegations as complaining about *increased* competition in the market for surgical bunion correction systems. Defendants Stryker Corporation and Wright Medical (together, "Stryker") cherry-pick statements from Treace's highly-detailed Complaint and run afoul of controlling rules for assessing the sufficiency of a complaint.

As the Complaint clearly details, Stryker engaged in anticompetitive conduct aimed purposefully at keeping competitors like Treace *out* of a substantial segment of the market for surgical bunion correction systems. Stryker is using its dominant position in a wholly unrelated market for trauma implants to force customers to buy its bunion correction systems instead of competitor systems. Consequently, Stryker impedes competitors' ability to compete on the merits of price or product quality.

Treace is not "[f]rustrated by [] competition," as Stryker argues, but rather by Stryker's unlawful actions to *foreclose* competition. Treace brought "this action to *protect a competitive market* where healthcare purchasing decisions are made on the merits of product effectiveness and price, rather than coercion of healthcare purchasing departments through large rebate payments in unrelated service lines." (Dkt. 1 (Complaint) ¶ 6 (emphasis added).)

Stryker's Motion ignores the Complaint's well-pleaded allegations and the elements of Treace's antitrust claims supported by those allegations. Stryker also

1

wrongly imposes a heightened standard for antitrust pleadings that the Supreme Court and this Circuit have previously rejected. Because the Complaint sufficiently, and in great detail, pleads claims for federal and state antitrust violations and unlawful interference with prospective economic advantage under New Jersey law, Stryker's Motion should be denied.

## <u>BACKGROUND</u>

### I.    TREACE'S BUNION CORRECTION SYSTEM AND PROCEDURE.

Treace is a medical technology company that advanced the standard of care for bunion and related midfoot deformities. (Dkt. 1 ¶ 3.) Treace pioneered and patented the Lapiplasty® 3D Bunion Correction System® and Procedure—a combination of instruments, implants, and surgical methods to surgically correct bunion deformities at their source, an unstable joint in the foot. (*Id.*)

Historically, bunion deformities went untreated or were treated by surgeries that inconsistently address the deformity, which can present in three anatomical planes. (*Id.* ¶¶ 29-31.) In 2015, Treace introduced a better surgical approach including instrumentation, implants, and procedures that for the first time allowed surgeons to reproducibly correct the bunion in up to three planes, secure the unstable tarsal-metatarsal ("TMT") joint, and restore the natural biomechanical structure of the foot. (*Id.*; *see also id.* ¶¶ 34-44.) Treace's system and methods led to improved patient outcomes as demonstrated in multiple clinical studies. (*Id.* ¶¶ 33, 56.)

Treace has invested over $150 million educating surgeons and patients on its instrumented Lapiplasty® System and Procedure and its clinical benefits compared to traditional techniques.  (*Id.* ¶ 50.)  Treace's efforts have included numerous clinical studies, hands-on surgeon training, marketing campaigns, and robust training guides and educational materials.  (*Id.* ¶¶ 50-55.)  Treace also developed a portfolio of patents to protect its innovations.  (*Id.* ¶¶ 64-77.)

## II.    STRYKER'S INFRINGEMENT AND ILLEGAL ACTIONS FORECLOSING COMPETITION IN THE MARKET FOR TMT BUNION CORRECTION SYSTEMS.

Stryker sought to capitalize on Treace's innovation and commercial success for its own financial gain.  (*Id.* ¶ 62.)  Stryker launched two knock-offs, willfully infringing Treace's patents.  (*Id.* ¶ 62 & Counts I-XII.)  Stryker has ***not*** moved to dismiss Treace's twelve infringement claims.

But Stryker's shoddy knock-offs had trouble gaining traction.  Despite Wright's specific targeting of Treace accounts after its initial product launch in 2020, in the first six months it was only able to convert fifteen Lapiplasty® System users. (*Id.* ¶¶ 86-94.)  Unable to compete on the merits of its products, Stryker leveraged its dominance in an unrelated market to foreclose competition against Stryker's infringing TMT bunion system knock-offs.[1]  (*Id.* ¶¶ 94, 131.)

---

[1] Treace refers to bunion correction systems and procedures as "TMT Bunion Systems" and "TMT Bunion Procedures," referencing the TMT joint these systems attempt to stabilize.  TMT Bunion Systems and Procedures include both

Specifically, Stryker has a dominant market position in the service line for trauma implants ("trauma service line"). (*See, e.g.*, *id.* ¶¶ 132, 143, 151, 155-57, 178, 186, 204, 229, 636.) The trauma service line refers to implants used to repair bone fractures and restore bone function during emergency medical treatment for traumatic bone injuries. (*Id.* ¶ 153.) Stryker is one of two primary suppliers of trauma products in a highly concentrated market and one of only two *de facto* suppliers with comprehensive offerings for the entire service line. (*Id.* ¶¶ 154-55.) Stryker has particularly dominant positions in key trauma product lines such as intramedullary hip screws (43% market share) and staple fixation (44% market share). (*Id.* ¶ 156.) Treace, a smaller company focused on innovation for bunion and midfoot deformities, does not sell any trauma service line products. (*Id.* ¶ 157.)

Stryker leverages its dominance in the trauma service line by using bundled agreements and substantial "discounts" or "rebates" to coerce hospital systems to purchase its non-trauma TMT Bunion Systems rather than competitor systems, like Treace's Lapiplasty® System. (*Id.* ¶ 132.) Stryker does so by offering substantial

---

*instrumented* TMT bunion systems and procedures as well as traditional, non-instrumented freehand bunion correction procedures. (*Id.* ¶¶ 163-64.) Instrumented TMT bunion systems and procedures have largely replaced traditional, non-instrumented freehand procedures because of the former's ease of use and reproducibility. (*Id.*) Accordingly, instrumented TMT bunion correction systems such as those created by Treace make up the vast majority of the market for TMT Bunion Systems and Procedures ("TMT Bunion Market"). (*Id.*)

rebates if healthcare systems buy a significant percentage—such as 80%—of their trauma products from Stryker's trauma service line and require that its non-trauma TMT Bunion Systems be included as part of the trauma service line. (*Id.* ¶¶ 144, 186.) Stryker does not dispute that TMT Bunion Systems are not a trauma product and are unrelated to the trauma service line. (*See id.* ¶¶ 132, 177.) Nor does it dispute that contracts combining unrelated product lines to exclude niche medical device suppliers have been found to be anticompetitive. (*See id.* ¶¶ 139-41.)

Yet under Stryker's agreements, every dollar spent on a non-Stryker TMT Bunion System counts against the hospital system's required percentage and endangers the bundled discount for the entire service line. (*Id.* ¶ 188.) Competitors such as Treace cannot offer a low enough price to offset the bundled rebate and cannot profitably offer TMT Bunion Systems when competing with Stryker's trauma bundle because the total rebate on the trauma bundle far exceeds any reduction in price that could be available from an equally efficient Stryker competitor in TMT Bunion Systems. (*Id.* ¶ 201.)

Stryker has had greatest success pressuring Integrated Delivery Networks ("IDNs") into accepting these bundled agreements. (*Id.* ¶ 132.) IDNs are groups of healthcare providers such as hospitals, ambulatory surgical centers, and other outpatient care facilities. (*Id.* ¶ 133.) IDNs contract on behalf of the facilities throughout its network; a medical equipment supplier generally must be "on

contract" to conduct business within the hospitals and facilities of an IDN.  (*Id.* ¶ 134.)  More than half of the instrumented TMT Bunion Procedures nationwide are performed at IDN-affiliated hospitals and surgical centers.  (*Id.* ¶ 133.)  And Stryker has trauma agreements with almost all IDNs in the United States that enter into such agreements, with trauma service line contracts at an estimated 80% or greater of IDNs nationally.  (*Id.* ¶ 186.)

Stryker's actions foreclose competition in a substantial portion of the market by impeding niche competitors like Treace from competing on the merits of price and product features.  (*Id.* ¶ 179.)  Customers have informed Treace that they could not purchase the Lapiplasty® System or had to limit their purchases because of Stryker's trauma contracts, including for example at major hospital systems like Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System.  (*Id.* ¶ 232.)  Stryker's anticompetitive actions foreclose competition, deny surgeons their choice of, and access to, better and more cost-effective devices, and harm consumers with ultimately higher prices, lower quality devices, and inferior patient outcomes.  (*Id.* ¶¶ 203, 208.)

## **LEGAL STANDARD**

The *Twombly*/*Iqbal* pleading standard governs.  A complaint must plead a plausible claim, but "[t]he plausibility standard is not akin to a '***probability*** requirement[.]'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (emphasis added).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   Rule 8(a) "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Stryker incorrectly implies that the standard for antitrust claims is heightened. (Dkt. 12-1 at 3-6 (*e.g.*, claiming a court's role as gatekeeper takes on "outsized significance" in antitrust cases).)  None of Stryker's cited cases support applying a different standard to these antitrust claims.  In fact, *Twombly* "expressly rejected the notion that a 'heightened pleading standard' applies in antitrust cases and *Iqbal* made clear that Rule 8's pleading standard applies with the same level of rigor in 'all civil actions.'"  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).  Stryker's concerns that discovery in a complex case may be costly do not warrant dismissal of a complaint that states with specificity a plausible claim, as Treace has done.  *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 528 n.17 (1983).

Stryker also claims that a court must particularly scrutinize pleadings where an "industry incumbent" draws on antitrust laws against a "new" competitor because of "too low" prices.  (Dkt. 12-1 at 4.)  That argument misconstrues both Treace's allegations and Stryker's cited authority.  Treace's Complaint is clear that Stryker's

anticompetitive conduct results in ***higher***, not lower prices. (Dkt. 1 ¶ 208 ("Stryker's conduct forecloses competition… and harms consumers in the form of ***ultimately higher prices*** and lower quality surgical devices." (emphasis added)); *see also id.* ¶ 223 (describing that Stryker's anticompetitive conduct results in "supracompetitive prices").) Moreover, the *Valspar* case Stryker cites related to ***summary judgment***, not the sufficiency of pleadings on a motion to dismiss. *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 192 (3d Cir. 2017). There is nothing unusual about competitors bringing antitrust cases.

As the Court does in assessing any pleading under *Twombly/Iqbal*, it must accept the plaintiff's well-pleaded facts as true, but may disregard legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The Court must also "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* (citation omitted). Treace's detailed and well-pleaded Complaint readily passes the plausibility threshold.

## ARGUMENT

Stryker's Motion is based on a misapplication of law to facts cherry-picked from Treace's Complaint, while ignoring well-pleaded allegations directly on point. Contrary to Stryker's contentions, Treace's Complaint adequately pleads violations of federal and state antitrust law and intentional interference under New Jersey law.

I.    **TREACE'S COMPLAINT STATES CLAIMS UNDER THE SHERMAN ACT, CLAYTON ACT, AND NEW JERSEY ANTITRUST ACT.**

"'Anticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties." *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (citation omitted). Examples of agreements that may constitute anticompetitive conduct include exclusive dealing arrangements, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005), and tying agreements, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). The Third Circuit has also held that offering bundled discounts can constitute anticompetitive conduct. *LePage's*, 324 F.3d at 154-58; *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978). In *SmithKline*, the Third Circuit affirmed as an antitrust violation the defendant's rebates based on the purchase of multiple products because the bundle, in effect, "insulated [its product] from true price competition." *Id.*

Here, Treace asserts that Stryker has engaged in three types of anticompetitive conduct: (1) exclusive dealing (*see* Dkt. 1 ¶¶ 198, 637, 649); (2) anticompetitive bundling (*see id.* ¶¶ 195, 199, 638, 650); and (3) tying (*see id.* ¶¶ 196-97, 639, 651).

A. **Antitrust Standing—Treace Pleads that Stryker Has Harmed Competition and the Competitive Process.**

1. **Antitrust Injury Is an Inherently Factual Determination.**

"Antitrust standing" refers to a set of prudential doctrines which this Circuit has enumerated as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Barton & Pittinos v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997) (citation omitted). Stryker's Motion focuses solely on antitrust injury. (*See* Dkt. 12-1 at 9-16 (failing to address any of issues (1), (3), (4), or (5) above).)

Stryker's Motion states that "Treace Lacks Antitrust Standing Because it Does Not Allege an Antitrust Injury and is not an Appropriate Antitrust Plaintiff." (*Id.* at 9.) While Stryker appears to treat "Antitrust Injury" and "not an Appropriate Antitrust Plaintiff" as separate bases for challenging antitrust standing, whether an antitrust plaintiff is "appropriate" is merely the second element of "antitrust injury." Specifically, to establish antitrust injury, a plaintiff must show: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff

which flows from that which makes the defendant's acts unlawful." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010).

"[T]he existence of antitrust injury is not typically resolved through motions to dismiss." *Schuykill Energy Res., Inc. v. Pa. Power & Light Co*., 113 F.3d 405, 417 (3d Cir. 1997); *Brader v. Allegheny Gen. Hosp*., 64 F.3d 869, 875-76 (3d Cir. 1995) (same); *see also TransWeb, LLC v. 3M Innovative Props. Co.*, No. 10-cv-4413 (FSH), 2011 WL 2181189, at *18 (D.N.J. June 1, 2011) (noting that antitrust injury is not typically resolved on a motion to dismiss because "causes of an injury are inherently factual in nature").

### 2. Treace Pleads Both Elements of Antitrust Injury.

The gravamen of Stryker's argument regarding the first element—"harm of the type the antitrust laws were intended to prevent"—is that Treace built the TMT Bunion Market and is a market leader, and thus any market activity that decreases Treace's market share is necessarily procompetitive. (*See* Dkt. 12-1 at 12, 14.) Stryker then cites a single paragraph of the Complaint for the idea that the basis for Treace's antitrust claims is "competition with a new competitor" based on the 2020 "launch[] of [Stryker's] new lapidus correction system—LapiFuse™." (*Id.* at 14.)

"To determine whether conduct is anticompetitive, courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in

isolation." *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018) (internal quotation and citation omitted).

Taken as a whole, Treace's antitrust claims are not based on Stryker entering the TMT Bunion Market as a competitor. Rather, Treace's claims are based on Stryker's anticompetitive leveraging of its trauma service line and related rebates to damage competition and the competitive process in the non-trauma TMT Bunion Market. It is Stryker, not Treace, that is seeking to eliminate competition. (*See*, *e.g.*, Dkt. 1 ¶ 196 ("This tying arrangement forces customers to forego purchasing the Lapiplasty® System from Treace Medical or TMT Bunion Systems from other competitors."); *id.* ¶ 203 ("Stryker's trauma bundling practices exclude equally and more efficient competitors within the TMT Bunion Market, including Treace Medical."); *id.* ¶ 205 ("Treace Medical and other competitors simply cannot match the total amount of the trauma rebate that Stryker attaches to the purchase of TMT Bunion Systems.").)

Tellingly, the antitrust standing section of Stryker's Memorandum ignores the "**Damage to Competition and Purchasers**" (emphasis in original) section at paragraphs 222-33 of Treace's Complaint. (*See* Dkt. 12-1 at 13 (briefly excerpting only a portion of ¶ 232).) These paragraphs of Treace's Complaint specifically allege damage to competition and the competitive process—at least as follows:

- "If competitors such as Treace Medical were able to compete with Stryker on the merits of price and quality of TMT Bunion

12

Systems, Stryker's pricing for the Stryker TMT Bunion Systems would be reduced." (Dkt. 1 ¶ 223.)

- "Stryker's anticompetitive conduct has resulted in fewer product choices for surgeons and patients being forced to use inferior products with inferior support." (*Id.* ¶ 224.)

(*See also id.* ¶¶ 225-27 (Stryker's anticompetitive acts disincentivize investments in competitive products and starve competitors of funding, which results in a lack of choice, inferior product designs, and limited product innovations and improvements); *id.* ¶ 228 ("Stryker forecloses competitors from reaching IDN purchasers with their offerings for Instrumented TMT Bunion Systems."); *id.* ¶¶ 229-32 (comparing a market segment with fair competition to the market segment illegally foreclosed by Stryker's anticompetitive acts).)

Such detailed allegations of damage to competition and the competitive process are more than adequate to plead antitrust harm. *See, e.g.*, *Int'l Raw Materials v. Stauffer Chem. Co.*, 978 F.2d 1318, 1328 (3d Cir. 1992) (finding that "allegation of decreased competition in the [relevant] market is the type of harm targeted by the antitrust laws"); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (same); *Sandoz, Inc. v. United Therapeutics, Corp.*, No. 3:19-cv-10170, 2020 WL 697137, at *9, *11 (D.N.J. Feb. 4, 2020) (explaining that "[a]nticompetitive effect has been described as a reduction in output, increase in price, or deterioration of quality of goods and services" and holding that "it is clear arrangements that prevent competitors from entering a market constitutes an

13

antitrust injury…, in that creating such barriers is one of the actions antitrust laws were intended to combat"); *GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082, 1085-87 (D. Del. 2013) (denying dismissal where the complaint stated that defendant, through exclusive dealing agreements, prevented entry of new competitors into the market and decreased consumer options).

Treace has properly pleaded the first element of antitrust injury—"harm of the type the antitrust laws were intended to prevent"— and as such, it becomes clear that Stryker's repeated reference to Treace as a "competitor" or a "market leader" is a red herring and unsupported by the law.

Of course, Treace does plead that it competes with Stryker in the TMT Bunion Market. (*See, e.g.*, Dkt. 1 ¶ 235.) The second element of antitrust injury, which requires the plaintiff to plead an injury that flows from that which makes the defendant's acts unlawful, "is generally met if the plaintiff is a competitor… in the relevant market." *Gulfstream III Assocs.*, 995 F.2d at 429 (internal quotation marks and citation omitted). Thus, where harm to competition is properly alleged, market competitors like Treace are prototypical plaintiffs to which injury flows from another competitor's anticompetitive acts. *See id.* This district has thus rejected similar challenges to competitor antitrust standing as "lack[ing] merit" based on Third Circuit holdings that "one of the essential tenets of antitrust standing is that a plaintiff must generally be a competitor or customer of the defendant." *BanxCorp*

*v. LendingTree LLC*, No. 10-cv-2467, 2011 WL 541807, at *4 (D.N.J. Feb. 7, 2011) (citation omitted).

### 3.    Stryker's Arguments to the Contrary Fail.

The cases cited by Stryker are inapposite, in that each involved a competitor that wholly failed to allege injury to competition and the competitive process, unlike this case. In *Philadelphia Taxi Ass'n v. Uber Techs.*, the taxi drivers challenging Uber's entry into the Philadelphia taxicab market did not allege a loss of choice to Philadelphia riders, but rather a loss of the value of their taxi medallions when Uber was willingly chosen in a competitive market. 886 F.3d at 340 (explaining that "inundating the Philadelphia taxicab market with Uber vehicles," "Uber's ability to operate at a lower cost[,]" and "hiring rivals" was not anticompetitive where allegations were consistent with "enhanced competition among market players, better products, and lower prices for consumers"). Similarly, in *Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, the cable installation contractor failed to "allege[] that Comcast decreased its demand for such services overall[.]" No. 3:16-cv-1000, 2018 WL 2209518, at *4 (M.D. Pa. May 14, 2018).

Nor are Treace's allegations conclusory, as Stryker contends. The two cases cited by Stryker are wholly inapposite. (*See* Dkt. 12-1 at 15-16.) In *Prescient Med. Holdings, LLC v. Lab. Corp. of Am. Holdings*, the competing lab test supplier merely alleged its own lost contracts constituted antitrust injury and did not provide properly

15

supported allegations that the "challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare." No. 18-600, 2019 WL 635405, at *2-3 (D. Del. Feb. 14, 2019) (quotations and citations omitted).

Likewise, Stryker's reliance on *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330, 339 (D.N.J. 1999), is misplaced. In that case, "Sequential nowhere alleged, much more supported with appropriate factual assertions [that] Syncsort threatened customers in the Windows NT(R) market to conduct business with them, or granted discounts to persuade customers to purchase the product of Syncsort over those of Sequential." *Id.* at 339.

Here, by contrast and as detailed above, Treace's Complaint includes detailed allegations of damage to competition and the competitive process. (*See* Dkt. 1 ¶¶ 222-33; *see also id.* ¶¶ 234-44.) These allegations are further supported by detailed allegations that Stryker's anticompetitive acts result in the use of inferior products and procedures (*e.g.*, *id.* ¶¶ 110, 122, 224-27) as well as increased costs to hospitals and patients. (*E.g.*, *id.* ¶ 179 ("[H]ealthcare purchasers are coerced to purchase Stryker TMT Bunion Systems that in fact cost these healthcare purchasers more when hidden costs, lower product quality, and bundled 'rebates' attached to those purchases are considered"); *id.* ¶ 203; *id.* ¶ 233 ("Stryker's conduct… increases long term costs to patients and insurers through revision surgeries and other costs from sub-optimal surgical outcomes.").) Further, as alleged by Treace,

"when providing pricing of the Stryker TMT Bunion Systems to IDNs for consideration, Stryker quotes a subset of components that often lack required… components for a complete Instrumented TMT Bunion Procedure" and "largely fails to acknowledge or discuss the need for and pricing of cut guides associated with the Stryker TMT Bunion Systems." (*Id.* ¶¶ 210-11.) Accordingly, "IDN staff are left making uninformed decisions when Stryker includes the Stryker TMT Bunion Systems in its trauma bundles." (*Id.*)

In sum, Treace adequately pleads both elements of antitrust injury. With respect to the first, Stryker ignores relevant allegations of "harm of the type the antitrust laws were intended to prevent." For the second, Stryker's argument that competitors do not suffer "injury that flows from that which makes the defendant's acts unlawful" is legally meritless where the competitor's injury is based on anticompetitive acts as alleged here.

### B. <u>Stryker Engaged in Anticompetitive Unreasonable Restraints of Trade in Violation of Federal and State Antitrust Laws.</u>

Stryker contends that Treace's claims should also be dismissed because the Complaint purportedly fails to plausibly define the relevant product and geographic markets. (Dkt. 12-1 at 16-21, 26-28.) The Court should reject Stryker's contention.

Relevant markets have two dimensions: product and geography. *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022). The relevant product market is defined as those products "reasonably interchangeable by

consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). The relevant geographic market is the area in which potential consumers ordinarily look to buy the products offered by the business. *Tunis Bros. Co. v. Ford Motor Co*., 952 F.2d 715, 722 (3d Cir. 1991).

"Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). "Because market definition is a deeply fact-intensive inquiry," courts ordinarily do not grant motions to dismiss on the basis of geographic or product market definitions. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (collecting cases). Indeed, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also Eastman Kodak Co.*, 504 U.S. at 482 (same). Thus, "the determination of a relevant product market or submarket… is a highly factual one best allocated to the trier of fact." *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. 12-cv-711, 2013 WL 812143, at *15 (D.N.J. Mar. 5, 2013) (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992)).

### 1.    Treace Has Adequately Alleged the Relevant Product Markets.

"'[T]he outer boundaries of a relevant market are determined by reasonable interchangeability of use' of a particular product within a particular geographic area." *LifeWatch Servs. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018). "[A]bsent… obvious oversights" such as "defin[ing] the relevant market without reference to interchangeability or cross-elasticity of demand" or "alleg[ing] a proposed relevant market that clearly does not encompass all interchangeable substitute products[,]" the Third Circuit has instructed that "courts are cautious before dismissing for failure to define a relevant market." *Id.*

The Complaint alleges two relevant product markets:  (1) the trauma service line, and (2) TMT Bunion Systems.  (*See* Dkt. 1 ¶ 132 ("Stryker has a dominant market position in the service line for trauma implants ('trauma service line')"); *id.* ¶ 164 ("the instrumented TMT bunion correction market created by Treace Medical makes up the vast majority of the market for TMT Bunion Systems").

Stryker first contends that Treace has not properly defined the trauma service line.  (Dkt. 12-1 at 19.)  Leaving aside the fact that Stryker's trauma service line agreements are confidential (Dkt. 1 ¶ 193), Stryker is simply incorrect and again ignores the Complaint's well-pleaded allegations.  Merely as examples, the Complaint alleges that "Stryker has a dominant market position in the service line for trauma implants ('trauma service line')…" and "[t]he products at issue in this

19

action are trauma implants from the trauma business segment." (Dkt. 1 ¶¶ 132, 149; *see also id.* ¶ 153 ("Within the hospital supply chain, the trauma service line is generally understood to refer to a variety of implants that are used to repair such fractures and restore bone function in the context of providing emergency medical treatment.").)  Although its lawyers now feign confusion over what products are in the trauma service line, Stryker's CEO has no such difficulty:

> As Stryker's CEO Kevin Lobo has acknowledged, as of the mid-2010s Stryker was a relative newcomer to bundled purchasing due to its history with "niche" products, but through growth and acquisitions could "actually run the entire trauma service center and service line of a hospital[,]" such that its strategic shift to "total account conversions" was "now working."

(*Id.* ¶ 178; *see also id.* ¶¶ 135, 137-39 ("service lines" is a terminology used by IDNs and medical device suppliers to describe medical device product offerings).) Stryker's advertisements and personnel similarly lack any such confusion. (*E.g.*, *id.* ¶ 158 ("Stryker's 'Orthopaedics' landing page distinguishes 'Trauma' from other types of orthopedic surgery markets…."); *id.* ("In public presentations such as a recent 'OTA Podcast…' Stryker employees refer to trauma as a distinct service line.").)

Having properly alleged a recognizable product market, the question for pleading purposes is whether Treace has failed to allege interchangeability or cross-elasticity of demand or alleged a market that clearly does not encompass all interchangeable substitute products. *LifeWatch*, 902 F.3d at 337.  Here, Treace has

clearly and specifically pleaded these issues. Stryker does not contend otherwise. (*See, e.g.*, Dkt. 1 ¶¶ 158, 161 (explaining that the trauma service line is "distinct from other medical device product markets" and trauma implants "have no reasonably interchangeable substitutes, and there is no significant cross-elasticity of demand with other non-trauma surgical products").)

These allegations surpass the threshold for defining a relevant market. *See, e.g.*, *NRT Tech. Corp. v. Everi Holdings Inc.*, No. 19-cv-804, 2020 WL 3403091, at *7 (D. Del. June 19, 2020) (finding that proposed "market is not inherently implausible" and concluding that "[t]hose allegations describing the differences between the market as alleged and potential substitutes are sufficient to survive a motion to dismiss, particularly since defining the relevant market is a 'fact-intensive inquiry'"); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 687 (D. Del. 2013) (finding market definition not "facially unsustainable" where "[t]he Complaint distinguishes the relevant market from other platforms that offer games").

With the trauma service line as a proper relevant product market, Treace notes that Stryker does not dispute that the TMT Bunion Market is a different relevant product market. (*See* Dkt. 12-1 at 17 (challenging only the "tying product" market definition).) Nor does it dispute Treace's well-pleaded allegations that TMT Bunion Systems are not trauma products. (*E.g.*, Dkt. 1 ¶¶ 177, 179, 187, 637-38, 649-50, 661.) Rather, as described below, Stryker improperly "bundles" multiple legal

theories in an attempt to attach legally erroneous standards and elements to Treace's well-pleaded claims.

As noted above, Treace pleads three distinct theories under each of the Sherman Act and the Clayton Act: exclusive dealing, anticompetitive bundling, and tying. Stryker does not address each of these theories or their required proofs. Instead, it cherry-picks allegations from the tying theory and faults Treace for failing to plead that "Stryker 'enjoyed a complete… monopoly'" (Dkt. 12-1 at 19) or that "Stryker 'faces no competition'" in the trauma service line (*id.* at 19, 21) to argue that Treace has not sufficiently pleaded Stryker's market power in a relevant market. Stryker is incorrect.

As an initial matter, Stryker's conflating of Treace's three theories is improper.[2] In deciding a motion to dismiss, the distinct elements and required proofs for each of these theories should be considered independently. *See* Judge Semper's Judicial Preferences, *available at* https://www.njd.uscourts.gov/content/jamel-k-semper ("**Motions to Dismiss**: Parties must explicitly cite the elements of a claim and how the allegations do or do not give rise to an entitlement of relief. Conclusory

---

[2] Indeed, under the "rule of reason" version of Treace's tying theory there is no requirement to even define a tying market. *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 1:20-cv-613, 2024 WL 4329936, at *5 (D. Del. Sept. 27, 2024) ("For a rule-of-reason tying theory, [the plaintiff] need define only the market for the tied product" but "need not define the tying market[.]").

allegations unsupported by facts and details will be deemed irrelevant to the Court's analysis."); *3Shape Trios A/S v. Align Tech., Inc.*, No. 18-cv-1332, 2020 WL 2559777, at *5-8 (D. Del. May 20, 2020) (explaining that "challenged conduct 'may be susceptible to more than one court-defined category'" and considering exclusive dealing and bundling allegations independently (citation omitted)); *Regeneron Pharms., Inc. v. Amgen Inc.*, No. 22-cv-697, 2023 WL 1927544, at *5-7 (D. Del. Feb. 10, 2023) (addressing exclusive dealing and bundling theories independently).

None of these theories require a plaintiff to plead a "complete monopoly" or that the defendant "faces no competition" as Stryker posits in its Memorandum.[3] For example, as to exclusive dealing, "[t]here is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant…." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012). Tying is a *per se* violation "where the defendant is found to have appreciable market power in the tying market," but can also be shown without market power where the plaintiff can show "that the

---

[3] The authorities Stryker cites referencing monopolization (*e.g.*, *SmithKline* and *LePage's*) dealt with claims under Section 2 of the Sherman Act, which prohibits monopolization or attempted monopolization. (Dkt. 12-1 at 19.) Treace at this time has not asserted such a claim. Yet even under Section 2 of the Sherman Act, there is no requirement at the pleading stage that a plaintiff allege a specific market size or percentage of market share. *See, e.g.*, *Hannah's Boutique, Inc. v. Surdej*, No. 13-cv-2564, 2013 WL 4553313, at *3 (N.D. Ill. Aug. 28, 2013) (rejecting argument that claimant needed to allege the size of a market or a market share).

arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998). Bundling claims "are best compared with tying, whose foreclosure effects are similar." *LePage's*, 324 F.3d at 155. None require "no competition."

Stryker also misses the mark in arguing that "the Complaint never alleges Stryker's market share in the trauma service line[.]" (Dkt. No. 12-1 at 21.) Stryker cites no cases requiring a plaintiff to allege a specific market size or percentage market share. At this stage, *Twombly* merely requires that a plaintiff state a plausible claim for relief; a plaintiff need not assert all facts sufficient to prove its case, which is the standard that Stryker is espousing here. *Twombly*, 550 U.S. at 570.

In any event, Treace has adequately pleaded Stryker's dominant market power in the trauma service line, as required under applicable law. Regarding market power, "[o]bviously no magic inheres in numbers; [t]he relative effect of percentage command of a market varies with the setting in which that factor is placed." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 (1953); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 318 n.53 (3d Cir. 2011) ("De Beers's ongoing leadership position—considering its purported 46% market share in the diamond market—afforded it ample opportunity to influence diamond prices, posing an ongoing and significant threat of antitrust injury.").

24

Here, the setting is a highly concentrated market for the trauma service line with two significant and two minor suppliers.  (Dkt. 1 ¶¶ 155-56 ("Stryker… [has] particularly dominant positions in key trauma product lines such as intramedullary hip screws (43% market share) and staple fixation (44% market share)."); *see also id.* ¶ 150 ("As explained by Stryker's CEO Kevin Lobo, its philosophy over the last decade has been to achieve the top 'category position' and be 'absolute leaders' in all markets it participates in, which it has primarily achieved through acquisitions.").)  Stryker's competitors in the trauma service line "have little ability to discipline Stryker's bundling practices, as evidenced by their limited market share of direct IDN bundled service line contracts for trauma bundles."  (*Id.* ¶ 204; *see also id.* ¶¶ 636, 648, 660 ("Stryker has a dominant position in the trauma service line market, as one of the two primary suppliers in a highly concentrated market, and as one of only two *de facto* suppliers for the entire service line.").)

Thus, "Stryker has trauma agreements with almost all IDNs in the United States that enter into such agreements, with trauma service line contracts at an estimated 80% or greater of IDNs nationally."  (*Id.* ¶ 186; *see also id.* ¶ 156 ("Stryker's dominance within the trauma service line is exacerbated in sophisticated IDN settings involving direct purchasing by large hospital systems, where on information and belief it has bundled trauma service line agreements with 80% or

more of IDNs.").)    These allegations more than sufficiently set out Stryker's dominant market power.

The *Shire US, Inc. v. Allergan, Inc.* case relied upon by Stryker is not to the contrary.  In that case, the antitrust plaintiff failed to allege a "highly-concentrated" market or the defendant's dominance in that market.  375 F. Supp. 3d 538, 557 (D.N.J. 2019).  That Court's discussion of bundling and exclusive dealing was also unnecessary to its decision, which primarily relied on the fact that the underlying agreements were short-term and open to competitive bidding.  *Id.* ("The contracts at issue here are for one year and are open to competitive bidding on an annual basis."). By contrast, the contracts at issue here are long term, with multiple extension options.  (Dkt. 1 ¶ 192 ("Stryker's trauma service line agreements typically have an initial term of 3 to 5 years and can be extended for additional years.  As a practical matter, these agreements often end up being extended multiple times.").) Ultimately, Treace more than plausibly alleges the relevant product markets.

## 2.    The Geographic Market Is Adequately Plead.

"The relevant geographic market is that area in which a potential buyer may rationally look for the goods or services he seeks," which is a contextual inquiry. *Hackensack Meridian Health*, 30 F.4th at 166-67 (citations marks omitted).  As the U.S. Supreme Court has explained, the geographic market must "both correspond to

the commercial realities of the industry and be economically significant." *Brown Shoe Co.*, 370 U.S. at 336-37 (footnote omitted).

Treace alleges that the relevant geographic market is the United States. (Dkt. 1 ¶ 147.) Treace does not plead a narrow nor implausible market. Treace has not tried to limit the market to a single producer's site, a small town, nor even a single state. Instead, Treace sufficiently pleads the relevant geographic market by alleging that both Treace and Stryker sell their products nationwide, as do most other competitors for Instrumented TMT Bunion Systems. (*Id.*) Treace alleged that it developed and popularized Instrumented TMT Bunion Systems and Procedures, resulting in a substantial increase of life-changing procedures performed in the United States and that "[t]he United States (as well as other countries) have unique legal and regulatory requirements for the design, manufacturing, and purchase of medical devices and equipment such as the devices at issue in this matter." (*Id.* ¶¶ 147, 164.) "Since [2015]… more than 100,000 Lapiplasty® Procedures have been performed in the United States." (*Id.* ¶ 49.)

Treace has also alleged that "[a]s one of the largest medical device companies having the broadest product portfolios, Stryker has trauma agreements with almost all IDNs in the United States that enter into such agreements, with trauma service line contracts at an estimated 80% or greater of IDNs nationally." (*Id.* ¶ 186.) The Complaint further states "[g]iven that almost 75% of Stryker's annual revenue is in

27

the United States, this constitutes a substantial portion of the United States population 'impacted' by Stryker as a patient each year." (*Id.* ¶ 148.) These allegations plausibly support Treace's contention that the United States is the economically significant geographic market.

Critically, Stryker's argument that Treace does not account for activity outside the United States goes to a factual dispute rather than whether Treace has sufficiently alleged a relevant geographic market. Contrary to Stryker's argument, the failure to "account for foreign producers" will not defeat an otherwise thoughtfully delimited geographic market at the Rule 12(b)(6) stage. *See In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 698 (E.D. Pa. 2007) ("Defendants argue that the relevant geographic market cannot be limited to the United States because that market definition does not account for foreign producers. However, because the relevant geographic market is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry, I cannot accept at this point defendants' argument as a proper basis for a motion to dismiss."); *U.S. Horticultural Supply, Inc. v. The Scotts Co.*, No. 03-cv-773, 2004 WL 1529185, at *6 n.9 (E.D. Pa. Feb. 18. 2004) (holding a complaint's identification of the United States as the geographic market was sufficient to defeat a motion to dismiss).

Stryker relies on *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012), and *Dicar, Inc. v. Stafford Corrugated Prods.*,

*Inc.*, No. 2:05-cv-5426, 2010 WL 988548 (D.N.J. Mar. 12, 2010), for the proposition that the Complaint is faulty for failing to allege whether a consumer would be unable to purchase a product abroad or whether producers outside the United States are unable to sell into the United States. (Dkt. No. 12-1 at 28.) However, *Synthes* merely stands for the proposition that the defendant failed to meet the standard of specifically identifying where a buyer looks for goods or services when it failed to even identify a geographic market at all. 2012 WL 4473228, at *7. Here, Treace makes multiple allegations that support the United States as the proper geographic market. And unlike the market rejected in *Dicar*, the geographic market Treace defines is appropriately customer focused, with supporting rationale as to why the United States is the correct market. 2010 WL 988548, at *11-12.

Treace need not ***prove*** the relevant geographic market at this stage. The determination of a relevant market is a "complex and fact-intensive inquiry." *Phila. Taxi Ass'n*, 886 F.3d at 341-42. That is because market definition turns on the details of substitutability, response to pricing movements, and the defendant's own behavior. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443-44 (4th Cir. 2011). Dismissals at the pleading stage are "rare" and generally limited to certain types of "glaring deficiencies," such as "fail[ing] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id.*; *see also PepsiCo, Inc. v. Coca–Cola Co.*, No. 98-cv-3282, 1998 WL 547088, at

*6 (S.D.N.Y. Aug. 27, 1998) ("Absent an inherently implausible market allegation, the question must be resolved on the facts and economic realities of the case."). Accepting Treace's allegations as true, Treace has more than adequately pleaded the United States as the relevant geographic market.

### 3. Stryker's Substantial Foreclosure of the TMT Bunion Market.

Stryker's argument regarding "substantial foreclosure" again confuses the required elements and proofs for Treace's three different substantive claims and simply ignores Treace's well-pleaded allegations.

### (a)  *Stryker Confuses Treace's Substantive Theories.*

First, Treace does not dispute that an exclusive dealing plaintiff must plead substantial foreclosure and addresses this issue below. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016).

Second, a tying claim can come in two forms. A *per se* tying claim merely requires that "a substantial amount of interstate commerce must be affected." *E.g.*, *Brokerage Concepts*, 140 F.3d at 512-13. In determining a substantial amount of interstate commerce for a *per se* tying claim, "the controlling consideration is simply whether a total amount of business" is "substantial enough in terms of dollar-volume so as not to be merely de minimis…." *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969). Stryker has not challenged the total amount of business impacted, which is in fact quite substantial. (*See, e.g.*, Dkt. 1 ¶¶ 163, 643, 655, 664.)

"A rule of reason tying claim requires a showing that the alleged tie 'unreasonably restrained competition[,]' which 'necessarily involves an inquiry into the actual effect of the [challenged conduct] on competition [in the tied market].'" *Kenney v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 142 (3d Cir. 2021) (quoting *Brokerage Concepts*, 140 F.3d at 519). Stryker's Motion does not argue that Treace has failed to plead unreasonable restraints on competition under the rule of reason. Indeed, Treace's Complaint describes in detail Stryker's anticompetitive acts, the unreasonable restraints on competition from those acts, Stryker's lack of business justification, and the lack of pro-competitive benefits. (*E.g.*, Dkt. 1 ¶¶ 174-233.)

Third, under a bundling theory, a plaintiff is merely required to show that the bundling practices "foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *3Shape Trios A/S*, 2020 WL 2559777, at *7 (quoting *LePage's*, 324 F.3d at 155). Stryker has not challenged whether Treace has alleged foreclosure of a portion of the market to a potential competitor who does not manufacture an equally diverse group of products, and this is in fact alleged in detail. (*E.g.*, Dkt. 1 ¶¶ 179, 186-88, 195, 204, 208, 637.)

(b)    *Stryker Mischaracterizes Treace's Well-Pleaded Facts.*

Stryker incorrectly claims the Complaint describes "four types of customers" (Dkt. 12-1 at 22) and then argues that there cannot be "substantial foreclosure" if

31

some of those customer types are available to Treace (*id.* at 23-24). But Treace has pleaded only two types of actual end-use customers for TMT Bunion Systems: (1) IDNs, and (2) independently owned surgical centers. (*E.g.*, Dkt. 1 ¶ 133.)

Contrary to Stryker's description of all "ambulatory surgical centers" ("ASCs") as an entirely separate "type" of customer (Dkt. 12-1 at 22), Treace has pleaded that IDNs *include* many ASCs: "IDNs are groups of healthcare providers such as hospitals, *ambulatory surgical centers*, and other outpatient care facilities that collectively provide comprehensive and 'integrated' customer care for virtually all types of procedures and healthcare needs." (Dkt. 1 ¶ 133 (emphasis added).) The only remaining customers within the TMT Bunion Market are independently owned ambulatory surgical centers.[4] (*Id.* ("[T]he remaining procedures [are] performed by independently owned surgical centers, *i.e.*, that operate outside of IDNs.").) Accordingly, "*[m]ore than half of instrumented TMT bunion procedures nationwide are performed at an IDN-affiliated hospital or surgical center*." (*Id.* (emphasis added).) The Complaint further explains how the non-IDN or

_____

[4] As for the other purported "type" of customer identified by Stryker, a group purchasing organization ("GPO") is not an end customer but rather is a middle-man seller of services to end customers, *i.e.*, as organizations that negotiate contracts with medical suppliers that can then be adopted by its IDN members. (Dkt. 1 ¶¶ 134, 136.) The Complaint does not identify GPOs as customers in the relevant markets, but rather explains that as sellers to hospitals and ASCs, the GPOs have longstanding written policies not to engage in the type of anticompetitive conduct Stryker has engaged in here. (*E.g.*, *id.* ¶¶ 138, 140, 177, 241.)

independent ASC portion of the market is ever-decreasing, such that "the percentage of surgeons unable to choose which TMT Bunion Systems to use, and instead forced to use the Stryker TMT Bunion Systems, will only increase." (*Id.* ¶¶ 172-73.)

(c)    *Treace Pleads Substantial Foreclosure.*

Once Stryker's mischaracterization of Treace's allegations are stripped away, Treace has clearly met its burden for pleading substantial foreclosure for its exclusive dealing claims.    Stryker argues that "foreclosure of some unknown percentage of slightly more than half of the customers in a market is insufficient to survive a motion to dismiss." (Dkt. 12-1 at 24.)  This argument is legally incorrect. The test is not total foreclosure, but rather, whether the "challenged practices… 'bar a substantial number of rivals or severely restrict the market's ambit.'" *Eisai*, 821 F.3d at 403 (quoting *Dentsply*, 399 F.3d at 191).  "There is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely in the degree of foreclosure they consider unlawful." *Id.* (quoting *ZF Meritor*, 696 F.3d at 327); *see also McWane v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015) (affirming factual finding of foreclosure "[a]lthough the Commission did not place an exact number on the percentage foreclosed" where there the defendant "'tie[d] up the key dealers' and that the foreclosure was 'substantial and problematic'").

Accordingly, "[t]he question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits

question not proper for the pleading stage." *DIPF Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19; *see also FTC v. Qualcomm Inc.*, No. 17-cv-00220, 2017 WL 2774406, at *24 (N.D. Cal. June 26, 2017) (explaining that before discovery, "a plaintiff is not necessarily required to allege a specific percentage of foreclosure" (citing *Kolon*, 637 F.3d at 452 n.12)). "[A]t the pre-discovery, motion-to-dismiss stage," plaintiffs—especially private plaintiffs like Treace—"likely ha[ve] insufficient information to calculate" "a specific percentage of market foreclosure." *Kolon*, 637 F.3d at 452 n.12.

In sum, for its exclusive dealing claim Treace has pleaded substantial foreclosure of a well-defined market for TMT Bunion Systems, *i.e.*, within the entire market including both IDNs and independent ASCs. It has alleged that Stryker's illegal acts impact more than 50% of the total market for TMT Bunion Systems, and that this percentage is ever-increasing due to the continued absorption of independent ASCs into IDNs. (Dkt. 1 ¶¶ 133, 172-73.) This is more than adequate at the motion to dismiss stage of the case. *See, e.g.*, *Roxul USA, Inc. v. Armstrong World Indus.*, No. 17-cv-1258, 2018 WL 810143, at *6 (D. Del. Feb. 9, 2018) (holding that the defendant's "factual defense regarding the availability and viability of alternative distribution channels is best reserved for summary judgment or trial"); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 388 (M.D.N.C. 2002) (compiling cases and noting that "Courts have condemned

provisions involving foreclosure as low as 24%" and discussing "50% as a level at which courts routinely condemn foreclosure"); *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 645-55 (N.D. Ill. 2022) (holding that allegation of 20% foreclosure was sufficient to withstand a motion to dismiss).

Stryker's cited cases depend on its mischaracterization of Treace's allegations.  Treace has identified all available buyers—IDNs and independent ASCs—and thus satisfies the guidance in *Allergan* and *Little Rock Cardiology* to not define the market too narrowly.[5]  *See Allergan*, 375 F. Supp. 3d at 547 (concluding that limiting market to "Medicare Part D" improperly excluded "non-government payers, to whom Plaintiff can sell its product"); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) ("LRCC proposes a market limited by how consumers pay for cardiology procedures.").  Treace more than adequately pleads substantial foreclosure of a market including all available buyers.

## II.     TREACE STATES A CLAIM FOR INTENTIONAL INTERFERENCE.

Finally, Stryker argues that the Court should dismiss Treace's claim for intentional interference with prospective economic advantage on two grounds: (a) the alleged conduct is based on the supposedly insufficient anticompetitive

---

[5] The discussion in *Race Tires* cited by Stryker relates to antitrust injury, not substantial foreclosure, and involved a factual finding at summary judgment that the evidence showed the plaintiff "had the clear opportunity to compete and did compete" in the only alleged market.  614 F.3d at 84.

allegations, and (b) Treace has failed to allege a protectable relationship or expectancy. Both arguments are without merit.

Under New Jersey law, the elements of a claim for intentional interference with prospective business advantage are as follows: (1) a prospective economic relationship from which the plaintiff has a reasonable expectation of gain; (2) intentional and unjustifiable interference with that expectation; and (3) a causative relationship between the interference and the loss of the prospective gain. *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 281 (3d Cir. 1995) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 749, 749 (N.J. 1989)). In *Printing Mart–Morristown*, the Supreme Court of New Jersey held that, in a claim of intentional interference with prospective business advantage, "[w]hat is actionable is '[t]he luring away, by devious, improper and unrighteous means, of the customer of another.'" 116 N.J. at 750 (citation omitted).

Under New Jersey law, the second element requires that "harm was inflicted intentionally and without justification or excuse" (*i.e.*, malice). *Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharmacy*, 34 F.4th 190, 200 (3d Cir. 2022). Stryker's first argument fails because Treace's allegations independently support Treace's tortious interference claim and sufficiently allege malice. *See Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, No. 16-cv-4544, 2017 WL 548944, at *1, *3-4 (D.N.J. Feb. 10, 2017) (finding the plaintiff's allegation that the defendant engaged

in an "'extensive anticompetitive scheme' by entering into exclusive agreements to restrict entry of competitors" would constitute intentional illegal behavior (*i.e.*, malice) if proven, and that the plaintiff's tortious interference claim was thus sufficiently pleaded).

As described above, Treace has alleged that Stryker holds a dominant position in the market for the trauma service line and has used that position and anticompetitive business practices such as exclusive dealing agreements, bundled discounts, and tying arrangements to foreclose competition in a substantial portion of the market for TMT Bunion Systems. As a result, Treace and other competitors in the market for TMT Bunion Systems are being significantly impeded in competing on the merits of product and price in the largest portion of the market for TMT Bunion Systems. (*See, e.g.*, Dkt. 1 ¶¶ 147-73, 187-235, 635-66.)

Treace also alleges that "[s]urgeons and IDN administrative staff who have been willing to discuss the decision-making process and rationale have almost universally confirmed that bundling in the trauma service line was the primary basis for being forced away from permitting surgeons to use the Lapiplasty® System." (*Id.* ¶ 194.) Further, the Complaint alleges on information and belief that Stryker "provides false and misleading information to surgeons and IDN staff in support of its trauma bundling scheme" including "false comparisons" with Treace's

37

Lapiplasty® System.  (*Id.* ¶¶ 209-20).  These allegations are more than sufficient to state a claim for intentional interference.

Next, Stryker incorrectly argues that the interference claim fails because Treace did not allege a protectable relationship or expectancy.  Stryker argues that "Treace's allegations are so vague that they call into question whether Treace even had a contractual relationship with the four customers" it referenced in the Complaint.  (Dkt. 12-1 at 30.)  Yet under New Jersey law, no actual contract need exist to pursue a claim for tortious interference; the law "protects both contracts and prospective business relationships" from interference by tortfeasors.  *Mandel v. UBS/Painewebber, Inc.*, 373 N.J. Super. 55, 79 (App. Div. 2004).  "It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract."  *Printing Mart*, 116 N.J. at 755 (citation omitted).

"Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference."  *Id.* at 752.  The question under the first element of tortious interference is whether the facts of the case "giv[e] rise to some 'reasonable expectation of economic advantage.'"  *Id.* at 751 (citation omitted).

Treace has sufficiently alleged a protectable relationship or expectancy.  Treace has alleged that it "has been stymied by Stryker's anticompetitive conduct at numerous hospitals nationwide."  (Dkt. 1 ¶ 232.)  Treace alleges that it has business

relationships with surgeons, hospitals, and IDNs and that "Stryker has interfered with at least the following prospective customers of Treace Medical:  Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System," which represent hospital *systems* not just individual hospitals.  (*Id.* ¶ 669.)

In addition, the Complaint explains that "Stryker knew that Treace Medical had a reasonable expectation of economic advantage and benefit through business relations with healthcare systems" and specifically outlined Stryker's anticompetitive and improper tactics:

> Without justification, Stryker intentionally and wrongfully interfered with Treace Medical's expected economic advantage and benefit by, among other things, engaging in the anticompetitive conduct discussed above; targeting specific IDNs where surgeons were using the Lapiplasty® System under agreements with IDNs or where Treace Medical had contracts or was bidding on contracts; monitoring Treace Medical procedures to enlist IDN staff to push the bundled Stryker products; and deceptively promising illusory discounts to induce hospitals to exclude the Lapiplasty® System.  Stryker intentionally took such measures to restrain hospitals from purchasing the Lapiplasty® System, thus, effectively excluding Treace Medical from larger portions of the TMT Bunion Market.

(*Id.* ¶ 670.)

Finally, Treace has alleged that "[a]s a direct result of Stryker's intentional and wrongful interference, IDNs have decreased their usage of the Lapiplasty® System or have been dissuaded from using the Lapiplasty® System, thereby damaging Treace's expected economic advantage and benefit."  (*Id.* ¶ 671.)

Treace has sufficiently alleged the first two elements of intentional interference, and Stryker does not dispute that Treace has plausibly alleged the third element (that Treace suffered loss as a result of Stryker's interference).  Thus, the Court should find that Treace has stated a plausible claim for intentional interference with prospective business advantage and deny Stryker's Motion to Dismiss this claim.

## CONCLUSION

For the reasons discussed above, the Court should deny Stryker's Motion to Dismiss.  Moreover, there is no basis for a dismissal with prejudice.  Even Stryker's oft-cited *Allergan* case resulted in a dismissal "without prejudice" and an opportunity to amend.  *Allergan*, 375 F. Supp. 3d at 558; *see also United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 250 (3d Cir. 2016) ("[W]e have rarely upheld a dismissal with prejudice of a complaint when the plaintiff has been given no opportunity to amend.").[6]

---

[6] Likewise, Stryker's one-sentence request to strike portions of the Complaint should be rejected.  *See DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (explaining that striking a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice" and should be used "sparingly").

Respectfully submitted,

Dated:  February 18, 2025          */s/ Rebekah R. Conroy*
_____

Rebekah R. Conroy
Shalom D. Stone
**Stone Conroy LLC**
25A Hanover Road, Suite 301
Florham Park, NJ  07932
Telephone:  (973) 400-4181
Facsimile:  (973) 498-0070

rconroy@stoneconroy.com
sstone@stoneconroy.com

***Of Counsel*:**

Kurt J. Niederluecke (*pro hac vice* forthcoming)
Timothy M. O'Shea (*pro hac vice* forthcoming)
Adam R. Steinert (*pro hac vice* forthcoming)
Barbara Marchevsky (*pro hac vice* forthcoming)
Luke P. de Leon (*pro hac vice* forthcoming)
**FREDRIKSON & BYRON, P.A.**
60 South 6th Street, Suite 1500
Minneapolis, MN  55402-4400
Telephone:  612.492.7000

KNiederluecke@fredlaw.com
TOShea@fredlaw.com
ASteinert@fredlaw.com
BMarchevsky@fredlaw.com
LdeLeon@fredlaw.com

Richard T. McCaulley (*pro hac vice* forthcoming)
**MCCAULLEY LAW GROUP, LLC**
180 North Wabash Avenue, Suite 601
Chicago, IL  60601
Telephone:  312.858.1105

Richard@mccaulleylawgroup.com

41

Joshua V. Van Hoven (*pro hac vice* forthcoming)
**MᶜCᴀᴜʟʟᴇʏ Lᴀᴡ Gʀᴏᴜᴘ, LLC**
3001 Bishop Drive, Suite 300
San Ramon, CA 94583
Telephone:  925.302.5941

Josh@mccaulleylawgroup.com

***Attorneys for Plaintiff***
***Treace Medical Concepts, Inc.***