Liza M. Walsh
Katelyn O'Reilly
Lauren R. Malakoff
**WALSH PIZZI O'REILLY
FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Fl
Newark, NJ 07102
(973) 757-1101
lwalsh@walsh.law
koreilly@walsh.law
lmalakoff@walsh.law

*Attorneys for Defendants Stryker Corporation and Wright Medical Technology, Inc.*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TREACE MEDICAL CONCEPTS, INC., | Case No. 24-cv-9763-JKS-MAH |
| Plaintiff, | |
| v. | **Return Date: January 5, 2026** |
| STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS COUNTS XIII TO XVI OF PLAINTIFF'S FIRST AMENDED
COMPLAINT WITH PREJUDICE AND TO STRIKE RELEVANT
PORTIONS OF THE SAME**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

STANDARD OF REVIEW ...................................................................................4

ARGUMENT ........................................................................................................7

I.  TREACE STILL FAILS TO STATE A CLAIM FOR RELIEF UNDER NEW JERSEY & FEDERAL ANTITRUST LAWS (COUNTS XIII-XV). ..7

A.  The FAC Confirms that Treace Lacks Antitrust Standing and is Not an Appropriate Antitrust Plaintiff. ......................................................8

1.  The FAC fails to establish antitrust injury................................9

2.  The FAC fails to establish the remaining *AGC* factors for antitrust standing. ...................................................................16

B.  Treace, the Market-Leading Incumbent, Still Does Not Plausibly Allege Harm to Competition from its Competitors' Rebates to Customers. ..........................................................................................19

1.  The FAC Still Fails to Name a Tying Product or Allege Stryker's Dominant Power in It. ...............................................20

2.  The FAC's Non-Conclusory Allegations Remain Inconsistent with Substantial Foreclosure of a Well-Pleaded Antitrust Market. ....................................................................................24

3.  The FAC Still Does Not Adequately Allege that "the United States" is an Appropriate Antitrust Geographic Market. ..........32

II. TREACE STILL FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE UNDER NEW JERSEY LAW (COUNT XVI).............34

CONCLUSION ...................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                               **Page(s)**

*AlphaCard Sys. LLC v. Fery LLC,*
    No. 19-20110, 2023 WL 3506414 (D.N.J. May 17, 2023) ..................................5

*Animal Sci. Prods., Inc. v. China Minmetals Corp.,*
    34 F. Supp. 3d 465 (D.N.J. 2014) ........................................................................8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................4, 6, 7

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
    Carpenters*, 459 U.S. 519 (1983)................................................................*passim*

*Avaya Inc., RP v. Telecom Labs, Inc.,*
    838 F.3d 354 (3d Cir. 2016) ..............................................................................22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).....................................................................................4, 6, 7

*Brunswick Corp. v. Pueblo Bowl—O—Mat, Inc.,*
    429 U.S. 477 (1977)............................................................................................9

*Burch v. Milberg Factors, Inc.,*
    662 F.3d 212 (3d Cir. 2011) ...............................................................................5

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.,*
    No. 16-1000, 2018 WL 2209518 (M.D. Pa. May 14, 2018), *aff'd,*
    767 F. App'x 348 (3d Cir. 2019) ...................................................................9, 11

*Connelly v. Lane Constr. Corp.,*
    809 F.3d 780 (3d Cir. 2016) ...............................................................................4

*Davis v. Hanna Holdings, Inc.,*
    771 F. Supp. 3d 552 (E.D. Pa. 2025).................................................................17

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.,*
    No. 14-4657, 2015 WL 1969380 (D.N.J. Apr. 29, 2015) .............................36, 37

*Dicar, Inc. v. Stafford Corrugated Prods, Inc.,*
    No. 05-5426, 2010 WL 988548 (D.N.J. Mar. 12, 2010) ......................................6

*Dill v. Yellin*,
    725 F. Supp. 3d 471 (D.N.J. 2024) .................................................................37

*Eichorn v. AT & T Corp.*,
    248 F.3d 131 (3d Cir. 2001) .........................................................................10

*Ethypharm S.A. France v. Abbott Lab'ys*,
    707 F.3d 223 (3d Cir. 2013) .........................................................................16

*Ford-Greene v. NHS, Inc.*,
    106 F. Supp. 3d 590 (E.D. Pa. 2015).............................................................38

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ...........................................................................5

*Giuliani v. Polysciences, Inc.*,
    275 F. Supp. 3d 564 (E.D. Pa. 2017).............................................................38

*Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*,
    No. 24-2260, 2025 WL 540012 (E.D. Pa. Feb. 18, 2025)...............................30

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
    32 F.4th 242 (3d Cir. 2022) ...............................................................9, 16, 31

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)........................................................................................7

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) (en banc) .................................................22, 23, 30

*Lifewatch Servs. Inc. v. Highmark, Inc.*,
    902 F.3d 323 (3d Cir. 2018) ......................................................................8, 20

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) .........................................................................25

*MacDougall v. Weichert*,
    144 N.J. 380 (1996) ......................................................................................36

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013)............................................................11

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
  886 F.3d 332 (3d Cir. 2018) ..........................................................................9, 10

*Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*,
  No. 18-600, 2019 WL 635405 (D. Del. Feb. 14, 2019) ........................10, 11, 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  922 F. Supp. 1055 (E.D. Pa. 1996), *aff'd*, 124 F.3d 430
  (3d Cir. 1997)..................................................................................................32

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ...........................................................................9, 27

*Reading Hospital v. Hill-Rom Holdings, Inc.*,
  No. 24-02715, 2025 WL 2637233
  (E.D. Pa. Sept. 12, 2025) ...............................................................28, 29, 30, 38

*Rightline, LLC v. FMC Corp.*,
  No. 24-2726, 2025 WL 1550234 (E.D. Pa. May 30, 2025) ...............................30

*Robinson v. Jackson Hewitt, Inc.*,
  No. 19-9066, 2019 WL 5617512 (D.N.J. Oct. 31, 2019)....................................6

*Shire US, Inc. v. Allergan, Inc.*,
  375 F. Supp. 3d 538 (D.N.J. 2019).............................................................*passim*

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978) .............................................................21, 22, 23

*St. Clair v. Citizens Fin. Grp.*,
  340 F. App'x 62 (3d Cir. 2009) .........................................................................6

*Syncsort Inc. v. Sequential Software, Inc.*,
  50 F. Supp. 2d 318 (D.N.J. 1999).....................................................................15

*Synthes, Inc. v. Emerge Med., Inc.*,
  No. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012)..............................34

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017) ..............................................................................4

*Varrallo v. Hammond Inc.*,
  94 F.3d 842 (3d Cir. 1996) ..............................................................................35

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ...................................................................6

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011) ...................................................................8

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ...........................................................8, 24

*Commonwealth of Pa. ex. Rel. Zimmerman v. PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988) ...............................................................7

## **INTRODUCTION**

This Court already considered whether Treace—a market incumbent with significant market power—had standing to sue a new competitor to prevent that competitor from taking share from Treace. The Court noted that "Treace's position as the market incumbent in the TMT bunion correction systems space [gave] the Court pause when considering Plaintiff's antitrust standing, as it is difficult to view the entry of a new player (i.e., Stryker) into that space as anything but an increase in competition." (*See* Opinion, Dkt. 75 at 6-7.) Consistent with that view, in their original motion to dismiss, Defendants indicated that counsel had "not found any comparable examples of market-leading, industry incumbents attempting to use the antitrust laws to suppress competition in the way Treace seeks here." (Dkt. 12-1 at 8 n. 1.) And Treace never identified any such cases. (*See* Dkt. 27 at 3 n. 1 ("Treace appears to concede its atypicality as an antitrust plaintiff. . . . The Opposition does not identify any such cases.").)

Despite this reality, Treace chose to re-plead its claims. But its new complaint (the "First Amended Complaint" or "FAC") continues to allege that in the very market from which it is seeking to exclude Stryker, Treace has almost as much or more market power as its next five largest competitors *combined*—hardly a fix for the failings of its original claims. Stunningly, Treace goes on to describe the market as being "fiercely competitive both in terms of sales to end purchasers and in terms

1

of legal disputes" and explains that Treace has been and is still now trying to use litigation (on patent grounds) to stifle at least two other competitors (Fusion and Paragon 28) in addition to Stryker. (FAC ¶ 186.) Despite the admitted existence of rich competition and alleged patent infringement by several entities, Treace proudly proclaims that it is "the undisputed leader in the field." (*Id.* ¶ 61.) Treace has not only doubled down on its market leader status, it has provided details on who else competes in the market and presented market shares confirming its status as the market leader. (*See id.* ¶ 190) ("Treace's market share in the TMT Bunion Market is estimated at less than 40% of overall procedures. The remaining market share is fragmented, with Stryker, Arthrex, CrossRoads [owned by DePuy Synthes], Fusion, and Paragon 28 [owned by Zimmer Biomet] all having significant market share, and still other competitors collectively holding more than 10% of the market."). Treace even explains that at least two *other* competitors in the alleged TMT Bunion Market offer Trauma Service Line bundles. (*Id.* ¶¶ 159 ("[T]here are only four providers that even attempt to offer a comprehensive Trauma Service Line bundle . . . . Among those four providers, Stryker and DePuy Synthes both have dominant shares, while Zimmer Biomet and Smith & Nephew both have approximately 10% shares."), 62 (explaining that Depuy Synthes and Zimmer Biomet offer instrumented TMT bunion products).) (emphasis added). As before, "Treace's position as the market

incumbent" with continued dominance over the market from which it is trying to exclude Stryker should give the Court "pause." (Dkt. 75 at 6.)

The FAC's amendments do nothing to cure Treace's lack of antitrust standing, and they give this Court even more reason to dismiss again—this time, with prejudice.

Separately, but no less fatally to the FAC, Treace still fails to identify a tying product (versus a list of products that are not interchangeable with each other) in which Defendants allegedly have dominant power. Indeed, Treace offers a new definition of the alleged tying "product" that is even less precise than in its original complaint. Similarly, Treace still fails to allege that anything Defendants have done has resulted in the foreclosure of a well-defined market and, as noted above, now affirmatively concedes that whatever market Treace is referring to is "fiercely competitive." Finally, Treace still fails to plausibly allege an appropriate geographic market for its allegedly tied market.

Each of these failures in the FAC is sufficient, independently, to dismiss the entirety of Treace's antitrust claims. That all of these deficiencies remain (and have even compounded) in the FAC makes clear that further amendment would be futile. The Court should dismiss the antitrust claims with prejudice. The state common law claims, which remain dependent on the antitrust claims, should similarly be once again dismissed, this time with prejudice.

## STANDARD OF REVIEW

For a complaint to survive dismissal under Federal Rule of Civil Procedure 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [its] claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). This is of particular import in antitrust cases because of "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts." *See, e.g.*, *Twombly*, 550 U.S. at 558 (finding that increasing costs and caseloads "counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the . . . complaint" (citation omitted)).

A court's role in evaluating whether to dismiss claims takes on outsized significance where, as here, an industry incumbent appears to be openly using antitrust law as a cudgel against a competitor it seeks to have the courts exclude from the market. *Cf., e.g.*, *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 192 (3d Cir. 2017) ("[M]istaken inferences are especially costly in antitrust

cases, since they could penalize desirable competitive behavior and chill the very conduct the antitrust laws are designed to protect" (internal quotation marks and citations omitted)).

"In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 545 (D.N.J. 2019) [hereinafter "*Allergan*"] (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). This requires a district court to separate the factual and legal elements of a complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of a claim's elements are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011); *see also* Judicial Preferences on Motion to Dismiss, Semper, J. ("Conclusory allegations unsupported by facts and details will be deemed irrelevant to the Court's analysis.").

In the antitrust context, complaints regularly use conclusory language that sounds somewhat like factual allegations—but in substance is a mere recitation of the elements of various types of antitrust claims. For example, a bald allegation that conduct "deter[red] and prevent[ed] other potential competitors from entering the relevant Marketplace" merely states an element of an antitrust claim based on exclusionary conduct. *AlphaCard Sys. LLC v. Fery LLC*, No. 19-20110, 2023 WL

3506414, at *4 (D.N.J. May 17, 2023). As a result, courts in this circuit regularly refuse to credit such bald allegations. *See, e.g.*, *Dicar, Inc. v. Stafford Corrugated Prods, Inc.*, No. 05-5426, 2010 WL 988548, at *12 (D.N.J. Mar. 12, 2010) ("[A] mere assertion that market access is restricted, without more, is insufficient to withstanding a motion to dismiss."); *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 66 (3d Cir. 2009) (finding that allegation that the defendants "effectively barricaded entry into the market" was too conclusory to be sufficient under *Twombly*).

When conclusory allegations are set aside, the remaining factual material alleged in the complaint must be considered against the elements of the claims. *E.g.*, *Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *see also Robinson v. Jackson Hewitt, Inc.*, No. 19-9066, 2019 WL 5617512, at *2 (D.N.J. Oct. 31, 2019) (quoting *Iqbal*, 556 U.S. at 678) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). And those remaining factual allegations must support a plausible inference of liability. "Some claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). "For example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." *Id.; see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459

6

U.S. 519, 528 n.17 (1983) (noting in an antitrust case that "a district court must retain the power to insist upon some specificity in [the] pleading before allowing a potentially massive factual controversy to proceed"). A complaint that provides facts "merely consistent with" liability "stops short of the line between possibility and plausibility" and should not survive review under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 555 U.S. at 557); *see also Commonwealth of Pa. ex. Rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 180 (3d Cir. 1988) ("It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.") (quoting *Associated Gen. Contractors*, 459 U.S. at 526 n.11).

## ARGUMENT

### I.    TREACE STILL FAILS TO STATE A CLAIM FOR RELIEF UNDER NEW JERSEY & FEDERAL ANTITRUST LAWS (COUNTS XIII-XV).

Counts XIII through XV of the FAC allege, respectively, a violation of Section 1 of the Sherman Act, a violation of Section 3 of the Clayton Act, and an unlawful restraint of trade under the New Jersey Antitrust Act. (FAC ¶¶ 667-706; 15 U.S.C. §§ 1, 14; N.J. Stat. Ann. § 56:9–3.) Section 1 of the Sherman Act declares "[e]very contract, . . . in restraint of trade . . . to be illegal." 15 U.S.C. § 1. Despite its sweeping language, the Supreme Court "has repeated time and again that § 1 outlaws only unreasonable restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (citation omitted). "An 'unreasonable' restraint is one

that inhibits competition in the relevant market." *Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323, 335 (3d Cir. 2018) (citation omitted).

The analysis of Treace's antitrust claims here does not vary based on whether analyzed under Section 1 of the Sherman Act or Section 3 of the Clayton Act. *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 80 (3d Cir. 2011); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 157 & n.10 (3d Cir. 2003) (en banc)). For its part, the New Jersey Antitrust Act is to "be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." *Allergan*, 375 F. Supp. 3d at 546 (quoting *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016)). Therefore, each of Treace's three antitrust counts should be analyzed together.

To state a claim under the relevant antitrust laws, Treace must provide enough well-pleaded facts that, taken as true, would establish (1) that Treace has "antitrust standing," meaning it is an appropriate plaintiff to bring a suit on the antitrust theories presented, and (2) that Defendants unreasonably restrained trade under the antitrust laws. *See, e.g.*, *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 481 (D.N.J. 2014). Treace fails on both fronts.

### A. The FAC Confirms that Treace Lacks Antitrust Standing and is Not an Appropriate Antitrust Plaintiff.

"Antitrust standing," despite its name, has nothing to do with Article III standing or this Court's jurisdiction. Rather, it is an element of a private antitrust suit

that must be alleged with well-pleaded facts like any other element. *E.g.*, *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248-49 & n.6 (3d Cir. 2022). While "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact," courts must also consider "whether the plaintiff is a proper party to bring a private antitrust action." *AGC*, 459 U.S. at 535 n. 31; *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018). "[A]ntitrust injury is a necessary . . . condition" to antitrust standing. *Id.* (citation omitted). Therefore, the absence of "antitrust injury" means a plaintiff lacks antitrust standing. *Id.* Treace has not alleged an "antitrust injury."

### 1.    The FAC fails to establish antitrust injury.

Antitrust injury is "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (quoting *Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993)); *accord Brunswick Corp. v. Pueblo Bowl—O—Mat, Inc.*, 429 U.S. 477, 489 (1977). These requirements ensure that the antitrust laws are enforced "for the protection of competition, not competitors." *Brunswick Corp.*, 429 U.S. at 488 (citation omitted); *accord Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, No. 16-1000, 2018 WL 2209518, at *3 (M.D. Pa. May 14, 2018), *aff'd*, 767 F. App'x 348 (3d Cir. 2019).

To establish antitrust injury, a plaintiff must demonstrate that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market, not just on plaintiff as a competitor." *Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings*, No. 18-600, 2019 WL 635405, at *2 (D. Del. Feb. 14, 2019) (collecting cases). "[I]t is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Phila. Taxi*, 886 F.3d at 338 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (1986) and *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Courts in this Circuit regularly and consistently dismiss complaints that allege only harm to a plaintiff's personal bottom-line that did not stem from a *reduction in competition*. As the Third Circuit has held, "[c]ompetition is at the heart of the antitrust laws; it is only anticompetitive conduct, or 'a competition-reducing aspect or effect of the defendant's behavior,' that antitrust laws seek to curtail." *Phila. Taxi*, 886 F.3d at 338 (quoting *Atl. Richfield*, 495 U.S. at 344); *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (noting that the Third Circuit has "consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market"). For example, in *Philadelphia Taxi*, the Third Circuit noted that the appellants, Philadelphia taxi drivers, could not plead antitrust injury by simply alleging that their businesses were harmed when a

10

powerful competitor, Uber, entered the market. 886 F.3d at 339; *see also Cable Line, Inc.*, 2018 WL 2209518, at *4 ("Plaintiffs' injury flows from their loss of a single—albeit lucrative—client. This type of injury does not amount to a decline in competition . . . . If anything, Comcast's subcontractor reduction plan . . . is exactly the type of competition that antitrust laws are meant to foster.") (cleaned up); *Prescient Med. Holdings*, 2019 WL 635405, at *2-3 ("Prescient argues that it suffered an antitrust injury in the loss of its contract with Connections and other loss of income. This, however, is an injury to Prescient's own business interests, and is not enough by itself to establish antitrust injury.") (cleaned up). In short, antitrust injury must stem from a "competition-reducing aspect" of the defendant's behavior. *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 433 (M.D. Pa. 2013) (citation omitted).

What was said of the original complaint in the granted motion to dismiss remains substantially true of the FAC, and the Defendants reassert those arguments here. (*See* Dkt. 12-1 at 9-16.) As before, the FAC's factual allegations do not describe any decrease in competition. Instead, Treace carefully describes the market as "fiercely competitive" (*see* FAC ¶ 186) and asserts its status as the market-leading, industry incumbent with almost as much market share as its next five largest competitors (including the Defendants) combined (*see* FAC ¶ 190). It describes a market that has gone from one competitor to twelve over the period of time relevant

11

to its antitrust claims. (*Compare* FAC ¶ 61 (Treace "created . . . and it has become the undisputed leader . . .") *with* FAC ¶ 62 (identifying ten competitors in addition to the parties).) Treace essentially admits that its loss of business is because of rampant, new competition. (*See* FAC ¶ 184 (describing entry by ten entities since 2018—six of which entered in 2023 or thereafter).) Its "injuries," thus, cannot be "antitrust" injuries.

The FAC explains that Treace created the Instrumented TMT Bunion Systems market and measures the market from 2015 to 2020 based solely on Treace's revenues. (*See* FAC ¶ 170 ("Sales of Instrumented TMT Bunion Systems had grown from essentially zero when Treace Medical launched the Lapiplasty® System in 2015 to $39,416,000 for Treace Medical alone in 2019 and $57,365,000 for Treace Medical alone in 2020.").) In antitrust parlance, this means that for five years, Treace enjoyed a monopoly in its alleged product market while its sales significantly increased. According to the FAC, Treace's growth continued after that as well: "From 2019 to 2024, Treace Medical achieved a compound annual revenue growth rate of 40%." (FAC ¶ 61). And, Treace's own website touts that there are currently "1,000s of trained & experienced Lapiplasty® surgeons":



*See* https://www.lapiplasty.com/faq/.

Against that backdrop, Treace complains that it "has been stymied . . . at numerous hospitals" and provides the names of four customers (Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System) who allegedly said "they could not purchase . . . or had their purchases limited" because of the Defendants' alleged conduct. (FAC ¶ 255.) In other words, the entirety of the alleged harm to competition is that Treace *may* have lost some sales to four customers. Of course, losing some business from a handful of customers to a new competitor does not make an antitrust claim, and a purported loss of business by the market leader is not the type of "harm to competition" that supports an antitrust suit.

The FAC alleges that the Defendants—as competitors—interfered with Treace's business by "targeting specific [Integrated Delivery Networks ("IDNs")] where surgeons were using the Lapiplasty® System under agreements with IDNs or where Treace Medical had contracts or was bidding on contracts." (FAC ¶ 711.) The result, according to the FAC, is that "Stryker is already either the first or second largest supplier of TMT Bunion Systems within IDNs, despite Treace Medical's product leadership and approximately 5-year head start." (FAC ¶ 192 (emphasis omitted).) In short: the FAC alleges that Treace's injury is that it lost some business from a set of customers that purchase in the alleged market to a new competitor and *might* be at risk of losing more business. Treace's solution is to sue the competitor

(along with two others in separate lawsuits, *see* FAC ¶ 186) and ask this Court and other courts to eliminate that competition to ensure Treace remains unthreatened in its number one position.

The FAC allegations are entirely inconsistent with a competitor who has been unable to sell its products due to anticompetitive exclusion. They are, however, entirely *consistent* with an industry incumbent upset that it no longer has 100% market share in its alleged market. When the FAC turns from Treace's loss of business to alleged harm to the broader market, it becomes noticeably conclusory. Unlike the robust factual allegations related to Treace's prior market dominance and its loss of business due to market entry, the allegations related to harm to the market are limited to bald assertions essentially reciting the legal elements of the antitrust counts. (*See, e.g.*, FAC ¶ 218 (Stryker "effectively tie[d] the Trauma Service Line in which it is dominant . . . ."); ¶ 6 (Stryker has "foreclosed competition in a substantial portion of the market of bunion correction systems through rebate agreements and other misconduct . . . ."); ¶ 260 ("Treace Medical and other competitors in the TMT Bunion Market are being seriously impeded in competing on the merits of product and price in the largest portion of the TMT Bunion Market.").)

Courts routinely disregard such conclusory allegations offered without supporting allegations of fact. *See, e.g.*, *Prescient Med. Holdings*, 2019 WL 635405, at \*4 (rejecting as conclusory allegations that patients "[we]re receiving lower

quality health care at higher costs" because they "[we]re being deprived of the ability to receive Prescient's unparalleled testing methodologies, efficiencies and accuracies which assist in diagnosis and which LabCorp's testing does not") (cleaned up); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330, 339 (D.N.J. 1999) ("Allegations that [the defendant] 'suppressed or reduced competition' in the leveraged market 'are the type of conclusory allegations . . . that are insufficient even at the pleading stage.'") (citations omitted).

Of course, the Court has already agreed that Treace lacks antitrust standing because it is the leading "market incumbent" complaining about a new competitor competing and gaining some business. (*See* Dkt. 75 at 7 ("[I]t is not clear to the Court at this point that the injuries of which Plaintiff complains are of the sort for which the antitrust laws were intended to provide redress.".) Treace's FAC does nothing to cure this flaw. On the contrary, as explained above, Treace now alleges that it has almost as much or more market power as its five largest competitors combined. (*See* FAC ¶ 190 ("Treace's market share in the TMT Bunion Market is estimated at less than 40% of overall procedures. The remaining market share is fragmented, with Stryker, Arthrex, CrossRoads, Fusion, and Paragon 28 all having significant market share, and still other competitors collectively holding more than 10% of the market.").) Indeed, Treace boasts that it:

> has maintained a strong share within this growing market because its ***product is genuinely superior***. In a fair competition on the merits,

Treace Medical wins on a combination of efficacy, price, education, and service. Accordingly, while the market has become fragmented with substantial share occupied by many firms, Treace has maintained a strong market share that reflects an appropriate and efficient market response to the superiority of its product offering.

(FAC ¶ 64 (emphasis added).) Treace's admission that it has lost share to entities other than Stryker despite the former's claimed "superior[ity]" makes clear that Treace's lost business to Stryker is not an antitrust injury but simply the budding fruits of competition.

Antitrust injury is necessary but insufficient for antitrust standing, and its absence alone precludes antitrust standing. *See, e.g.*, *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 233-37 (3d Cir. 2013); *Host Int'l, Inc.*, 32 F.4th at 249 ("[A]ntitrust injury is a necessary condition of antitrust standing. If it is lacking, a court need not address the remaining *AGC* factors.") (cleaned up). Such was the case in the Court's dismissal of Treace's original complaint, and the continued absence of any allegations to support antitrust injury in the FAC is sufficient for the Court to conclude again that Treace is not an appropriate antitrust plaintiff.

**2.     The FAC fails to establish the remaining *AGC* factors for antitrust standing.**

Putting aside antitrust injury, however, Treace's new allegations also make apparent its inappropriateness as an antitrust plaintiff under the other *AGC* factors. The *AGC* factors are a prudential collection of "several considerations concerning the nature of the injury alleged and the role of the plaintiff in the allegedly

16

anticompetitive marketplace" in order to discern "who has antitrust standing and who does not." *Davis v. Hanna Holdings, Inc.*, 771 F. Supp. 3d 552, 574 (E.D. Pa. 2025). The four *AGC* factors other than antitrust injury, as distilled in the Third Circuit, include:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;
> . . .
> (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;
> (4) the existence of more direct victims of the alleged antitrust violations; and
> (5) the potential for duplicative recovery or complex apportionment of damages.

*Davis*, 771 F. Supp. 3d at 574 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993). Treace's new allegations fail on all of them.

For instance, Treace's allegations of the competitiveness and complexity of the market it leads put the **first and fifth *AGC* factors** against it. As to the first factor, Treace's claims make the causation connection between Stryker's alleged conduct (bundling) and the alleged harm (loss of business) to Treace difficult (if not impossible) to ascertain. The FAC makes clear that Stryker is one of ten or so bunion system competitors that have all grown in the last several years. This directly implicates that first *AGC* factor because tracing Treace's loss of its monopoly market share to Stryker's alleged conduct and calculating any damages related thereto will

17

present insurmountable complications.  Indeed, the FAC alleges that Treace has lost share to no fewer than nine different companies. (*See* FAC ¶ 62.) Of those companies, three can offer bundled pricing with trauma products. (*See* FAC ¶¶ 62, 159.) If Treace has lost some portion of some customers' business to these other companies, then there cannot be a clear causal connection between Treace's loss of some business to Stryker's alleged bundling. And, even if there is a connection for some portion of one or more customers, it cannot be extrapolated to all of the business Treace lost.  This makes apportionment of damages remarkably complex if not impossible and, thus, implicates the fifth *AGC* factor.

Moreover, if Treace's case theory is true, the clearer "direct victims" are the customers who are allegedly forced to pay more than they should for Stryker's purportedly inferior products, which implicates the **third and fourth *AGC* factors**. The customers are better positioned to know the difference between procompetitive bundled arrangements that offer the best collection of products at the best prices and those that do not. (Recall, bundling arrangements are not usually unlawful. *Allergan*, 375 F. Supp. 3d at 557.) By contrast, Treace, as a competitor, is "harmed" anytime it loses share to a bundled product regardless of whether the bundle is procompetitive or anticompetitive. This renders Treace's conclusory allegations self-serving and underpins why the fourth *AGC* factor looks to see if there would be more direct victims if the alleged antitrust violation occurred. To that end, customers are only

harmed by *anticompetitive* bundling arrangements. Customers are thus a much more natural plaintiff with a more direct relationship to the alleged harm than a marketing-leading incumbent seeking to re-capture share and thereby increase market concentration. The existence of these customers puts the third *AGC* factor, which goes to the directness of the putative antitrust plaintiff's alleged harms (as compared to other potential plaintiffs), against Treace.

Even if a competitor like Treace could get past the third *AGC* factor, the FAC indicates that there are other competitors who would be more appropriate plaintiffs than Treace. According to the FAC, two of those competitors can offer the kinds of bundled rebates that Defendants allegedly can, (*See* FAC ¶¶ 62, 159.), leaving—on Treace's own theory—seven or eight TMT Bunion Systems competitors who are not the market-leading incumbent, who cannot offer the same alleged bundles, and who face the same alleged foreclosure that Treace is facing.  In other words, even looking past the third *AGC* factor, Treace still fails the fourth *AGC* factor because there are several competitors who are arguably "more direct victims of the alleged antitrust violations."

For these reasons, the Court should once again dismiss Treace's antitrust claims for want of antitrust standing.

**B.    Treace, the Market-Leading Incumbent, Still Does Not Plausibly Allege Harm to Competition from its Competitors' Rebates to Customers.**

Supposing Treace is an appropriate antitrust plaintiff (which it is not), the FAC should still be dismissed for failure to allege an "unreasonable restraint of trade" as required under the antitrust laws. "An 'unreasonable' restraint is one that inhibits competition in the relevant market." *Lifewatch Servs. Inc.*, 902 F.3d at 335 (citation omitted). Here, the allegedly anticompetitive conduct is a "bundled rebate," in which Defendants are alleged to provide a discount across a portfolio (the "bundle") of separate products.

The Third Circuit has developed a rich body of law explaining how to evaluate precisely this theory of harm. These cases were summarized by Judge Vazquez in *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538 (D.N.J. 2019), and the dismissal there maps very closely to why Treace's antitrust counts should be dismissed here. Specifically, Treace's FAC fails to adequately plead an unreasonable restraint of trade because it fails to plausibly allege:

- A tying product with which Defendants bundle TMT Bunion Systems and in which they have dominant market power;
- A well-defined antitrust market for a tied product in which Defendants have substantially foreclosed competition; and
- That "the United States" is an appropriate geographic market for its allegedly tied market.

Each of these failures individually warrants dismissal of Treace's antitrust claims.

## 1. The FAC Still Fails to Name a Tying Product or Allege Stryker's Dominant Power in It.

In their original motion to dismiss, Defendants argued that Treace failed to name a tying product in which Defendants had dominant market power. (*See* Dkt. 12-1 at 17-21.) Defendants argued that a line of products is not a "tying product." (*Id.* at 19-20.) And while a defendant can have monopoly power in more than one product that it includes in its bundle, *see SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1060-61, 1065 (3d Cir. 1978) (identifying two different bundled products for which the defendant "faced no competition"), the plaintiff must identify which product or products within the bundle it believes the defendant is using to gain an advantage in the tied market. Treace responded by pointing to a mystery bag of products—called "the trauma service line"—that were not interchangeable or substitutable for each other, keeping secret the identity and competitive conditions of the product within that line that was the source of Defendants' allegedly dominant power.

Treace's "solution" in the FAC is to make the mystery bag bigger.

The lynchpin of Treace's antitrust theory, then as now, is that Defendants have dominant power in a tying product that they use to force customers to buy unwanted TMT Bunion Systems (the "tied products") by bundling them with that powerful tying product—thereby eliminating competition for TMT Bunion Systems. Of course, "neither bundled rebates nor exclusive dealing contracts are inherently anticompetitive." *Allergan*, 375 F. Supp. 3d at 557. And treating all bundling as

unlawful "would risk making practically every product the subject of an antitrust suit. . . . in theory at least, most any product can be deconstructed into component parts that could be sold separately." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016).

Against that legal backdrop, Treace asserts "TMT Bunion Systems" as a tied product and "the Trauma Service Line" as a tying product. (*See, e.g.*, FAC ¶¶ 218-19.) Treace's claims depend on adequately pleading (among other things) (i) a plausible market for a tying product in which (ii) Defendants have dominant market power. *See, e.g., SmithKline*, 575 F.2d at 1060 (alleging that the defendant had almost 90% market share in Keflin and Keflex, the tying (or "linked") products); *LePage's*, 324 F.3d at 146 (asserting that 3M controlled over 90% of the transparent tape market and used that market power to eliminate competition in other bundled products).

Treace fails in both respects. Indeed, it still does not identify any specific tying product in the "Trauma Service Line" in which Defendants have dominant market power. On this front, Treace makes very few substantive changes.[1] Where Treace does make changes, it does so in ways that deepen rather than resolve the ambiguities

---

[1] Non-substantively, Treace now makes sure that the phrase "Trauma Service Line" appears in capital letters. (*See, e.g.*, FAC ¶¶ 137, 143-45, 156, 158, 160-62, 167, 168, 192, 197-99, 201, 206, 208, 210, 213-15, 217-20, 222, 225, 251, 259-62, 270, 668-72, 682-86, 697-99.)

of its original complaint, i.e., it *broadens* its earlier definition of "Trauma Service Line" and adds *more* products to the list of potential tying products. (*Compare* Compl. ¶ 132 *with* FAC ¶ 134 (changing the definition from "the service line for trauma implants" to "*products such as* implants, plates, screws, nails, staples, pins, rods, frames, wedges, and bone growth stimulators") (emphasis added); *see also* FAC ¶¶ 152-53, 157 (similar changes).) But it never identifies which of these products supposedly give Defendants dominant power in "the Trauma Service Line," or how any such product market would satisfy a hypothetical monopolist test. (*See* FAC ¶¶ 162, 168.) Treace does not allege that Defendants "enjoyed a complete . . . monopoly" over any trauma product, as asserted in *SmithKline*, 575 F.2d at 1059, nor does it allege that Defendants "face no competition" for any alleged product, as claimed in *LePage's*, 324 F.3d at 156. And Treace "has not asserted that [customers] must have" any particular tying product that Stryker sells with its TMT Bunion Systems. *Allergan*, 375 F. Supp. at 557 (dismissing bundling claim for similar reasons).

Because Treace has not identified any tying product, much less one in which Defendants "face[] no competition," its antitrust claims remain fatally defective and should be dismissed once again.

23

2. **The FAC's Non-Conclusory Allegations Remain Inconsistent with Substantial Foreclosure of a Well-Pleaded Antitrust Market.**

It is unsurprising that the market-leading incumbent who claims that it has almost as much or more market share than its next five competitors combined, (*see* FAC ¶ 159), cannot plausibly allege that it faces a foreclosed market. This was true when Defendants filed their original motion to dismiss, and the new allegations Treace added to the FAC do not resolve the deficiency. On the contrary, the FAC brings the absence of competitive foreclosure into starker relief. The Court should, therefore, dismiss Counts XIII-XV because Treace has not provided well-pleaded factual allegations of "substantial foreclosure" in any tied market. (*See* Dkt. 12-1 at 21-26; Dkt. 27 at 15-18); *see also e.g.*, *ZF Meritor*, 696 F.3d at 271 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961)).

Treace proffers that the market for TMT Bunion Systems was substantially foreclosed to it. (*See, e.g.*, FAC ¶ 192 ("Stryker has already . . . foreclosed a substantial portion of the market for TMT Bunion Systems . . . .").) Defendants explained in the original motion to dismiss that one of Treace's errors was that all of its allegations of foreclosure related to only one type of customer (IDNs) within Treace's broader alleged market. (*See* Dkt. 12-1 at 22-24.) The law is clear that "the relevant product market consists of those to whom the supplier can sell unless special circumstances exist." *Allergan,* 375 F. Supp. 3d at 547 (dismissing the complaint

because plaintiff's proposed market "fail[ed] to account for others, such as non-government payers, to whom Plaintiff can sell its products"); *see also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) (similarly holding that competitor-plaintiffs alleging exclusion must allege a market defined as all available buyers). The FAC doubles down on the error and continues to focus exclusively on Treace's purported loss of a few IDN sales. (*See, e.g.*, FAC ¶¶ 156, 161, 169, 223, 225.)

While the absence of allegations related to foreclosing behavior concerning non-IDN customers—customers who are in the alleged market—would by itself preclude Treace's claims, the FAC actually provides details about how other sources of demand are affirmatively ***not*** foreclosed. This is both inconsistent with Defendants' alleged "dominance" in any tying product (whatever it may be) and fails to meet Treace's obligation to plausibly allege foreclosure in the allegedly tied market.

For example, the FAC affirmatively alleges that ambulatory surgical centers (or "ASCs") "typically specialize and thus do not purchase a trauma bundle that Stryker can leverage. *Thus, independent ASCs provide an example of competition on the merits, without Stryker's bundling practices.*" (FAC ¶ 227 (emphasis added); *see also* FAC ¶ 228 ("Treace Medical's Lapiplasty® System has a greater market share within these cost-constrained ASCs, while the Stryker TMT Bunion Systems have

minimal market share.").) The FAC also makes clear that group purchasing organizations ("GPOs") *do not allow for bundled rebates* of the kind Treace is attempting to challenge here. (*See* FAC ¶¶ 140-42 ("Many GPOs have explicit policies prohibiting bundles of unrelated products. . . . A Government Accountability Office report similarly indicates that 'all five GPOs reported that they did not bundle unrelated products.' . . .").) The FAC goes on to explain that in the non-IDN "portion of the market, Treace Medical and other competitors have a much larger share of the market and Stryker's market share is significantly lower than its market share within IDNs." (FAC ¶ 252.) In other words, the FAC admits that there is **no** foreclosure, much less substantial foreclosure for these sources of demand. While the FAC is unclear as to how much of the market these categories of customers comprise, it makes clear that the three categories combined represent approximately as much demand as IDNs. (*See* FAC ¶ 135 (alleging that "[m]ore than half of instrumented TMT bunion procedures nationwide are performed at an IDN-affiliated hospital or surgical center, with the vast majority of the remaining procedures performed by independently owned surgical centers, *i.e.*, that operate outside of IDNs.").)

Even with regard to IDNs, the FAC does not allege how much business Defendants have purportedly foreclosed: it merely alleges that Defendants "ha[ve] the highest percentage of direct agreements with IDNs of all suppliers." (FAC ¶ 145.) And it does not assert that all of these agreements contain bundled rebates.

In other words, the FAC on its face concedes (a) that the alleged "bundling" has had no effect on several categories of customers, which together comprise about half of the alleged market and (b) that the alleged conduct only affects some undefined portion of the only purportedly affected category of customer (IDNs).

Treace is the clear leader in sales to most, if not all, of the categories of customers it conveniently ignores in its foreclosure allegations. (*See, e.g.*, FAC ¶ 228 ("Treace Medical's Lapiplasty® System has a greater market share within these cost-constrained ASCs, while the Stryker TMT Bunion Systems have minimal market share."); ¶ 252 (Outside of IDNs, "Treace Medical and other competitors have a much larger share of the market and Stryker's market share is significantly lower than its market share within IDNs.").) Similar to the plaintiff in *Race Tires America,* Treace has very obviously not "suffered the kind of injury that gives rise to an antitrust claim." *Race Tires Am.*, 614 F.3d at 84. "On the contrary, it has had the clear opportunity to compete and did compete, sometimes successfully." *Id.*

According to the FAC, entire classes of customers can ignore Defendants' alleged preference to give bundled rebates. Such factual allegations are entirely inconsistent with an inference that Defendants have dominant power as a seller of the (unnamed) tying product.  In fact, those allegations demonstrate the falsity of Treace's foreclosure claims; the pleaded facts mean that Treace does ***not*** face a "substantially foreclosed" market.

27

Remarkably, the FAC includes only the same four customers that the original complaint included as examples of customers having moved some of their business to Defendants as an alleged result of bundled rebates. Over a year later, Treace appears not to have identified any additional examples. And even with regard to those same four customers, the FAC is drafted carefully to avoid ruling out that *Treace may still be selling to all four of them*. (*See* FAC ¶ 255 ("The following are some examples of the many customers who told Treace Medical that they could not purchase the Lapiplasty® System *or had their purchases limited* because of Stryker trauma contracts: Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System.") (emphasis added)).

Since the briefing on Stryker's prior motion to dismiss, the case law on antitrust foreclosure has developed unfavorably for Treace. Just a few months ago, Judge Gallagher in *Reading Hospital v. Hill-Rom Holdings, Inc.*, No. 24-02715, 2025 WL 2637233 (E.D. Pa. Sept. 12, 2025) dismissed very similar allegations based on the failure to adequately allege substantial foreclosure. That plaintiff (Reading Hospital), similar to Treace, alleged that the defendant (Hill-Rom) would "link all of an IDN's buying decisions together and offer substantial rebates in exchange for a confidential agreement to engage in long-term, exclusive dealing." *Id.* at *4. Hill-Rom's agreements with IDNs were allegedly "designed to bundle and link together all of the purchasing decisions by hospitals within an IDN in numerous

28

distinct product markets, including the Relevant Products, into a single overarching agreement with a collective rebate." *Id.* The court dismissed the plaintiff's claims on the basis that it had "plead foreclosure of no more than twenty percent of any market," which was "far less than the traditional threshold for liability in exclusive dealing cases of forty percent." *Id.* at *8 (internal alterations and quotation marks omitted) (quoting *Eisai*, 821 F.3d at 404).

Here, as noted, Treace does not actually allege how much of a well-defined market of all buyers has been purportedly foreclosed to it. But, based on the allegations in the FAC, we know that Treace has not alleged that Stryker foreclosed more than 40% of the alleged market from Treace—the traditional threshold identified in *Reading Hospital*. Indeed, according to Treace, Defendants have not achieved a 40% market share in the putative tied market. On the contrary, according to the FAC, Defendants are *one of five different companies* sharing the 50% of the market not served by Treace or other unidentified competitors. (*See* FAC ¶ 190.) The only competitor who may have a 40% market share, according the FAC, is Treace itself. *See id.* On its face, that is enough to dismiss Treace's claims with prejudice, consistent with *Reading Hospital*. But Treace even adds the admission that Defendants are not the only providers of trauma products bundling with bunion treatments; so, whatever foreclosure Treace is facing in the marketplace, it is not all attributable to (or remediable by) Defendants. (*See* FAC ¶ 161.)

In both of the cases decided over the last year where the plaintiff was found to have plausibly stated a foreclosure claim, the plaintiff was able to allege key facts that Treace has now twice failed to plead. *See Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, No. 24-2260, 2025 WL 540012, at *4 (E.D. Pa. Feb. 18, 2025) ("Greystone plausibly alleges that Equifax's conduct foreclosed at least 40% of the market through multiyear exclusive deals and de facto exclusive deals."); *Rightline, LLC v. FMC Corp.*, No. 24-2726, 2025 WL 1550234, at *4 (E.D. Pa. May 30, 2025) (alleging that the plaintiff had less than 20% market share and was foreclosed from 80-85% of one market and over 95% of another by the dominant defendant).

In stark contrast to those cases, Treace's new allegations confirm "fierce" competition, with no fewer than twelve competing TMT bunion product sellers, some of whom can offer the same alleged trauma bundles as Defendants and many others who cannot. (*See* FAC ¶¶ 62, 159, 186.) All of this competition is new, *i.e.*, it has entered since Treace "created" this market in 2015, with six competitors entering since 2023. (*See* FAC ¶¶ 49, 184); *see also Reading Hosp.*, 2025 WL 2637233, at *9 (explaining that *LePage's* reasoning "is limited to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products," therefore a case involving a defendant with two competitors who are both "multiple-product producers" does not fit into its "limited scope") (internal quotation marks and citations omitted).

In short, the market-leading incumbent Treace has again failed to plausibly allege that it faces a substantially foreclosed market of all buyers available to it. The prevalence of companies that have no trauma bundles, the presence of other companies that offer bundles, and Treace's continued retention of a market share close to or eclipsing its five largest competitors, (FAC ¶ 190), combine to render implausible any inference that Treace has faced an anticompetitively foreclosed market. Treace's substantive allegations remain irreconcilable with any theory that Defendants—who have less market share—have substantially foreclosed their larger, market-leading competitor.

There is one other important addition to the FAC on this issue. Seemingly recognizing that it cannot allege substantial foreclosure *today*, Treace adds allegations about how much foreclosure might happen in the future. (*See* FAC ¶¶ 221 ("*If Stryker is able to* continue driving Treace Medical and other suppliers… out of IDNs… Stryker *is likely to* foreclose a large portion of the TMT Bunion Market within IDNs, *with the likely foreclosure* including a large percentage (80% or more) of the well over 50% portion of the TMT Bunion Market that is within IDNs.") (emphases added)). The Court should take these new allegations as a tacit admission that "the undisputed leader" Treace (*see* FAC ¶¶ 61, 274) is aware that it cannot plausibly allege substantial foreclosure *today* and dismiss its antitrust claims accordingly. *See, e.g., Host Int'l, Inc.*, 32 F.4th at 251-52 ("To recover treble

31

damages under Section 4 of the Clayton Act, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent, not potential injury.") (cleaned up).

### 3.    The FAC Still Does Not Adequately Allege that "the United States" is an Appropriate Antitrust Geographic Market.

"Market definition" is important in antitrust cases where, as here, market power is an element of the claim. An antitrust market has two components: (1) a product market and (2) a geographic market. *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055, 1060 (E.D. Pa. 1996) (collecting cases and stating, "in order to state a Sherman Act claim under either § 1 or § 2, a plaintiff must identify the relevant product and geographic markets and allege that the defendant exercises market power within those markets"), *aff'd*, 124 F.3d 430 (3d Cir. 1997).

Treace needed to plausibly allege two geographic markets to state its particular claim for relief under the antitrust laws. It needed to allege a geographic market for *a tying product* to meet its burden to plausibly allege that Defendants have "dominant" power over the sale of that product. It also needed to allege a geographic market for *its tied market*, *i.e.*, a well-defined market based on all available buyers of TMT Bunion Systems to participants in that market, which would be the market from which Treace is allegedly excluded and substantially

foreclosed. *See, e.g.*, *Allergan*, 375 F. Supp. 3d at 547 (dismissing complaint because it "fail[ed] to account for others . . . to whom Plaintiff can sell its product[s]").

Despite Defendants pointing out the need for these two different geographic market definitions in their original motion to dismiss, Treace continues to devote only a single paragraph (albeit it a longer one) to its alleged geographic market in the FAC. (*See* FAC ¶ 150.) Treace's passing attempt to cure its failed geographic market is unsuccessful.

The additions to the paragraph relate to the fact that TMT Bunion Systems require FDA clearance to be sold in the United States. Despite the benefit of prior briefing on this issue,[2] Treace's added allegations still do not state a geographic market with respect to TMT Bunion Systems. The revised Paragraph 150 gets the market definition backwards, defining it around *where a customer buys* rather than *where a TMT Bunion Systems producer can sell*. The tied market (TMT Bunion Systems) is what Treace has allegedly been excluded from; so, it should be all of the customers to which TMT Bunion System competitors could sell its products. *See, e.g.*, *Allergan*, 375 F. Supp. 3d at 547 (dismissing complaint because it "fail[ed] to account for others . . . to whom Plaintiff can sell its product[s]"). The FAC leaves

---

[2] *See* Dkt. 27 at 13-14 (explaining that "[t]he tied market's geographic scope must encompass all available buyers of TMT Bunion Systems. . . . The tying market, by contrast, should comprise all suppliers that customers would look to for trauma service line products.").

open whether there are customers outside the United States to which Treace could sell its relevant products. Instead, the FAC focuses on the market for the purchase of TMT Bunion Systems – a market Treace's customers (not Treace) compete in and a market that can be bounded by FDA constraints.

As before, the FAC vaguely gestures towards unidentified foreign countries' "legal and regulatory requirements" without elaboration. (FAC ¶ 150; *see also* Dkt. 12-1 at 27-28 (citing Compl., Dkt. 1 at ¶ 147).) Treace has not alleged whether these laws and regulations prevent Treace, Defendants or any of the other identified TMT Bunion Systems competitors from offering their products outside the United States; assuming the answer is yes (though Treace does not allege as much), the FAC does not explain how Defendants have sales outside of the United States. (*See* FAC ¶ 150 (asserting that "a majority of Stryker's sales are in the United States"); *see also Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012) ("Emerge has made no effort to explain why the relevant market is limited to the United States, particularly where Synthes is alleged to be a 'multi-national corporation.'"). These questions remain as unanswered as they were when the Court last dismissed Treace's antitrust claims.

## II. TREACE STILL FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE UNDER NEW JERSEY LAW (COUNT XVI).

Under New Jersey law, tortious interference has four elements: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done

intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989)).

Intentional interference counts are common in antitrust complaints, and their dismissal as also-rans are common in antitrust cases. Here, as is typically the circumstance when the claims are dismissed along with the antitrust counts, the only qualifying "malicious" (intentional) conduct alleged in the FAC is the same conduct that purportedly supports Treace's antitrust allegations. As a result, as the antitrust counts go, so should the interference count. *Allergan*, 375 F. Supp. 3d at 558 (dismissing New Jersey interference claims because "as pled, the only improper conduct on which Plaintiff bases its claim for tortious interference is Defendants' alleged anticompetitive activity," which the court also dismissed). This was true of this Court's dismissal of the Complaint. (*See* Dkt. 75 at 7 ("Here, as in *Allergan*, the only improper conduct on which Plaintiff bases its claim for tortious interference is Defendants' alleged anticompetitive activity and as a result, because the Court is dismissing Plaintiff's antitrust counts, it also dismisses Plaintiff's tortious interference count.") (cleaned up).)

And as was true for the original Complaint, so here: there is no conduct alleged in the FAC beyond the insufficient antitrust allegations that could remotely

qualify as intentional interference. *Cf. Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, No. 14-4657, 2015 WL 1969380, at *7 (D.N.J. Apr. 29, 2015) (stating a "'bare recital that Defendants' alleged interference was carried out with "malice" falls short' of the required allegations to sustain a claim under this count") (citation omitted).

Treace's interference claim also fails for another, independent reason: Treace has once again failed to allege a protectable relationship or expectancy. *See, e.g.*, *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996) (articulating elements of a New Jersey interference claim, including the requirement that the plaintiff "allege facts that show some protectable right—a prospective economic or contractual relationship") (citation omitted). The FAC names four customers from which Defendants allegedly took some business from Treace. (*See* FAC ¶ 255.) But the FAC does not explain what Treace's contractual relationship is or was with any of them, the length of those contracts, why Treace had some expectancy that it would continue to do business with them, or what level of business it reasonably expected to have.

These conclusory allegations are similar to those rejected in the dismissed complaint in *Debjo*:

> Plaintiff provides a list of twenty-three school districts with which it had "agreements," but does not provide adequate specifics concerning these agreements. As an example of this deficiency, it is not clear whether any of these agreements were actual paying contracts. Plaintiff

36

also fails to identify the date any of these agreements became effective, so it is unclear whether any of these agreements predate the policy change. Given the ambiguity of Plaintiff's Amended Complaint, the Court finds that Plaintiff has failed to identify valid relevant contracts with reasonable specificity.

2015 WL 1969380, at *7 (citing *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012), which dismissed a tortious interference claim because plaintiffs failed to "allege [ ] adequate details about a specific contract"); *see also Dill v. Yellin*, 725 F. Supp. 3d 471, 488-89 (D.N.J. 2024) (stating that "a mere assertion that Plaintiff prevented Defendant from raising necessary funds is simply too speculative to qualify as a reasonable expectation") (cleaned up).

Just as in *Debjo* and the cases it relies upon, Treace's tortious interference claim has not been adequately pled and should be dismissed.

37

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court again dismiss Treace's antitrust and New Jersey state law claims in Counts XIII-XVI and strike the allegations that relate to these claims.[3] The FAC did not cure the failures in the original complaint. In fact, the FAC is even more deficient than the original complaint, and there is no reason to believe that a third bite at the apple will eliminate the fundamental problems with Treace's antitrust claims. Leave to amend will simply allow the market-leading industry incumbent to continue to extract significant costs on its smaller-shared rival without any change in result. As such, the Court should dismiss Treace's claims with prejudice. *See Reading Hosp.*, 2025 WL 2637233, at *10 (dismissing FAC with prejudice after the antirust plaintiff could not allege substantial foreclosure of any market).

---

[3]For the sake of clarity, those would include paragraphs 6, 12, 82, 133-277, and 667-717 of the FAC. *See, e.g.*, *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 615 (E.D. Pa. 2015) ("Federal Rule of Civil Procedure 12(f) permits a court to strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."); *Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 579 (E.D. Pa. 2017) (striking portions of a complaint after a partial dismissal).

Dated: December 3, 2025                    Respectfully submitted,

*Of Counsel* (*admitted pro hac vice*):    /s/*Liza M. Walsh*
                                           Liza M. Walsh
Corey W. Roush                             Katelyn O'Reilly
J. Matthew Schmitten                       Lauren R. Malakoff
SIDLEY AUSTIN LLP                          **WALSH PIZZI O'REILLY FALANGA LLP**
1501 K Street, N.W.                        Three Gateway Center
Washington, D.C. 20005                     100 Mulberry Street, 15th Fl
(202) 736-8000                             Newark, NJ 07102
corey.roush@sidley.com                     (973) 360-7900
jmatthew.schmitten@sidley.com              lwalsh@walsh.law
                                           koreilly@walsh.law
                                           lmalakoff@walsh.law
Taylor Randleman
SIDLEY AUSTIN LLP
787 Seventh Avenue                         *Attorneys for Defendants Stryker Corporation*
New York, NY 10019                         *and Wright Medical Technology, Inc.*
(212) 839-5915
taylor.randleman@sidley.com

Stephanie P. Koh
Rachel Zingg
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
(312) 853-7000
skoh@sidley.com
rzingg@sidley.com

Phillip M. Aurentz
Morgan Mendicino
SIDLEY AUSTIN LLP
1501 K Street, N.W.
2021 McKinney Ave. Ste. 2000
Dallas, TX 75201
paurentz@sidley.com
mmendicino@sidley.com