**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TREACE MEDICAL CONCEPTS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC., <br><br> *Defendants*. | Civil Action No. 24-9763 <br><br> **OPINION** <br><br> July 13, 2026 |

**SEMPER**, District Judge.

   **THIS MATTER** comes before the Court on Defendants Stryker Corporation ("Stryker") and Wright Medical Technology Inc.'s ("Wright") (collectively, "Defendants") Motion to Dismiss Counts XIII to XVI of Plaintiff Treace Medical Concepts, Inc.'s ("Treace" or "Plaintiff") First Amended Complaint (ECF 79, "First Amended Complaint" or "FAC"; ECF 89, "Motion" or "Mot.")  Plaintiff opposed the Motion.  (ECF 97, "Opposition" or "Opp.")  Defendants filed a reply.  (ECF 101, "Reply.")  The Court has decided this Motion upon the submissions of the parties, without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons stated below, Defendants' Motion to Dismiss Counts XIII, XIV, XV, and XVI of Plaintiff's First Amended Complaint is **GRANTED**.  Counts XIII, XIV, XV, and XVI of Plaintiff's First Amended Complaint are **DISMISSED** without prejudice.

1

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

A.  **Factual Background**

This matter arises from antitrust, tortious interference, and patent infringement claims brought by Plaintiff Treace against Defendants Stryker and Wright.  (*See generally* FAC.)

Plaintiff is a medical technology company that developed the Lapiplasty® 3D Bunion Correction System® ("Lapiplasty System"), which is a system of "instruments, implants, and surgical methods designed to surgically correct all three planes of bunion deformity and secure the unstable joint, addressing the bunion's root cause."  (*Id.* ¶ 3.)  The United States Patent and Trademark Office has awarded Plaintiff numerous patents related to this technology, including the following: U.S. Patent No. 9,622,805 (the "'805 Patent"); U.S. Patent No. 10,874,446 (the "'446 Patent"); U.S. Patent No. 11,039,873 (the "'873 Patent"); U.S. Patent No. 11,116,558 (the "'558 Patent"); U.S. Patent No. 11,602,386 (the "'386 Patent"); U.S. Patent No. 11,602,387 (the "'387 Patent"); U.S. Patent No. 11,911,085 (the "'085 Patent"); U.S. Patent No. 11,937,849 (the "'849 Patent"); and U.S. Patent No. 11,950,819 (the "'819 Patent") (collectively, the "Asserted Patents"). (*Id.* ¶ 4.)  The Asserted Patents were issued between July 15, 2014 and April 9, 2024.  (*Id.* ¶¶ 66-79.)

Defendant Stryker is a medical technology company which offers two similar products that also address bunion deformities: the ORTHOLOC™ 2 LapiFuse™ Triplanar Correction System ("LapiFuse System") and the PROstep® MIS Lapidus System ("PROstep System").  (*Id.* ¶¶ 8, 10,

---

[1] The Court incorporates by reference the factual background in its October 2, 2025 Opinion granting Defendants' motion to dismiss Plaintiff's original complaint.  (ECF 75, "Opinion" or "Op.")  Additional facts and procedural history are drawn from the First Amended Complaint (FAC) and documents integral to or relied upon by the First Amended Complaint.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  For the purposes of a motion to dismiss, the facts drawn from the First Amended Complaint are accepted as true.  *See Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

18, 151.)  Stryker also maintains the dominant market position in the service line for trauma products, such as implants, plates, screws, nails, staples, pins, rods, frames, wedges, and bone growth stimulators ("Trauma Service Line").  (*Id.* ¶ 134.)  The Trauma Service Line refers to technologies used to repair fractures and restore bone function when providing emergency medical treatment.  (*Id.* ¶ 157.)  Defendant Wright is a subsidiary of Stryker.  (*Id.* ¶¶ 9, 90.)

At issue here are Plaintiff's allegations that Defendants have used their dominant market power in other markets (specifically the Trauma Service Line) to stifle competition and increase prices for consumers in the market for tarsal-metatarsal ("TMT") bunion correction systems (the "TMT Bunion Systems Market") by engaging in anticompetitive marketing and bundling practices.  (*Id.* ¶¶ 133-92.)  Plaintiff specifically alleges that Defendants manipulate Integrated Delivery Networks ("IDNs")[2] to coerce hospital systems into purchasing their LapiFuse and PROstep Systems through bundled agreements, discounts, and rebates.  (*Id.* ¶ 134)  Plaintiff also alleges that Defendants "forc[e] hospitals to accept TMT Bunion Systems bundled with its Trauma Service Line, even though TMT Bunion Systems are not trauma products and even though neither TMT Bunion Systems nor other foot and ankle products have traditionally been included in bundled service line agreements at all, let alone within the Trauma Service Line."  (*Id.* ¶ 208.)

Plaintiff further claims that "Stryker has engaged in *de facto* tying by structuring its bundled service line rebates so as to effectively tie the Trauma Service Line . . . to the IDN's purchase of Stryker TMT Bunion Systems."  (*Id.* ¶ 218.)  Accordingly, "IDNs are induced to purchase all, substantially all, or significantly more of the Stryker TMT Bunion Systems than they

---

[2] IDNs are groups of healthcare providers, such as hospitals and ambulatory surgical centers, that collectively provide customer care for many types of procedures and healthcare needs.  (*See id.* ¶ 135.)  IDNs maintain administrative purchasing departments which contract with medical equipment suppliers; the contracts license medical suppliers to provide their products to the IDN's departments and surgeons.  (*Id.* ¶ 136.)

would otherwise purchased based on their quality and/or price relative to the Lapiplasty® System." (*Id.*)  Plaintiff concludes that IDNs are effectively "penalized for purchasing the Lapiplasty® System or any other competitive systems." (*Id.*)  Plaintiff also claims that Stryker has engaged in "unlawful exclusive dealing and *de facto* exclusive dealing by conditioning its Trauma Service Line rebates on an IDN's agreement to include Instrumented TMT Bunion Systems in its trauma bundles." (*Id.* ¶ 219.)

### B. Procedural History

Plaintiff initiated this action against Defendants on October 14, 2025.  (ECF 1, "Complaint.")  Defendants filed their first motion to dismiss Counts XIII to XVI of Plaintiff's Complaint on January 24, 2025. (ECF 12.)  This Court granted Defendants' motion on October 2, 2025.  (ECF 75, "Opinion" or "Op.")  Plaintiff filed its First Amended Complaint on October 24, 2025, alleging twelve (12) patent infringement claims and violations of Section 1 of the Sherman Act (Count XIII), Section 3 of the Clayton Act (Count XIV), unlawful restraint of trade under the New Jersey Antitrust Act (Count XV), and unlawful interference with prospective economic advantage (Count XVI).  (FAC ¶¶ 278-717.)  Defendants filed a Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 3, 2025. (Mot.)  Plaintiffs opposed the Motion on January 6, 2026.  (Opp.)  Defendants filed a reply on January 27, 2026.  (Reply.)

### II. LEGAL STANDARDS

#### A. Rule 12(b)(6)

Federal Rule of Civil Procedure Rule 12(b)(6) permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state

a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorably to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

### B. Antitrust Standing

"For plaintiffs suing under federal antitrust laws, one of the prudential limitations is the requirement of 'antitrust standing.'" *Ethypharm S.A. France v. Abbot Labs.*, 707 F.3d 223, 232 (3d Cir. 2013) (citing *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998)). Courts may dismiss antitrust claims where plaintiffs fail to sufficiently plead antitrust standing. *See Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249 n.6 (3d Cir. 2022) ("[W]e can

dismiss solely for lack of antitrust standing."); *see also W. Penn Power Co.*, 147 F.3d at 269 (affirming the district court's dismissal of a plaintiff's antitrust claims for failure to establish antitrust standing, specifically antitrust injury).  In determining whether a plaintiff has antitrust standing, the reviewing court must consider:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Abbot Labs.*, 707 F.3d at 232-33 (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 114, 1165-66 (3d Cir. 1993)).  "The second factor, antitrust injury, 'is a necessary but insufficient condition of antitrust standing.'"  *Id.* at 233 (citing *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)).  A court need not address the remaining factors if antitrust standing is lacking.  *See id.*

Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  "The Third Circuit requires that an allegation of antitrust injury reflect the challenged activity's anti-competitive effect on the competitive market and that the allegedly anticompetitive conduct harmed the competitive landscape and not just [the] [d]efendant." *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 468 (D.N.J. 2023); *see Brunswick Corp.*, 429 U.S. at 489 ("The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) ("We have consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an

6

antitrust injury unless the activity has a wider impact on the competitive market."). The challenged conduct must affect, and an antitrust plaintiff's injury must derive from, "the prices, quantity, or quality of goods or services, not just [the plaintiff's] own welfare." *See Host Int'l, Inc.*, 32 F.4th at 250 (quoting *Matthews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)); *McLoughlin v. Cantor Fitzgerald L.P.*, 162 F.4th 378, 388 (3d Cir. 2025).

### III.    ANALYSIS

#### A.  The First Amended Complaint Fails to Establish Antitrust Injury.

Defendants argue that Plaintiff's First Amended Complaint fails to establish antitrust injury because it does not "describe any decrease in competition." (Mot. at 11.) According to Defendants, Plaintiff's allegations about its loss of business concern only harm to its own bottom line, (*id.* at 11-13), and Plaintiff's allegations of harm to broader competition fail because they are conclusory. (*Id.* at 14.) Defendants also argue that the First Amended Complaint otherwise fails to establish the remaining elements of antitrust standing. (*Id.* at 16.) In opposition, Plaintiff argues that it has sufficiently pled harm to competition, establishing antitrust injury. (Opp. at 5.) Plaintiff argues that Defendants' allegedly anticompetitive practices have reduced consumer choice, harmed product quality, and increased prices. (*Id.* at 8-10.) Plaintiff also argues that its allegations of harm to competition are not conclusory, (*id.* at 16), and that its First Amended Complaint adequately pleads the remaining elements of antitrust standing. (*Id.* at 19.)

To prove that it has suffered an antitrust injury, Plaintiff must establish that (1) it suffered the type of injury the antitrust laws were designed to prevent (here, that Defendants' conduct has harmed competition in the TMT Bunion Systems Market), and that (2) its injury "flow[s] from the unlawful nature of [D]efendants' acts." *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 534 (D.N.J. 2004); *Host Int'l, Inc.*, 32 F.4th at 249-50. But in its First Amended Complaint, Plaintiff

again fails to plead specific facts alleging that Defendants' act of bundling their TMT Bunion Systems with their Trauma Service Line has harmed competition in the TMT Bunion Systems Market.

In its First Amended Complaint, Plaintiff continues to make conclusory allegations about the impact of Defendants' conduct on price, quantity, and quality. (*See, e.g.*, FAC ¶ 199 ("Stryker's anticompetitive acts have not only harmed the competitive process in the TMT Bunion Market, but have harmed purchasers and patients in the form of higher prices and lower quality surgical devices."); *id.* ¶ 221 ("As a result of Stryker's anticompetitive acts, the competitive process is harmed and thousands of surgeons will not have access to superior, higher quality, and more cost-effective products that deliver proven clinical results to patients."); *id.* ¶ 229 ("Stryker's conduct forecloses competition, denies IDNs the choice of, and access to, better and more cost-effective surgical devices, and harms consumers in the form of ultimately higher prices and lower quality surgical devices."); *id.* ¶ 244 ("Stryker's actions have damaged the market for TMT Bunion Systems by foreclosing a substantial portion of that market from competition, resulting in pricing distortions, reduced product quality, and damage to the competitive process."); *id.* ¶ 245 ("If competitors such as Treace Medical were able to compete with Stryker on the merits of price and quality of TMT Bunion Systems, Stryker's pricing for the Stryker TMT Bunion Systems would be reduced."); *id.* ¶ 246 ("Stryker's anticompetitive conduct has resulted in fewer product choices for surgeons and patients being forced to use inferior products with inferior support.").)

Plaintiff provides no concrete factual assertions demonstrating that Defendants' conduct has led to an increase in price, decrease in quantity, or decrease in the quality of TMT Bunion

8

Systems in the TMT Bunion System Market.[3] *Cf. BanxCorp v. Bankrate, Inc.*, No. 07-3398, 2008 WL 5661874, at *9 (D.N.J. July 7, 2008) (finding that a plaintiff pled antitrust injury both to itself and to general competition in the market when it alleged "that as a result of [Defendant's] purported illicit conduct, its 'market share and consequential revenues have declined at a rate of approximately 25% annually, year after year, for the last four years'"); *Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 494-95 (D.N.J. 2015) (finding antitrust injury in the form of increased prices where a plaintiff alleged that "between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent").

As Defendants note, the injuries Plaintiff does plead with particularity pertain solely to Plaintiff's welfare, not the broader competitive market. (*See* Mot. at 12-14.) And courts in this Circuit have consistently held that a plaintiff "fails to adequately plead antitrust injury [when] it only alleges injury to itself, not to competition in the relevant market." *See AlphaCard Sys. LLC v. Fery LLC*, No. 19-20110, 2021 WL 2190901, at *2 (D.N.J. May 31, 2021); *Eichorn*, 248 F.3d at 140; *Miller Indus. Towing Equip. Inc.*, 659 F. Supp. 3d at 468. For example, Plaintiff alleges that it "has incurred losses that flow directly from Stryker including TMT Bunion Systems with its Trauma Service Line in its agreements with IDN purchasers," (FAC ¶¶ 677, 687, 692, 703), noting that it is "obtaining fewer sales than it would in an efficient market undistorted by Stryker's anticompetitive practices." (*Id.* ¶ 260.) And while it is true that "reduced consumer choice

---

[3] The Court also notes that Plaintiff appears to concede that the TMT Bunion System Market remains competitive throughout its First Amended Complaint. (*See, e.g.*, FAC ¶ 186 ("The TMT Bunion Market is fiercely competitive both in terms of sales to end purchasers and in terms of legal disputes."); *id.* ¶ 188 ("The competitiveness of the TMT Bunion Market is demonstrated by Treace Medical's own performance.").)

constitutes antitrust injury when caused by anticompetitive practices," *see Deborah Heart and Lung Ctr. v. Penn Presbyterian Medical Ctr.*, 2011 WL 6935276, at \*7 (D.N.J. Dec. 30, 2011); *In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at \*14 (D.N.J. Oct. 29, 2015), Plaintiff's allegations about consumer choice pertain to its own harm and its own product, not a limitation of consumer choice in the broader TMT Bunion System Market. (*See* FAC ¶¶ 208, 255 (noting that "Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System" did not purchase Plaintiff's Lapiplasty System because of Defendants' conduct); *id.* ¶¶ 215, 246 (noting that around 12 surgeons were unable to use Plaintiff's Lapiplasty System due to Defendants' conduct).)

Plaintiff's conclusory assertions are therefore "insufficient to state an antitrust injury." *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, (D.N.J. 1999) ("Allegations that [the defendant] suppressed or reduced competition in the leveraged market are the type of conclusory allegations … that are insufficient even at the pleading stage." (internal quotations and citations omitted)); *AlphaCard Sys. LLC*, 2021 WL 2190901, at \*3; *Iqbal*, 556 U.S. at 678; *Baraka*, 481 F.3d at 211. Counts XIII, XIV, and XV of the First Amended Complaint are thus **DISMISSED** without prejudice. *See Verify Smart Corp. v. Bank of America, N.A.*, No. 17-4248, 2019 WL 1594474, at \*13 (D.N.J. Apr. 15, 2019) (dismissing a plaintiff's antitrust claims for failure to establish antitrust injury).

### B. Treace's Tortious Interference Claim

Defendants argue that Plaintiff's tortious interference claim fails because "the only qualifying 'malicious' (intentional) conduct alleged in the FAC is the same conduct that purportedly supports Treace's antitrust allegations," which should be dismissed, and Plaintiff fails to allege a protectable relationship or expectancy. (Mot. at 34-36.) Plaintiff argues that

10

Defendants' intentional and malicious interference is demonstrated by its anticompetitive scheme, "Target Treace campaign," and "false and misleading conduct with surgeons and hospitals." (Opp. at 38-39.)   Plaintiff also argues that it has sufficiently alleged a protectable relationship or expectancy. (*Id.* at 39.)

"[A]s a matter of law, tortious interference can cover wrongful conduct other than antitrust activity." *Id.*  However, while Plaintiff argues in its Opposition brief that Defendants intentionally and maliciously interfered in its prospective economic advantage via actions separate from the alleged anticompetitive scheme, (Opp. at 38-9), "the only improper conduct on which Plaintiff bases its claim for tortious interferences" in its First Amended Complaint "is Defendants' alleged anticompetitive activity." *See Allergen, Inc.*, 375 F. Supp. 3d at 558.  Plaintiff pleads its allegations that Defendants "target[ed] specific IDNs where surgeons were using the Lapiplasty® System under agreements with IDNs or where Treace Medical had contacts or was bidding on contracts; monitor[ed] Treace Medical procedures to enlist IDN staff to push the bundled Stryker products; and deceptively promis[ed] illusory discounts to induce hospitals to exclude the Lapiplasty® System," (FAC ¶ 711), as examples of Defendants' alleged anticompetitive activity. (*See e.g.*, *id.* ¶ 207 ("Treace Medical sales representatives reported that surgeons requesting to perform surgeries using the Lapiplasty® System were being refused by IDNs due to TMT Bunion Systems being included within Trauma Service Line bundled agreements with Stryker."); *id.* ¶ 241 ("[The] public Stryker advertisement evidences the false narrative that, on information and belief, Stryker has employed with IDN staff to make incorrect and false comparisons with 'Lapiplasty®,' in support of bundling with unrelated trauma products[.]"); *id.* ¶ 223 ("Given the breadth and importance of the Trauma Service Line to all IDNs, the size of the discount that would be endangered by permitting the use of non-Stryker TMT Bunion Systems is enormous to the IDN,

11

and from the IDN's perspective, far outweighs any increase in quality or price concession that Treace Medical could hope to offer.").)  Thus, "[a]s a result, because the Court is dismissing Plaintiff's antitrust counts, it also dismisses Plaintiff's tortious interference count." *See Allergen, Inc.*, 375 F. Supp. 3d at 558; *Sandoz Inc. v. United Therapeutics Corp.*, No, 19-10170, 2022 WL 17335696, at *18 (D.N.J. Mar. 30. 2022); (Op. at 7.)  Count XVI of Plaintiff's First Amended Complaint is therefore **DISMISSED** without prejudice.

### IV.    CONCLUSION

For the reasons stated above, this Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.  Counts XIII, XIV, XV, and XVI of Plaintiffs' First Amended Complaint are **DISMISSED** without prejudice.  An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:       Clerk
cc:         Michael A. Hammer, U.S.M.J.
            Parties