**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TREACE MEDICAL CONCEPTS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>STRYKER CORPORATION and WRIGHT MEDICAL TECHNOLOGY, INC.,<br><br>*Defendants*. | Civil Action No. 24-9763<br><br>**OPINION**<br><br>November 12, 2026 |

**SEMPER**, District Judge.

**THIS MATTER** comes before the Court by way of a joint application for claim construction pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), presented by Plaintiff Treace Medical Concepts, Inc. ("Treace Medical" or "Plaintiff") and Defendants Stryker Corporation ("Stryker") and Wright Medical Technology Inc. ("Wright") (collectively, "Defendants"). The Court held a *Markman* hearing on May 21, 2026. (ECF 122; ECF 134, "Transcript" or "Tr.") This Opinion sets forth the Court's construction of the disputed claim terms.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

The patent infringement claims at issue involve surgical systems for the correction of bunions. (*See* ECF 141, "Second Amended Complaint" or "SAC.") Plaintiff Treace Medical is the United States' "leading" designer, developer, and manufacturer of bunion corrections systems. (*Id.* ¶ 28.) At issue here is Plaintiff's tarsal-metatarsal ("TMT") bunion correction innovation,

comprised of the Lapiplasty® 3D Bunion Correction® System ("Lapiplasty System") and Lapiplasty® Procedure ("Lapiplasty Procedure"), for which Plaintiff owns U.S. Patent Nos. 9,622,805 (the "'805 Patent"); 10,874,446 (the "'446 Patent"); 11,039,873 (the "'873 Patent"); 11,116,558 (the "'558 Patent"); 11,602,386 (the "'386 Patent"); 11,602,387 (the "'387 Patent"); 11,911,085 (the "'085 Patent"); 11,937,849 (the "'849 Patent"); and 11,950,819 (the "'819 Patent") (collectively, the "Asserted Patents"). (*Id.* ¶¶ 4, 28, 37; ECF 96-6, "'805 pat."; ECF 96-7, "'446 pat."; ECF 96-8, "'873 pat."; ECF 96-9, "'558 pat."; ECF 96-10, "'386 pat."; ECF 96-11, "'387 pat."; ECF 96-12, "'085 pat."; ECF 96-13, "'849 pat."; ECF 96-14, "'819 pat.")[1]

Defendant Stryker is a medical technology company which offers two similar products that also address bunion deformities: the ORTHOLOC™ 2 LapiFuse™ Triplanar Correction System ("LapiFuse System") and the PROstep® MIS Lapidus System ("PROstep System"). (SAC ¶¶ 10, 12, 20, 211.) Defendant Wright is a subsidiary of Stryker. (*Id.* ¶ 11.) Plaintiff alleges that the LapiFuse System infringes at least nine Asserted Patents: the '805, '446, '873, '558, '386, '387, '085, '849, and '819 Patents. (*Id.* ¶ 72.) Plaintiff further alleges that the PROstep System infringes at least three Asserted Patents: the '386, '805, and '819 Patents. (*Id.*)

Bunions, scientifically known as hallux valgus deformities, are common forefoot problems and affect approximately 67 million Americans. (*Id.* ¶ 29.) A bunion is a deformity of the bone structures within the foot that occurs when an unstable joint in the middle of the foot causes a metatarsal bone on the big toe of the foot to rotate out of alignment. (*Id.* ¶¶ 29-30.) Bunions often require surgical intervention. (*Id.* ¶ 31.) Traditionally, bunions were treated by an osteotomy

---

[1] The United States Patent and Trademark Office ("USPTO") issued the '805 Patent on April 18, 2017, the '446 Patent on December 29, 2020, the '873 Patent on June 22, 2021, the '558 Patent on September 14, 2021, the '386 and '387 Patents on March 14, 2023, the '085 Patent on February 27, 2024, the '849 Patent on March 26, 2024, and the '819 Patent on April 9, 2024. (SAC ¶¶ 426, 461, 493, 528, 563, 616, 648, 717, 752.)

technique, which involved shaving off the bump and cutting and shifting the big toe's metatarsal bone, or by a "traditional Lapidus fusion," which involved fusing the unstable joint. (*Id.* ¶¶ 32-33.) However, both approaches produced mixed results. (*Id.* ¶ 31.)

In 2015, Plaintiff invented a technique, including instrumentation, implants, and procedures, which allowed surgeons to correct bunions in up to three anatomical planes and address the root cause of the deformity. (*Id.* ¶ 35.) More specifically, Plaintiff's Lapiplasty System is comprised of procedural instrumentation and implant kits that are used to surgically correct bunion deformities with the Lapiplasty Procedure. (*Id.* ¶ 28.) Plaintiff's technique involves realigning the entire metatarsal bone into its anatomical position in three planes and securing the unstable joint with fixation implants. (*Id.* ¶ 35.) Plaintiff alleges that its Lapiplasty System and Procedure is the first of its kind to allow surgeons to correct bunion deformities in all three anatomical planes. (*Id.* ¶ 37.) For example, the Lapiplasty System and Procedure can correct the alignment of the first metatarsal in the transverse, frontal, and sagittal planes. (*Id.* ¶¶ 39-40.)

The parties dispute and request claim construction of fifteen (15) terms across the Asserted Patents. Specifically, the parties dispute the following terms: (1) "bone positioning guide," (2) "guide surface," (3) "guiding surface," (4) "an anatomically misaligned position [with respect to a second metatarsal]," (5) "an anatomically aligned position [with respect to a second metatarsal]," (6) "an alignment … adjusting an alignment [of the first metatarsal relative to the first cuneiform]," (7) "a corrected alignment [relative to the first cuneiform]," (8) "bone engagement member," (9) "tip," (10) "a main body member," (11) "the bone positioning guide is fabricated from a radiolucent material," (12) "system," (13) "base," (14) "leg," and (15) "bridge."[2] (ECF 120,

---

[2] At the *Markman* hearing, the parties agreed to Defendants' alternative construction for the term "guide feature" in the '849 Patent. Defendants proposed an alternative construction for "guide feature" in the '849 Patent in their response brief: "a part of a cutting guide containing a guide

"Amended Joint Claim Construction and Prehearing Statement" or "Am. JCC.") The '805, '873, '558, '085, and '849 Patents are "directed to methods for performing TMT bunion correction surgery." (SAC ¶ 73.) The '446, '386, '387, and '819 Patents are "directed to instrumented TMT bunion correction apparatus or systems." (*Id.* ¶ 79.)

**B. Procedural History**

Plaintiff initiated this action, bringing both patent infringement and antitrust claims against Defendants, on October 14, 2024. (ECF 1.) Defendants filed their first motion to dismiss Plaintiff's antitrust claims on January 24, 2025. (ECF 12.) This Court granted Defendants' motion on October 2, 2025. (ECF 75.) Plaintiff filed its First Amended Complaint on October 24, 2025. (ECF 79.) Defendants filed their second motion to dismiss Plaintiff's antitrust claims on December 3, 2025. (ECF 89.) This Court granted Defendants' second motion on July 13, 2026. (ECF 135.) Plaintiff filed its Second Amended Complaint on August 12, 2026. (SAC.) Defendants filed their third motion to dismiss Plaintiff's antitrust claims on October 13, 2026. (ECF Nos. 163, 164.)

Concurrently, the parties submitted their initial Joint Claim Construction and Prehearing Statement on November 12, 2025, followed by opening *Markman* briefs on January 2, 2026, and responsive briefs on March 10, 2026. (ECF 84, "JCC"; ECF 95, "Defendants' Opening Brief" or "Defs. Br."; ECF 96, "Plaintiff's Opening Brief" or "Pl. Br."; ECF 108, "Defendants' Response Brief" or "Defs. Res. Br."; ECF 109, "Plaintiff's Response Brief" or "Pl. Res. Br.") The parties submitted an Amended Joint Claim Construction and Prehearing Statement on May 4, 2026. (Am. JCC.) The Court conducted a claim construction hearing on May 21, 2026. (ECF 122; Tr.) After the hearing, the Court ordered the parties to provide additional responsive briefing to a series of

---

surface." (Defs. Res. Br. at 12.) Plaintiff accepted this construction at the *Markman* hearing. (Tr. 48:15-49:3.) As such, the Court adopts this construction.

questions. (ECF 123.) The parties subsequently responded. (ECF 124; ECF 125; ECF 126; ECF 127.) This Opinion follows.

## II. LEGAL STANDARDS

### A. Claim Construction

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*Markman I*)). "[T]he meaning and scope of patent claims are questions of law to be decided by the Court." *Pacira Pharms., Inc. v. eVenus Pharms. Lab'ys, Inc.*, No. 22-718, 2023 WL 3841559, at *2 (D.N.J. Jun. 6, 2023) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) (*Markman II*)). Courts rely on both intrinsic and extrinsic evidence when determining the proper construction of a patent claim. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

#### 1. Intrinsic Evidence

Courts must "look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Id.* When evaluating intrinsic evidence, courts first "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *See id.*; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004))). The words of a claim are given their "ordinary and customary meaning." *See Vitronics Corp.*, 90 F.3d at 1582. "[T]he ordinary and customary meaning of a claim term is the

meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1313. However, as this Court has noted, there are two exceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Parcia Pharms.*, 2023 WL 3841559, at *3 (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). "A patentee acts as lexicographer where it 'clearly set[s] forth a definition of the disputed claim term,' and 'clearly express[es] an intent to define the term.'" *Id.*

Second, courts "review the [patent] specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics Corp.*, 90 F.3d at 1582. Patent claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman I*, 52 F.3d at 979). The specification may "act[] as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* at 1321 (quoting *Vitronics Corp.*, 90 F.3d at 1582). The specification "is the single best guide to the meaning of a disputed term." *Id.* at 1315.

"Third, the court may also consider the prosecution history of the patent, if in evidence." *Id*. The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark office, including any express representations made by the applicant regarding the scope of the claims." *Id.* This history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

### 2. Extrinsic Evidence

Courts may also rely on extrinsic evidence, which "consists of all evidence external to the

patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman I*, 52 F.3d at 980. The Federal Circuit has observed that technical dictionaries and treatises "can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *See Phillips*, 415 F.3d at 1318. However, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of disputed claim language.'" *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). Extrinsic evidence "may not be used to 'vary[]' or 'contradict[]' the terms of a claim, and it should be discounted where 'clearly at odds with the [intrinsic evidence].'" *Pacira Pharms., Inc.*, 2023 WL 3841559, at *3 (quoting *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)). Courts should not rely on extrinsic evidence if an analysis of the intrinsic evidence resolves the ambiguity in the disputed claim terms. *See Vitronics Corp.*, 90 F.3d at 1583.

**B. Person of Ordinary Skill in the Art ("POSA")**

While courts in this District typically determine "the level of skill that a POSA possessed at the time of the invention" before performing a claim construction analysis, *Cambria Co. LLC v. Hirsch Glass Corp.*, No. 21-10092, 2022 WL 4031422, at *3 (D.N.J. Sept. 2, 2022) (citing *Supernus Pharm., Inc. v. Actavis, Inc.*, No. 14-6102, 2016 WL 901837, at *2 (D.N.J. Mar. 9, 2016)), they also refrain from resolving disputes over POSA definitions where the outcome does not affect their claim construction analysis. *See Arbutus Pharma Corp. v. Pfizer, Inc.*, No. 23-1876, 2025 WL 2603612, at *2 n.1 (D.N.J. Sept. 9, 2025) (court not deciding POSA issue where parties conceded that it would not impact claim construction); *Janssen Prods., L.P. v. eVenus Pharms. Laby's Inc.*, No. 20-9369, 2022 WL 1044970, at *2 n.3 (D.N.J. Apr. 7, 2022) (same);

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 760 F. Supp. 3d 184, 196 (D.N.J. 2024) (same).

The parties here present different definitions of a POSA. Plaintiff defines a POSA as:

> (1) an engineer with a Bachelor of Science or equivalent in biomedical, biomechanical, or mechanical engineering and at least three to five years experience designing orthopedic or podiatric implants and instruments;
> (2) a podiatric surgeon with a podiatric medical degree (DPM) and one to two years of post-residency practice using, designing, or developing foot/ankle surgical implants and/or instruments; or
> (3) an orthopedic surgeon with a medical degree (MD, DO) having completed an orthopedic residency, at least one year of a foot and ankle fellowship, and at least one to two years of practice using, designing, or developing foot/ankle surgical implants and/or instruments.

(Pl. Br. at 2.) Defendants define a POSA as having:

> At least a bachelor's degree in engineering with at least two years of experience in the field, such as experience with the design of surgical implants or devices, or would have been a clinical practitioner with a medical degree and at least two years of experience as an orthopedic or podiatric surgeon.

(Defs. Br. at 4.) However, while Defendants disagree with Plaintiff's proposed definition, they concede that any differences in POSA definition are not meaningful, as they argue that their proposed constructions are correct under either definition. (*See* Defs. Res. Br. at 19.) Meanwhile, Plaintiff presents no objection to Defendants' proposed definition. (*See* Pl. Res. Br.) As such, the Court will not resolve the POSA dispute at this stage. *See Arbutus Pharma Corp*, 2025 WL 2603612, at *2 n.1; *Janssen Prods., L.P.*, 2022 WL 1044870, at *2 n.3; *Janssen Pharms., Inc.*, 760 F. Supp. 3d at 196.

## III. <u>ANALYSIS</u>

The parties request construction of the following terms across the Asserted Patents: "bone positioning guide," "guide surface," "guiding surface," "an anatomically misaligned position [with respect to a second metatarsal]," "an anatomically aligned position [with respect to a second metatarsal]," "an alignment … adjusting an alignment [of the first metatarsal relative to the first

cuneiform]," "a corrected alignment [relative to the first cuneiform]," "bone engagement member," "tip," "main body member," "the bone positioning guide is fabricated from a radiolucent material," "system," "base," "leg," and "bridge." (*See* Am. JCC.) The Court addresses each term in turn after considering the parties' claim construction briefs, supplemental letters, applicable statutory and case law, and argument during the May 21, 2026 *Markman* hearing.

As described below, the Court adopts Plaintiff's proposed construction of "bone positioning guide," "guide surface" and "guiding surface" in the '849 Patent, and "the bone positioning guide is fabricated from a radiolucent material." The Court adopts Defendants' proposed construction of "guide surface" in the '387 Patent, "bone engagement member," "tip," and "system." Finally, the Court adopts its own construction of the term "main body member." At this stage, the Court does not construct the terms "an anatomically aligned position [with respect to a second metatarsal]," "an anatomically misaligned position [with respect to a second metatarsal]," "an alignment…adjusting an alignment," "a corrected alignment," "base," "leg," and "bridge."

**A. The "Guide" Terms**

**1. "Bone Positioning Guide"**

The parties dispute the construction of the term "bone positioning guide" as found in claim 9 of the '805 Patent, claims 1-4, 6, 8-12, 18, 21-25, and 28-30 of the '446 Patent, claims 1, 4, 12-13, 25, and 28-29 of the '873 Patent, claims 1, 13, 15-16, and 27-29 of the '558 Patent, claims 1-8, 10-12, 16-19, 24-28, and 30 of the '386 Patent, claims 1, 3, 6, and 17-18 of the '387 Patent, claims 1, 4-5, 11, 13-16, 18, 20-22, 24-25, and 29 of the '085 Patent, and claims 1-2, 6-7, 13, and 16-17 of the '819 Patent. (Pl. Br. at 4-5.) Plaintiff's proposed construction for the term is "a device specifically designed to regulate or direct the progressive motion of a bone being

repositioned," and Defendants' proposed construction is "a device that positions bones." (*Id.* at 4; Defs. Br. at 4.)

The Court notes that the parties agreed to a construction of a "bone positioning device" as "[a] device that positions bones" in the '849 Patent. (*See* Am. JCC, Ex. A at 3.) Thus, the critical issue here is whether "bone positioning guide" and "bone positioning device" are interchangeable terms, or whether a "bone positioning guide" is distinct from a "bone positioning device." For the reasons set forth below, the Court concludes that the intrinsic and extrinsic evidence support Plaintiff's proposed construction of "bone positioning guide."

**i. Intrinsic Evidence**

The Court first looks to the intrinsic evidence, and within that, the language of the patent claims themselves. *See Vitronics Corp.*, 90 F.3d at 1582. The claims describe a "bone positioning guide" as an entity that directs the movement of a bone being repositioned, or "positions bones." (*See, e.g.*, '805 pat. at cl. 9 ("[a] method of correcting a bunion deformity, comprising the steps of … moving, with a bone positioning guide having a bone engagement member engaged with a first metatarsal and a tip contacting a metatarsal other than the first metatarsal … the first metatarsal from an anatomically misaligned position …."); '873 pat. at cl. 1 ("[a] method of correcting a bunion deformity … comprising … moving the first metatarsal using a bone positioning guide having a bone engagement member engaged with the first metatarsal … wherein moving the first metatarsal using the bone positioning guide comprises moving the first metatarsal using the bone positioning guide in at least two planes ….").)

However, the claims do not make obvious that "bone positioning guide" and "bone positioning device" describe interchangeable structures. Instead, the claim terms suggest that, while a "bone positioning device" may contain a "bone engagement member" that directly applies

force to a bone, a "bone positioning guide" engages, or directs, a "bone engagement member," but does not necessarily apply force itself. (*See id.*; '873 pat. at cl. 1 ("moving the first metatarsal using a bone positioning guide having a bone engagement member engaged with the first metatarsal …")); *Phillips*, 415 F.3d at 1313. In other words, the claims describe a "bone positioning guide" guiding a "bone engagement member," which itself moves bones. (*See, e.g.*, '386 pat. at cls. 1, 2 (describing how the "bone positioning guide" causes the "bone engagement member" and "tip" to move toward each other, "causing the first metatarsal to move …").)

Further, "bone positioning guide" and "bone positioning device" do not appear in the same patent claims, nor are they used interchangeably within them. *But cf. Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017) (concluding that a patent's claims used the words "emit" and "transmit" interchangeably where one claim described a "transmitter" that both "emitt[ed]" a pressure transmitting signal to a receiver and "transmitted" an identification signal to the same receiver); *Bid for Position, LLC v. AOL, LLC*, 601 F.3d 1311, 1317-18 (Fed. Cir. 2010) (concluding that a patent's claim used the terms "bid" and "value of the bid" interchangeably where it recited "checking for whether a first bid from the first bidder exceeds a second bid from the second bidder," where the bidders' relative positions were "dependent on whether the value of the first bid exceeds the value of the second bid"). The language of the claims indicates that "bone positioning guide" is distinct from a "bone positioning device" and supports Plaintiff's proposed construction.

The patent specification also supports Plaintiff's proposed construction of "bone positioning guide" as directing the movement of a bone, and as being distinct from a "bone positioning device" which itself positions bones. For example, the specification describes the bone positioning guide as more narrowly "*regulate*[ing] or *direct*[ing] the progressive motion of a bone

being repositioned," as opposed to always positioning the bone itself. (Pl. Br. at 4; *see* '805 pat. at 4:31-33 ("The bone positioning guide 10 can be useful for positioning a bone (e.g., orientating and/or translating) during a medical procedure."); '873 pat. at 9:64-10:3 ("A specific embodiment of a method … includes the steps of engaging a bone engagement member with a first bone, placing a tip of the bone positioning guide in apposition to a second bone … and moving the bone engagement member with respect to the tip to change the position of the first bone …..).)

The patent specification further indicates that "guide" and "device" are separate structures, and that a "device" encompasses a "guide." For example, it notes that "[t]he bone preparation guide can be provided with a bone positioning guide, or either device can be provided or used independently." (*See, e.g.*, '805 pat. at 7:8-11; '446 pat. at 7:64-67; '387 pat. at 7:23-26.) The specification suggests that, while a "bone positioning guide" may be a type of "bone positioning device," a "bone positioning device," is not necessarily a "bone positioning guide."[3]

**ii. Claim Differentiation**

Plaintiff's proposed construction is also supported by the doctrine of claim differentiation. Under the doctrine of claim differentiation, different claim terms are presumed to have different meanings. *See Seachange Int'l., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) ("The doctrine of claim differentiation stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" (citing *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999))); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366 (Fed. Cir. 2000) ("Under the

[3] Defendants' examples support this conclusion. For example, Defendants point out that Figure 1 in the '805 Patent displays a "bone positioning guide," which is then described in Figure 2 as a "bone positioning device." (Defs. Br. at 7; *see* '805 pat. at 4:31-33, 5:7-8, Fig. 1, Fig. 2.) While this specification suggests a "bone positioning guide" is a type of "bone positioning device," it does not indicate that a "bone positioning device" is necessarily a "bone positioning guide."

doctrine of claim differentiation, two claims of a patent are presumptively of different scope."); *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings."). The presumption of claim differentiation is "overcome by a contrary construction dictated by the written description or prosecution history." *Seachange Int'l, Inc.*, 413 F.3d at 1369.

It thus follows that "bone positioning guide" and "bone positioning device," which appear in different claim terms, have different meanings. (*See* '805 pat. at cls. 5, 9.) And since the patent specification supports this construction, the presumption of claim differentiation applies. *See MacDermid Printing Sols., L.L.C. v. E.I. du Pont de Nemours & Co.*, No. 07-4325, 2010 WL 988653, at *7 (D.N.J. Mar. 15, 2010) (applying presumption of claim differentiation where the patent specification and prosecution history supported the differing meanings and scopes of the different claim terms).[4]

**iii. Extrinsic Evidence[5]**

Finally, the extrinsic evidence supports Plaintiff's construction, and more significantly, Plaintiff's argument that "bone positioning guide" and "bone positioning device" are not interchangeable structures. (Pl. Res. Br. at 3.) As discussed, Courts may rely on extrinsic evidence

[4] Defendants' reliance on *Edwards* to argue that "[a] patent's consistent and clear interchangeable use of two terms can result in a definition equating the two terms" is unavailing, because, as discussed, the Court concludes that "bone positioning guide" and "bone positioning device" are not used interchangeably across the relevant patents. (*See* Defs. Res. Br. at 4); *see Aortic Innovations LLC v. Edwards Lifesciences Corp.*, 159 F.4th 1, 8 (Fed. Cir. 2025). Therefore, the doctrine of claim differentiation applies.

[5] The parties address only the patents' prosecution histories with respect to the claim "the bone positioning guide is fabricated from a radiolucent material." (*See* Pl. Br. at 31-32; Defs. Br. at 23, 26-27; Pl. Res. Br. at 27-29; Defs. Res. Br. at 30.) As such, the Court considers only the patents' prosecution histories when reviewing the parties' proposed constructions for that claim.

such as dictionaries and treatises to further understand the meaning of patent claims so long as they do not contradict the intrinsic evidence. *See Markman I*, 52 F.3d at 980; *Pacira Pharms., Inc.*, 2023 WL 3841559, at *3. Plaintiff's proffered dictionary definitions indicate that "guides" are a subset of, but not necessarily interchangeable with, "devices." (Pl. Br. at 7, Ex. 16 (defining "guide" as "a device that regulates or directs progressive motion or action").) The extrinsic evidence is consistent with the intrinsic evidence and Plaintiff's proposed construction.[6]

**2. "Guide Surface" in the '387 Patent**

The parties dispute the construction of the term "guide surface," found in claims 1, 8, and 12 of the '387 Patent. Plaintiff's proposed construction is "a portion of a bone preparation or cutting guide that regulates or directs the progressive motion of a tissue removing instrument and/or cutting tool," whereas Defendants' is "an enclosed surface of the bone preparation guide that abuts a tissue removing instrument to guide cutting of a bone." (Pl. Br. at 5; Defs. Br. at 29.) The Court adopts Defendants' proposed construction of "guide surface" in the '387 Patent.

The intrinsic evidence supports Defendants' proposed construction. The claim language and patent specification indicate, and the parties do not dispute, that "guide surface" is a component of a "bone preparation guide" that directs a tissue removing instrument or cutting tool. (*See* Defs. Br. at 29-30 ("The parties are in general agreement about what the guide feature/guide surface/guiding surface does in the '387 patent … it guides or directs the cutting of bone."); '387 pat. at cl. 1 ("A metatarsal correction system comprising a bone preparation guide comprising a

[6] In response to questions posed by this Court after the *Markman* hearing, Plaintiff offered additional excerpts from the 2013 edition of McGlamry's Comprehensive Textbook of Foot and Ankle Surgery as extrinsic evidence indicating that "bone positioning device" and "bone positioning guide" are not interchangeable. (*See* ECF 125.) Defendants oppose this Court's consideration of Plaintiff's new evidence on the basis that they lacked an opportunity to respond. (*See* ECF 126.) Given that the Court was able to construct the term at issue without this evidence, the Court does not consider the parties' arguments at this time.

body defining a guide surface configured to be positioned over an end of a bone, the guide surface being configured to guide a tissue removing instrument for cutting the end of the bone . . . ."); *id.* at 12:18-22 ("In some embodiments, the end of the first metatarsal 210 facing the medical cuneiform 220 can be prepared with a tissue removing instrument 296 guided by a guide surface of bone preparation guide . . . ."); *id.* at 12:31-34 (same).)

As Defendants note, the dispute lies in what form the "guide surface" takes—specifically, whether a "guide surface" is an "enclosed surface." (*See* Defs. Br. at 30.) The Court starts with the language of the claims themselves. *See Vitronics Corp.*, 90 F.3d at 1582. Claims 1 and 8 do not describe the form of a "guide surface," let alone indicate whether a "guide surface" is an "enclosed surface." (*See* '387 pat. at cl. 1 (described above); *id.* at cl. 8 ("[T]he guide surface comprises a first guide surface and second guide surface, the first guide surface being configured to be positioned over the first metatarsal . . . .").) However, claim 12 provides some instruction on form, describing a "guide surface" as being surrounded or enclosed by a "facing surface," forming a slot. (*See id.* at cl. 12 ("the bone preparation guide further comprises a facing surface spaced from the guide surface to define a guide slot").)

The patent specification supports Defendants' contention that a "guide surface" is an "enclosed surface." Specifically, Figures 5, 6A, 6B, and 22 show a "'guide surface' as the edge of an enclosed cutting slot formed by paired guide surfaces 160/164 and adjacent facing surfaces 166/168 of the bone preparation guide." (*See* Defs. Br. at 30.) "Guide surfaces" are labeled with the numbers 160 and 164 in the figures below.

Fig. 5


184
150
178
180
168
174
164
170
154
166
160
172
176
180
182

Fig. 6A


188
192
194
196
150
154
190
198


194
154
TMC
LOT #
PATENT
PENDING
150

Fig. 6B

Fig. 22


296
270
270
150
20
10
220
210
200

The written descriptions also support this construction. (*See, e.g.*, '387 pat. at 7:44-48 ("the distance between the first guide surface and the first facing surface defines a first guide slot, and the distance between the second guide surface and the second facing surface defines a second guide slot" (describing Figure 5)); *id.* at 12:30-35 ("the end of the medial cuneiform 220 facing the first metatarsal 210 can be . . . (e.g., inserted through a slot defined by a second guide surface and a second facing surface)." (describing Figure 22)).) Put simply, the specification supports a construction of "guide surface" where it "operates as one wall of a of a slot that confines the cutting tool within a defined plane." (*See* Defs. Res. Br. at 8.)

Plaintiff contends that its proposed construction is supported by the doctrine of claim differentiation and the Federal Circuit's directive against reading a limitation from a patent specification into the claims. (Pl. Br. at 11-12; Tr. 31:19-34:2.) But while it is true that "presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim," this presumption can be overcome "if the evidence favoring a different claim construction is strong." *See Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009) ("[C]laim differentiation is a rule of thumb that does not trump the clear import of the specification."). Here, Plaintiff argues that Defendants impermissibly read a limitation found in a dependent claim (claim 12)—that a "guide surface" is somehow enclosed by an opposite surface, forming a slot—into the independent claim (claim 1), rendering claim 12 superfluous. (*See* Pl. Br. at 11). But, as in *Cook*, the written descriptions and figures in the patent specification consistently portray the "guide surface" as an enclosed surface that confines the cutting instrument, or, in other words, operates as one wall of a slot that confines the cutting instrument. (*See* '387 pat. at Figures 5, 6A, 6B, and 22; *id.* at 7:44-48, 12:30-35); *see Cook Inc.*,

582 F.3d at 1331-32 (holding that the claimed graft devices must have wires because "every embodiment described in the specification and shown in the drawings includes wires"). As such, the Court disagrees with Plaintiff and concludes that the doctrine of claim differentiation and the presumptions that come with it are overcome by the patent specification.

Finally, with respect to reading limitations into patent claims, courts in this District have noted that a "specification may make clear that the claimed invention has a narrower scope than otherwise implied by the claim language." *See Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.*, 346 F. Supp. 3d 643, 664 (D.N.J. 2016). As discussed, the patent specification makes clear that "guide surface" is an enclosed surface, and is therefore narrower in scope than the language of claim 1 implies.

**3. "Guide surface" and "Guiding surface" in the '849 Patent**

The parties dispute the construction of the terms "guide surface" and "guiding surface" which are found in claims 6 and 10-12 of the '849 Patent. (Pl. Br. at 5.) As with "guide surface" in the '387 Patent, Plaintiff proposes that the Court construct both "guide surface" and "guiding surface" as "a portion of a bone preparation or cutting guide that regulates or directs the progressive motion of a tissue removing instrument and/or cutting tool." (*Id.*) Defendants propose that "guide surface" and "guiding surface" be constructed as "a single, flat, unenclosed surface that abuts a cutting tool to guide cutting of a bone." (Defs. Br. at 29.) As explained below, the Court adopts Plaintiff's proposed construction of "guide surface" and "guiding surface" in the '849 Patent.

The language of the claims themselves makes clear that a guide surface and a guiding surface guide, or regulate, a tissue removing instrument or cutting tool, such as a bone cutting guide, in the cutting of a bone. (*See* '849 pat. cl. 6 ("The method of claim 1, wherein … the guide feature defines a guiding surface that is offset from the joint plate a distance ranging from 1

millimeter to 20 millimeters."); *id.* at cls. 10, 12 ("using the guide feature of the bone cutting guide to guide the cutting tool comprises placing the cutting tool in apposition to a guide surface defined by the guide feature of the bone cutting guide"); *id.* at cl. 11 ("wherein the guide surface is operable to guide the cutting tool in a plane parallel to the guide surface").) However, as with "guide surface" in the '387 Patent, the language of the claims does not resolve the parties' debate over the form of the guide surface/guiding surface in the '849 Patent—more specifically, whether it is a "single, flat, unenclosed surface that abuts a cutting tool." (*See* Defs. Br. at 29.)

Unlike in the case of the '387 Patent, the written descriptions in the '849 Patent's specification are ambiguous as to the form of the "guide surface" or "guiding surface." (*See* '849 pat. at 5:20-23 ("The surface 250 can provide a cutting tool guide surface operable to guide a cutting tool to cut a leading edge of a bone in a plane parallel to the plate 210."); *id.* at 5:10-13 ("In the embodiment shown in FIG. 9, the block 230 can include a surface 250 parallel to the plate 210 and offset from the plate by a distance (e.g., 1-20 millimeters).").) And while the patent's drawings (specifically Figures 9, 10, and 11) depict a "guide surface" or "guiding surface" as a "single, flat, unenclosed surface that abuts a cutting tool," (*see* '849 pat. at Figs. 9, 11), the Federal Circuit has cautioned courts against reading limitations from patent drawings alone into the claims. *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("[T]he mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration."); *TI Grp. Auto. Sys. (N. Am.), Inc. v, VDO N. Am., L.L.C.,* 375 F.3d 1126, 1138 (Fed. Cir. 2004) ("[T]he fact that the drawings are limited to a particular embodiment does not similarly limit the scope of the claims."). Importantly, the facts here are different from those in *Cook*, where the Federal Circuit concluded that *both* the written descriptions and the drawings in the patent specification *together* supported a proposed

construction, and in *Baxter Healthcare*, where the court concluded that the written descriptions supported a narrower proposed construction. *See Cook Inc.*, 582 F.3d at 1331-32; *Baxter Healthcare Corp.*, 346 F. Supp. 3d at 666-67.

Given the ambiguity in both the claim language and written descriptions of the patent specification, this Court declines to read limitations from the '387 Patent's figures into the claims and adopts Plaintiff's proposed construction. The guide or guiding surface is labeled 250 in the figures below.




FIG. 9




FIG. 11

## B. The "Bone Engagement Member" and "Tip" Terms

### 1. "Bone Engagement Member"

The parties dispute the construction of the term "bone engagement member" as found in claim 9 of the '805 Patent, claims 1, 3, 6, 9-10, 18, 22-24, and 28 of the '446 Patent, claims 1, 12 and 28 of the '873 Patent, claims 1, 2, 14, 19, 23, 28, and 30 of the '558 Patent, claims 1-3, 7-8, 17-19, 24, 27-28, and 30 of the '386 Patent, claims 3-4, 18, and 20 of the '387 Patent, claims 14-16, 18 and 24-25 of the '085 Patent, and claims 6 and 16 of the '819 Patent. (Pl. Br. at 12.) Plaintiff proposes the Court construct "bone engagement member" as "a part specifically designed to

interface with a bone." (*See id.*) Defendants' proposed construction is "part of the bone positioning guide that contacts a misaligned bone." (Defs. Br. at 8.) Defendants also submit an alternative construction: "part of the bone positioning guide capable of contacting a misaligned bone." (Defs. Res. Br. at 16.) As explained below, the Court adopts Defendants' alternative proposed construction of "bone engagement member" in the relevant patents.

The intrinsic evidence supports Defendants' alternative proposed construction. First, the patents' claims describe a "bone engagement member" as being part of a "bone positioning guide." (*See, e.g.*, '805 pat. cl. 5 ("wherein the force is applied by a bone engagement member of a bone positioning device"); *id.* at cl. 9 ("moving, with a bone positioning guide having a bone engagement member"); '446 pat. cl. 1 ("the bone positioning guide comprising … a bone engagement member on one side of the main body member"); '873 pat. cl. 1 ("the method comprising … moving the first metatarsal using a bone positioning guide having a bone engagement member engaged with the first metatarsal…."); '558 pat. cl. 1 ("the method comprising: providing a bone positioning guide comprising a main body member, a bone engagement member on one side of the main body member").) This construction is supported by the patent specification as well, which describes and depicts a "bone engagement member" as being part of a "bone positioning guide." (*See, e.g.*, '805 pat. at 1:62-63 (describing Figure 2 as depicting a "side perspective view of a bone engagement member of a bone positioning guide"); *id.* at 4:46-48 ("bone positioning guide 10 includes a main body member 20 and a shaft 30, and the bone engagement member 40 is connected to the shaft"); '873 pat. at 2:1-3, 4:49-51 (same).)

Second, the patents' claims also describe the function of a "bone engagement member" as capable of contacting a misaligned bone. The claims frequently describe a "bone engagement member" as contacting the first metatarsal, which is the anatomically misaligned bone corrected

through the patented bunion procedure. (*See, e.g.*, '446 pat. cl. 1 ("the bone engagement member being configured to contact a first metatarsal of a foot"); '386 pat. cl. 7 ("wherein the bone engagement member is configured to contact the medial side of the first metatarsal"); '558 pat. cl. 1 ("positioning a surface of the bone engagement member in contact with a medial side of the first metatarsal").) The patent specification also describes and depicts a "bone engagement member" as contacting the relevant bone. (*See, e.g.*, '805 pat. at 5:8-11 ("[i]n some embodiments, the bone engagement member includes a surface 90 configured to contact a bone"); *id.* at 9:12-16 ("in this example, the position of the first metatarsal 210 is corrected with respect to the second metatarsal 292 generally in three planes by actuating a single bone positioning guide 10 to urge a bone engagement member 40 toward a tip 50").)

Plaintiff argues that "engagement" and "contact" are distinct, pointing to language in both the claims and the patent specification describing a "bone engagement member" as *engaging*, rather than *contacting*, a bone. (*See* '805 pat. cl. 9 ("moving, with a bone positioning guide having a bone engagement member engaged with a first metatarsal and a tip"); *id.* at 4:39-41 ("[w]hen the mechanism is actuated it causes a first bone engaged with the bone engagement member to move to correct an alignment"); '873 pat. cl. 1 ("moving the first metatarsal using a bone positioning guide having a bone engagement member engaged with the first metatarsal").) However, "engagement" and "contact" are used interchangeably across the relevant patents. For example, claim 1 of the '873 patent describes a "bone engagement member" as being "engaged with" the first metatarsal, while claims 12 and 28 of the same patent describe the "bone engagement member" as being "in contact with" the first metatarsal. (*See* '873 pat. cl. 1 ("moving the first metatarsal using a bone positioning guide having a bone engagement member engaged with the first metatarsal"); *id.* at cl. 12 ("prior to moving the first metatarsal using the bone positioning

guide, positioning a surface of the bone engagement member in contact with a medial side of the first metatarsal"); *id.* at cl. 28 (same).) There is no distinction between the two terms; both describe the bone engagement member's physical interaction with the first metatarsal after the bone positioning guide adjusts the bone. *See Bid for Position, LLC*, 601 F.3d at 1317-18 (concluding that the terms "bid" and "value of the bid" are used interchangeably where they both describe the different bids' position of priority). The patent specification describes the same interchangeable function between the terms—interacting with the first metatarsal. (*See* '805 pat. at 10:58-60 ("the bone engagement member engages a medial ridge of the first metatarsal 210"); *id.* at 15:23-26 ("bone engagement member 40 positioned in contact with the medial ridge of the first metatarsal 210").) And as the Federal Circuit has held, "[a] patent's consistent and clear interchangeable use of two terms can result in a definition equating the two terms." *See Aortic Innovations LLC*, 159 F.4th at 8. As such, the two terms are not distinct within the patents.[7]

Plaintiff also argues that a "bone engagement member" need not interface with only misaligned bones, citing language from the patent specification indicating that "[i]n some embodiments, the bone engagement member includes a surface 90 configured to contact a bone, such as a metatarsal or a cuneiform." (*See, e.g.*, '805 pat. at 5:8-11; '873 pat. at 5:11-14 (same); '386 pat. at 5:64-67 (same); '446 pat. at 5:64-67 (same).) This tension is resolved by Defendants' alternative construction, which states that a "bone engagement member" is capable of contacting a misaligned bone, not that it must always do so.[8]

---

[7] The Court notes that, unlike in the case of "engagement" and "contact," both the claim language and patent specification suggest that "bone positioning guide" and "bone engagement device" are different, non-interchangeable structures. *See supra* Part III(A)(1)(i).

[8] The Court notes that Defendants' alternative proposed construction, which it adopts, resolves any potential mixed-class claiming issues. (*See* Pl. Br. at 15; Defs. Res. Br. at 16). Mixed-class claiming issues arise when a "single claim cover[s] both an apparatus and a method of use." *See*

**2. "Tip"**

The parties dispute the construction of the term "tip" as found in claim 9 of the '805 Patent, claims 1-4, 8-9, 18, 22, and 28 of the '446 Patent, claims 1, 12 and 28 of the '873 Patent, claims 1, 14-17, 19, 23, and 28-30 of the '558 Patent, claims 1-2, 5-6, 10, 17-19, 25-26, and 28 of the '386 Patent, claims 3 and 18 of the '387 Patent, claims 14, 16, 18, and 24 of the '085 Patent, and claims 6 and 16 of the '819 Patent. (Pl. Br. at 12.) Plaintiff asserts that no construction for "tip" is necessary, but to the extent one is required, proposes that a "tip" is "a tapered, slender, or pointed end or extremity." (*See id.*) Defendants' proposed construction is "part of the bone positioning guide that contacts a bone distinct from a bone contacted by the bone engagement member." (Defs. Br. at 12.) Defendants also propose an alternative construction in their response brief, which is "part of the bone positioning guide capable of contacting a bone distinct from a bone contacted by the bone engagement member." (Defs. Res. Br. at 19.) As explained below, the Court adopts Defendants' proposed alternative construction of "tip" in the relevant patents.

The intrinsic evidence supports Defendants' proposed alternative construction. First, the patent claims consistently use "tip" to refer to a part of the bone positioning guide that is capable of contacting a bone different from the bone contacted by the bone engagement member. For example, claim 9 of the '805 patent describes the step of "moving, with a bone positioning guide

---

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). In such instances, "reciting both an apparatus and a method of using that apparatus renders a claim indefinite" and leads the manufacturer and seller to "not know from the claim whether it might also be liable for contributory infringement because a buyer or user of the apparatus later performs the claimed method of using the apparatus." *See id.* Here, Defendants' inclusion of "capable of" prevents the apparatus claim from converting into a method claim. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 775 ("[A] method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method.").

having a bone engagement member engaged with a first metatarsal and a tip contacting a metatarsal other than the first metatarsal." (*See* '805 pat. cl. 9; *see also* '446 pat. cl. 1 (describing a bone engagement member configured to contact a first metatarsal on one side of a main body member, with "a tip on another side of the main body member, the tip being configured to contact a metatarsal other than the first metatarsal"); '873 pat. cl. 12 ("the bone positioning guide comprises a main body member, the bone engagement member on one side of the main body member, the tip on another side of the main body member … positioning a surface of the bone engagement member in contact with a medial side of the first metatarsal and positioning the tip in contact with a lateral side of the metatarsal other than the first metatarsal").)

The patent specification also supports this construction. (*See, e.g.*, '805 pat. at 4:33-43 ("[i]n some embodiments, the bone positioning guide includes a bone engagement member, a tip … [w]hen the mechanism is actuated it causes a first bone engaged with the bone engagement member to move to correct an alignment in more than one plane with respect to a second bone in contact with the tip"); '446 pat. at 10:50-54 ("[a] specific embodiment of a method in accordance with an embodiment of the invention includes the steps of engaging a bone engagement member with a first bone, placing a tip of the bone positioning guide in apposition to a second bone, the second bone being different from the first bone…."); '085 pat. at 6:1-5 (describing "a tip 50 of bone positioning guide" and noting that "[t]he tip 50 can be useful for contacting a bone, generally a bone distinct from a bone contacting the bone engagement member").)

As Defendants correctly note, the Court will not consider extrinsic evidence when the intrinsic evidence is clear. *See Vitronics Corp.*, 90 F.3d at 1583. Given that both the patent claims and specifications make clear that a "tip" is part of a bone positioning guide that can contact a bone distinct from the bone contacted by the "bone engagement member," this Court does not

examine Plaintiff's proffered dictionary definitions. The Court also notes that Plaintiff's proposed construction, rooted in extrinsic dictionary definitions, contradicts the specifications. (*See* Pl. Br. at 16.) In addition to describing a "tip" as "tapered," the patent specification describes a "tip" as including a "textured surface 100, such as serrated, roughened, cross-hatched, knurled, etc." (*See* '085 pat. at 6:9-12; '805 pat. at 5:61-4 (same); '873 pat. 5:64-8 (same).) These characteristics are notably missing from Plaintiff's proposed construction of a "tip" as "tapered," "slender" and "pointed." (*See* Pl. Br. at 12); *see Vitronics Corp.*, 90 F.3d at 1584 (noting that courts may not rely on extrinsic evidence, such as dictionary definitions, when it varies from or contradicts the claim language or patent specifications); *Grace Instrument Indus,. LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1010 (Fed. Cir. 2023) (concluding that a lower court erred in relying on dictionary definitions "that contradict the scope and meaning" of the term in the intrinsic record).[9]

Due to the foregoing analysis, and in the interest of quelling any potential mixed-class naming issue, the Court adopts Defendants' alternative proposed construction. (*See* Pls. Br. at 17; Defs. Res. Br. at 19); *IPXL Holdings, L.L.C.*, 430 F.3d at 1384.

### C. "Main Body Member"

The parties dispute the construction of the term "main body member" which is found in claims 1, 3, and 22 of the '446 Patent, claims 12 and 28 of the '873 Patent, claims 1 and 28 of the '558 Patent, and claims 17 and 18 of the '386 Patent. (Pl. Br. at 27.) Plaintiff asserts that no construction is necessary, but to the extent one is required, proposes that "a main body member" is "a principal part, position, or trunk." (*See id.*) Defendants' proposed construction is "one or more components configured to contact and move bones." (Defs. Br. at 20.) As explained below,

[9] This is unlike in the case of "bone positioning guide," where the Court considered the proffered dictionary definitions when they supported the intrinsic evidence. *See supra* Part III(A)(1)(iii),

the Court adopts its own construction of the term: "the structural component that includes, carries, and/or supports the parts of the bone positioning guide used to contact and move bones."

**1. Construction is Necessary**

As an initial matter, the Court deems a construction of "main body member" necessary because reliance on an ordinary meaning does not resolve the parties' dispute. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' … may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."). Plaintiff asserts that, if constructed, "main body member" should be construed according to its ordinary meaning, which it contends is "a principal part, portion, or trunk." (Pl. Br. at 27-28; Pl. Res. Br. at 23-24.) Defendants assert that a "main body member" is a structure that moves or contacts bones. (Defs. Br. at 20.) Plaintiff's proffered ordinary meaning does not resolve the dispute over whether a "main body member" actually moves or contacts bones, so construction is necessary. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1361.

**2. The Parties' Proposed Constructions Are Legally Flawed**

Neither party's proposed construction is supported by the intrinsic evidence. The language of the claims describes a main body member as being part of a bone positioning guide that is situated between the bone engagement member and the tip. (*See* '446 pat. cl. 1; '873 pat. cls. 12, 28; '558 pat. cl. 1; '386 pat. cl. 17 (describing a bone positioning guide which comprises a main body member, a bone engagement member on one side of the main body member, and a tip on another side of the main body member); '446 pat. cl. 3; '386 pat. cl. 18 ("The bone positioning guide … wherein the main body member defines a base, a first leg carrying the bone engagement member, and a second leg defining the tip").) The patent specifications similarly describe a

structure that is connected to a bone engagement member and a tip. (*See, e.g.*, '446 pat. at 5:35-38; '873 pat. at 4:49-52; '558 pat. at 5:35-38; '386 pat. at 5:35-38 ("In the embodiment of FIG. 1, bone positioning guide 10 includes a main body member 20 and a shaft 30, and the bone engagement member 40 is connected to the shaft and the tip 50 is connected to the main body member.").) The patent specification also describes a "main body member" that engages with the shaft. (*See, e.g.*, '446 pat. at 5:50-54; '873 pat. at 4:64-5:1; '558 pat. at 5:50-54; '386 pat. at 5:50-54 ("A shaft 30 can be movably connected to the main body member 20 proximate its first end 60. In some embodiments, the shaft 30 includes threads 80 that engage with the main body member 20 such that rotation of the shaft translates the shaft with respect the main body member.").)

Nothing in the language of the claims nor the patent specification describe a main body member that consists of a "a principal part, position, or trunk" or that "contacts" or "moves" bones. (*See* Pl. Br. at 27; Defs. Br. at 20.) Defendants themselves appear to concede that a "main body member" refers to the structural component that includes, carries, and supports "the parts of the bone positioning guide used to contact and move bones," not the structural component that itself performs this function. (*See id.*) It is true that, in determining the ordinary meaning of claim terms, courts may look to dictionaries in addition to the intrinsic evidence. *See Intell-A-Check Corp. v. Autoscribe Corp.*, 346 F. Supp. 2d 698, 703 (D.N.J. 2004) ("In order to determine the ordinary meaning of claim terms, the Court may look to the intrinsic evidence, i.e., the claims themselves, the specification and prosecution history, and dictionaries and treatises.") However, the Court does not find dictionaries useful where, as here, Plaintiff pulls from multiple definitions, words, and dictionaries to construct one term, and where Plaintiff's proposed construction is unsupported by the intrinsic evidence. (*See* Pl. Br. at 27-28; ECF 96-20; ECF 96-31; ECF 96-32; ECF 96-33); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)

("Indiscriminate reliance on definitions found in dictionaries can often produce absurd results … One need not arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim." (quoting *Liebscher v. Boothroyd*, 258 F.2d 948, 951 (C.C.P.A. 1958))); *see Vitronics Corp.*, 90 F.3d at 1584.

**3. The Court Adopts Its Own Construction of a "Main Body Member"**

Given that the Court cannot adopt either party's proposed construction of the term, it adopts a construction of its own. "[T]he court has an independent obligation to construe the terms of a patent, [and] need not accept the constructions proposed by either party." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323-24 (Fed. Cir. 2008); *see Holmberg v. United States*, 124 Fed. Cl. 610, 613 (Fed. Cl. 2016) ("Further, a court construing patent claim terms need not adopt the constructions proposed by the parties, and should determine its own constructions if it determines the parties' proposals to be legally flawed."); *LMT Mercer Grp., Inc. v. Maine Ornamental, LLC*, No. 10-4615 & 10-6699, 2014 WL 183823, at *16 (D.N.J. Jan. 16, 2014) ("As the Court cannot accept either party's proposed construction, it instead adopts its own construction.").

To do so, the Court looks again to the claim language and the specifications. *See Phillips*, 415 F.3d at 1312, 1315. As discussed, both the claims and the specifications describe the "main body member" as a structure that is part of the "bone positioning guide," and appears to be connected to the tip, bone engagement member, and shaft. (*See* '446 pat. cls. 1, 3, 22, 5:35-38; '873 pat. cls. 12, 28, 4:49-55; '558 pat. cl. 1, 5:35-38; '386 pat. cls. 17, 18, 5:35-38.) The specification describes an example of an embodiment of a "main body member" which includes a "generally C-shaped configuration with a first end 60 and a second end 70." (*See, e.g.*, '446 pat. at 5:42-43.) Finally, the specification also describes a "main body member" as a structure that engages with the shaft. (*See, e.g.*, '446 pat. at 5:50-56, '873 pat. at 4:64-5:4, '558 pat. at 5:50-56,

and ’386 pat. at 5:50-56.) As mentioned, Defendants describe these functions throughout their brief. (*See* Defs. Br. at 20 (“a ‘main body member’ refers to the structural component(s) that includes, carries, and/or supports the parts of the bone positioning guide used to contact and move bones”); *id.* at 22 (“In other words, regardless of form—C-shaped or tong-style—the ‘main body member’ remains the structural assembly that includes, supports, and/or carries the bone-moving components.”).) Defendants’ proposed construction, “one or more components configured to contact and move bones,” is inconsistent their own subsequent description of the term. (*See* Defs. Br. at 20-22.) But given that Defendants’ description is consistent with the intrinsic evidence, the Court construes the term “main body member” to mean “the structural component that includes, carries, and/or supports the parts of the bone positioning guide used to contact and move bones.”

**D. “The Bone Positioning Guide Is Fabricated From a Radiolucent Material”**

The parties dispute the construction of the term “the bone positioning guide is fabricated from a radiolucent material,” which is found in claims 21 and 30 of the ’446 Patent, and claim 12 of the ’386 Patent. (Pl. Br. at 30.) Plaintiff’s proposed construction is “the bone positioning guide is constructed in part or whole from radiolucent material.” (*See id.*) Defendants’ proposed construction is “all parts of the bone positioning guide are constructed from radiolucent material.” (Defs. Br. at 23.) The Court adopts Plaintiff’s proposed construction.

The intrinsic evidence favors Plaintiff’s proposed construction, as it does not suggest that a bone positioning guide, including its multiple components, must exclusively be fabricated from a radiolucent material. The claims recite a “bone positioning guide” that is made from radiolucent material. (*See* ’386 pat. cl. 12 (“the bone positioning guide of claim 1, wherein the bone positioning guide is fabricated from a radiolucent material”); ’446 pat. cls. 22, 30 (same).) The specification describes that “[e]mbodiments of the bone positioning guide may include any

suitable materials. In certain embodiments, the bone positioning guide is fabricated from a radiolucent material such that it is relatively penetrable by X-rays and other forms of radiation, such as thermoplastics and carbon fiber materials." (*See* '386 pat. at 7:39-44; '446 pat. at 7:39-44.) Neither the claims nor the specification make clear that a bone positioning guide must, in its entirety, be fabricated from radiolucent material. *See CAO Lighting, Inc. v. Gen. Elec. Co., Consumer Lighting (U.S.), LLC*, Nos. 20-681 & 20-690, 2022 WL 1477515, at *4 (D. Del. May 10, 2022) (concluding that the disputed term, "said enclosure being fabricated from a material substantially transparent to white light" did not mean that the entirety of the "enclosure" was fabricated from the a "material substantially transparent to white light" because neither the claim language nor the patent specification required that the entirety of the enclosure be fabricated from the material). Here, as noted, the specification suggests that a bone positioning guide can in fact include other materials as long as they are suitable, and that a bone positioning guide is only sometimes fabricated from a radiolucent material. (*See* '386 pat. at 7:39-44 (noting that "[e]mbodiments of the bone positioning guide may include any *suitable* materials" and that "in *certain* embodiments, the bone positioning guide is fabricated from a radiolucent material" (emphasis added)); '446 pat. at 7:39-44 (same).)

The prosecution history also supports Plaintiff's proposed construction. It informs the Court that the prior art referred to in the prosecution of the '446 and '386 patents described an analogous or similar tool to the bone positioning guide as only partly fabricated from a radiolucent material. (*See* Pl. Br. at 31; ECF 96-15, Ex. 10 at 5 (patent examiner's statements about a prior art reference of a bone positioning guide); ECF 96-17, Ex. 12 at 7 (prior art patent describing a bone positioning guide where "at least the tip portion … is made to be radiopaque").) Defendants argue that this specific patent prosecution history lacks weight since the applicant did not amend the

radiolucent-material claims in response to the prior art nor adopt the examiner's characterizations. (Defs. Br. at 26.) But, the Federal Circuit has held that, while "unilateral statements by an examiner do not give rise to a clear disavowal of claim scope by an applicant, it does not necessarily follow that such statements are not pertinent to construing claim terms." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005). In other words, "statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Id.* As such, taken together with the claim language and patent specification, this Court accepts the examiner's statements as additional evidence in support of, and thus adopts, Plaintiff's proposed construction.

**E. "System"**

The parties also dispute the construction of the term "system" as found in claims 1-10, 12-14, 17-25, and 27-30 of the '387 patent, and claims 1-7 and 9-20 of the '819 patent. (Pl. Br. at 32.) Plaintiff contends that no construction of the term is necessary, and to the extent the Court requires one, it proposes: "an assemblage or combination of things or parts forming a complex or unitary whole." (*See id.*) Defendants' proposed construction is "each device or component recited in the claim is a non-optional part of the system." (Defs. Br. at 27.) As explained below, the Court deems a construction of "system" necessary and adopts Defendants' proposed construction.

**1. Construction is Necessary**

Construction of "system" is necessary because the term has multiple ordinary meanings and reliance on an ordinary meaning does not resolve the parties' dispute. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1361. The parties assert that their competing dictionary definitions of "system" reveal its ordinary meaning, thus indicating that the term's ordinary meaning is in dispute. *See id.*; (*see* Pl. Br. at 33 (citing a dictionary definition of "system" as "an assemblage or combination of things

or parts forming a complex or unitary whole"); Defs. Br. at 28-29 (citing the following dictionary definitions of "system": "a regularly interacting or independent group of items forming a unified whole," "[a] group of interacting, interrelated, or independent elements forming a complex whole," "a set or arrangement of things so related or connected as to form a unity or organic whole," and "an interconnected set of elements that is coherently organized in a way that achieves something").) Further, no proffered "ordinary" meaning of the term resolves the parties' dispute over whether every component or device recited in the relevant claims is a non-optional part of the "system." *See O2 Micro Int'l Ltd.*, 521 F.3d at 1361; (*see* Pl. Br. at 33-34.) The various "ordinary" meanings presented by the parties do not make clear whether the recited components of a "system" are optional or non-optional. (*See* Pl. Br. at 33-34; Defs. Br. at 29.)

**2. The Intrinsic Evidence Supports Defendants' Proposed Construction**

The intrinsic evidence supports Defendants' proposed construction of "system." First, as Defendants note, the claims of the relevant patents define "system" by reference to the specific components or devices included in each claim. (*See, e.g.*, '387 pat. cl. 1 ("A metatarsal correction system comprising: a bone preparation guide … a bone positioning guide … and at least one fixation device positionable across a tarsal-metatarsal joint...."); *id.* at cl. 8 ("[t]he system of claim 1, wherein the guide surface comprises a first guide surface and a second guide surface"); *id*. at cl. 17 ("The system of claim 1, further comprising a sterile kit containing at least the bone preparation guide and the bone positioning guide."); '819 pat. cl. 1 ("[a] bone positioning system comprising: a bone positioning guide … a tissue removing instrument … a fixation device…."); *id.* at cl. 4 ("The bone positioning system of claim 1, wherein the fixation device comprises one or more of a compressing bone screw, a bone plate, and a bone staple."); *id.* at cl. 18 ("The bone positioning system of claim 13, wherein the tissue removing instrument comprises one or more of a saw, a

bur, and an osteotome.").)

Further, the Federal Circuit has held that while a claim's use of the word "comprising" allows for additional elements to be included beyond those recited, it renders the recited elements non-optional. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.'"); *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context, the term 'comprising' is well understood to mean 'including but not limited to.'"); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) (explaining that patent claims "use the signal 'comprising,' which is generally understood to signify that the claims do not exclude the presence in the accused device or method of factors in addition to those explicitly recited"). Here, many of the claims of the relevant patents use the word "comprising" or "comprises" when reciting the components of a "system," indicating that the recited components are essential, or, in other words, non-optional. (*See, e.g.*, '387 pat. cls. 1-4, 8, 12-13, 17-20, 22, 25, 27-30; '819 pat. cls. 1, 4-7, 9-20.) The language of the claims thus support Defendants' construction of the term, which mandates that each device or component recited in a claim is a necessary, or non-optional, part of the "system." (*See* Defs. Br. at 27).

Plaintiff argues that Defendants' construction introduces unwarranted limitations on "system." (Pl. Br. at 33.) Plaintiff specifically points to Figure 33 in the '387 patent, which depicts a "system containing multiple different size fulcrums." (Pl. Br. at 33; '387 pat. at Fig. 33.) As Plaintiff notes, the patent specification emphasizes that clinicians are sometimes "provided a system containing multiple different size fulcrums and allowed to choose the specific sized fulcrum desired for the specific procedure being performed." (Pl. Br. at 33; '387 pat. at 15:67-

16:7.) Plaintiff asserts that this language indicates "a clinician will generally use only one of the fulcrums contained in the system for any particular surgical procedure," and Defendants' construction would require the "use of every component of the system." (*See* Pl. Br. at 33.) However, Defendants' proposed construction does not require that "every possible component within the system must be used at all times." (*See* Defs. Res. Br. at 31.) Defendants' construction instead suggests that if a claim requires a fulcrum as part of the claimed system, the claimed system must include that fulcrum. (*See id.*) And as the specification supports, a clinician can choose from among "multiple different size fulcrums," within the "system." (*See* '387 pat. at 15:67-16:7.)

Finally, the Court does not weigh the parties' proffered dictionary definitions as they do not provide clarity in the dispute over whether every component or device recited in the relevant claims is a non-optional part of a "system." *See supra* Part III(E)(1); *ACME Worldwide Enters., Inc. v. United States*, 146 Fed. Cl. 341, 355 (Fed. Cl. 2019) (declining to weigh dictionary definitions proffered by the parties where they did not "provide any meaningful clarity").

**F. The Indefiniteness Terms**

Defendants argue that several of the disputed patent terms are indefinite. Specifically, Defendants argue that the terms "an anatomically aligned position [with respect to a second metatarsal]," "an anatomically misaligned position [with respect to a second metatarsal]," "an alignment … adjusting an alignment," "a corrected alignment," "base," "leg," and "bridge" are indefinite. (*See* Defs. Br. at 19-20, 37-38.) Plaintiffs propose several constructions for the above-listed terms. (*See* Pl. Br. at 17-18, 25-27, 38-40.)

"Indefiniteness renders a claim invalid and must be proven by clear and convincing evidence." *Chiesi USA Inc. v. MSN Pharms. Inc.*, No. 19-18564, 2021 WL 4843806, at *10 (D.N.J. Oct. 18, 2021). "Because questions of definiteness are 'potentially dispositive, require a high

burden of proof, and may more profitably be considered in connection with patent validity,' courts in this District typically decline to resolve them at the *Markman* stage, instead deferring consideration until summary judgment or trial to allow for a fully developed record." *Id.* (citing *Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, No. 15-3654, 2016 WL 5109142, at *9 (D.N.J. Sept. 20, 2016)); *see, e.g.*, *Par Pharm., Inc. v. Sandoz, Inc.*, No. 18-14895, 2020 WL 1130387, at *8 (D.N.J. Mar. 9, 2020) ("[I]t is the typical practice of courts in this Circuit to defer consideration of an indefiniteness challenge until time for summary judgment or trial, when there is a fully developed expert record."); *Sanofi-Aventis U.S. LLC v. Mylan GmbH*, No. 17-9105, 2019 WL 2067373, at *10 (D.N.J. May 9, 2019) ("[T]his Court addresses invalidity disputes, of which indefiniteness is one, at summary judgment or at trial."); *Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, No. 16-7721, 2019 WL 1789463, at *4 (D.N.J. Apr. 24, 2019) ("It is not uncommon for courts to defer ruling on an indefiniteness challenge at the claims construction stage where such a ruling would be better suited for trial.").

As such, the Court declines to consider Defendants' indefiniteness arguments at this time and does not construct the terms "an anatomically aligned position [with respect to a second metatarsal]," "an anatomically misaligned position [with respect to a second metatarsal]," "an alignment … adjusting an alignment," "a corrected alignment," "base," "leg," and "bridge" in this Opinion. *See Chiesi USA Inc*, 2021 WL 4843806, at *10.

## IV. <u>CONCLUSION</u>

For the reasons described above, the Court adopts Plaintiff's proposed construction of "bone positioning guide," "guide surface" and "guiding surface" in the '849 Patent, and "the bone positioning guide is fabricated from a radiolucent material." The Court adopts Defendants' proposed construction of "guide surface" in the '387 Patent, "bone engagement member," "tip,"

and "system." The Court adopts its own construction of the term "main body member." Finally, the Court does not construct the terms "an anatomically aligned position [with respect to a second metatarsal]," "an anatomically misaligned position [with respect to a second metatarsal]," "an alignment … adjusting an alignment," "a corrected alignment," "base," "leg," and "bridge" at this time. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: Alex D. Silagi, U.S.M.J.
Parties